**UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF INDIANA**

| | | |
|---|---|---|
| LSP Transmission Holdings II, LLC, LS Power Midcontinent, LLC, Central Transmission, LLC, and LS Power Grid DRS Holdings, LLC,<br><br>          *Plaintiffs*,<br><br>          v.<br><br>James F. Huston, Chairman, Indiana Utility Regulatory Commission, Wesley R. Bennett, Commissioner, Indiana Utility Regulatory Commission, Sarah E. Freeman, Commissioner, Indiana Utility Regulatory Commission, David E. Veleta, Commissioner, Indiana Utility Regulatory Commission, and David E. Ziegner, Commissioner, Indiana Utility Regulatory Commission, each in his or her official capacity,<br><br>          *Defendants*. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | No. _____ |

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

LSP Transmission Holdings II, LLC ("LSP"), LS Power Midcontinent, LLC ("LSP Midcontinent"), Central Transmission, LLC ("Central Transmission"), and LS Power Grid DRS Holdings, LLC ("LS Power Grid") (collectively, "Plaintiffs"), hereby bring this Complaint against James F. Huston, Wesley R. Bennett, Sarah E. Freeman, David E. Veleta, and David E. Ziegner, each in his or her official capacity (collectively, "Commissioners" or "Defendants"). Plaintiffs bring this Complaint based on personal knowledge as to all Plaintiff facts, and on information and belief as to all other matters.

## PRELIMINARY STATEMENT

1.     Growing demands for electricity, coupled with federal and state policies promoting renewable energy, are driving a substantial need for new electric transmission infrastructure.

2.     To meet that demand, two major interstate transmission operators are slated to award massive new interstate transmission projects in the coming months.   Midcontinent Independent System Operator ("MISO"), a federally regulated manager of a regional electric grid spanning 15 states across the Midwest and beyond, is planning billions of dollars' worth of new investment in the region's power transmission system over the next several years.   PJM Interconnection, LLC ("PJM"), is similarly planning a multibillion-dollar wave of new investment in its transmission facilities.  MISO covers most of Indiana, while PJM covers portions of northern Indiana.

3.     When an interstate transmission operator like MISO or PJM orders qualified developers to build large greenfield transmission projects and allocates the cost across multiple utilities and states, federal regulations ordinarily require it to use a competitive process, awarding such projects to the developers that can provide the best transmission infrastructure to energy consumers in the most cost-efficient manner.  MISO and PJM enshrined that principle into their own governing documents more than a decade ago, when—at the demand of the Federal Energy Regulatory Commission ("FERC")—they abolished so-called right-of-first-refusal ("ROFR") provisions that would simply award certain projects to local incumbents who already owned and operated transmission facilities, even if those incumbents would complete the work at a lower quality and higher cost than other potential providers.

4.     When MISO began "Tranche 1" of its multibillion-dollar Long Range Transmission Planning ("LRTP") initiative in July 2022, it solicited competitive bids for five projects across the region.  One of those projects was in Indiana.  And, after competitive bidding, the Indiana project

was awarded to an LSP affiliate.

5.     To incumbent transmission providers (i.e., those with an existing physical presence) in Indiana, that award was not just a product of federally mandated competition for development of federally regulated instrumentalities of interstate commerce; it was business that they could not win when forced to compete.  It was also a harbinger of far more lost business to come:  MISO has planned tens, if not hundreds, of billions of dollars' worth of investment in the coming years, with approximately $21 billion slated for approval in December 2024 alone.  This upcoming "Tranche 2.1 portfolio" includes approximately 4,000 miles of new high-voltage transmission lines across nine states—projects for which, under the MISO tariff, incumbent transmission providers would be forced to compete.

6.     Fearing that they would lose business to more efficient and less expensive competitors from out of state, incumbent transmission providers in Indiana leapt into action, urging the state legislature to enact legislation protecting them from competition.  The Indiana legislature complied, narrowly passing House Enrolled Act 1420 of 2023 ("HEA 1420"), which grants a right of first refusal to in-state incumbents, i.e., "public utilit[ies]" that already "own[], operate[], and maintain[]" "electric transmission facilit[ies] in whole or in part in Indiana."  Ind. Code §8-1-38-2.  In effect, HEA 1420 dictates that new electric transmission projects in Indiana will be built, owned, and operated only by the small handful of companies that already own the facilities to which the new transmission lines connect—to the exclusion of new out-of-state entrants.  The law thus recreates the anti-competitive regime FERC ordered MISO and PJM to abolish.

7.     HEA 1420 is unconstitutional.  By its express terms, the statute discriminates in favor of entities with an existing in-state presence and against both interstate and out-of-state commerce.  It is a classic protectionist law that is virtually *per se* invalid under the Commerce

Clause.

8.      The Fifth Circuit has already held as much with respect to Texas' nearly identical ROFR law, explaining that it is no different from "a law saying that only those with existing oil wells in the state could drill new wells."  *NextEra Energy Cap. Holdings, Inc. v. Lake*, 48 F.4th 306, 309 (5th Cir. 2022), *cert denied*, 144 S.Ct. 485 (2023).

9.      This Court should hold the same.  Indeed, Indiana's protectionism is not just blatant, but pernicious.  Because MISO is, by design, an interstate grid, transmission costs can be passed along to consumers throughout much or all of its territory, spanning from Mississippi to Montana, even if a project is located entirely in one state.  The same goes for PJM, which stretches from the Atlantic coast to northern Illinois.  Consequently, because of HEA 1420's effort to insulate Indiana incumbents from competition, energy consumers across the Midwest and beyond now must pay higher rates than what FERC has found just and reasonable—rendering the law not just protectionist, but preempted by federal law.

10.      Pursuant to 42 U.S.C. §1983 and *Ex parte Young*, 209 U.S. 123 (1908), Plaintiffs seek declaratory relief to invalidate Indiana Code §8-1-38-9, as amended by HEA 1420, on the ground that it violates the Commerce Clause and Supremacy Clause of the United States Constitution, as well as the Privileges and Immunities Clause of the Indiana Constitution. Plaintiffs seek injunctive relief to prevent Defendants from enforcing this unconstitutional law and to protect Plaintiffs from the irreparable loss of the ability to compete for (and, if history serves as a guide, secure) new interstate transmission projects in Indiana.

## THE PARTIES

11.      LSP Transmission Holdings II, LLC, is a Delaware limited liability company with its principal place of business at 16150 Main Circle Drive, Suite 310, Chesterfield, MO 63017. LSP and its subsidiaries and affiliates develop and own electric transmission projects throughout

the United States.

12.    LS Power Midcontinent, LLC, Central Transmission, LLC, are subsidiaries of LSP and LS Power Grid DRS Holdings, LLC, is an affiliate of LSP.  LSP Midcontinent is qualified to bid on regional electric transmission projects awarded by MISO in Indiana.  Central Transmission is qualified to bid on regional electric transmission projects awarded by PJM in Indiana.  LS Power Grid is the majority owner of Republic Transmission, LLC ("Republic"), which has been certified as an Indiana public utility by the Indiana Utility Regulatory Commission ("Commission") and has successfully qualified and competed through MISO for regional electric transmission projects located in Indiana.

13.    Defendant James F. Huston is the Chairman of the Indiana Utility Regulatory Commission; Defendants Wesley R. Bennett, Sarah E. Freeman, David E. Veleta, and David E. Ziegner are Commissioners of the Indiana Utility Regulatory Commission.  In those roles, Defendants are responsible for regulation of electric utilities doing business in Indiana.  Pursuant to HEA 1420, the exercise of a ROFR by an incumbent transmission owner occurs by formal notice to the Commission followed by a report by the incumbent to the Commission.  Ind. Code §8-1-38-9(c), (d).  The Commission also performs the function of certifying new transmission owners and has jurisdiction over contracts between incumbent and new transmission owners.  *Id.* §§8-1-38-7, -10.  By statute, the Commission must "inquire into any neglect or violation of the statutes of th[e] state … by any public utility doing business therein" and has both the "power" and the "duty[] to enforce" "all … laws[] relating to public utilities," including HEA 1420.  *Id.* §8-1-2-115.

## JURISDICTION AND VENUE

14.    This Court has subject-matter jurisdiction over the claims asserted in this action pursuant to 28 U.S.C. §§1331, 1332, and 1367.  Plaintiffs assert claims under 42 U.S.C. §1983 and the Constitution of the United States; Plaintiffs' Indiana-law claim is so related to the federal

claims that it forms part of the same Article III case or controversy.

15.    This Court has personal jurisdiction over Defendants because all Defendants are residents of Indiana and conduct their business as utility regulators in Indiana.

16.    Venue is proper in this Court under 28 U.S.C. §1391(b), because Defendants reside in the District and a substantial part of the events giving rise to this claim have occurred in it.

## STATEMENT OF FACTS

### A.    Congress and FERC Have Long Sought to Curb Monopoly Power in the Interstate Transmission of Energy.

17.    In the early 20th century, electricity markets largely "operat[ed] as vertically integrated monopolies in confined geographic areas." *FERC v. Elec. Power Supply Ass'n*, 577 U.S. 260, 267 (2016).  Over time, however, an interstate market for electricity developed, with resource-rich states generating electricity to sell at wholesale for transmission across state lines to local retail distributors.  In 1935, Congress enacted the Federal Power Act ("FPA") to regulate this burgeoning interstate market.

18.    The FPA gave FERC (formerly the Federal Power Commission) exclusive jurisdiction over the interstate transmission and wholesale sale of electricity.   16 U.S.C. §824(b)(1).  But the FPA largely left to the states matters they had traditionally regulated, such as the siting and permitting of facilities used to generate electricity, used in local distribution, or used only for intrastate transmission.  *Id.*  Congress later amended the FPA to direct FERC to "divide the country into regional districts for the voluntary interconnection and coordination of facilities for the generation, transmission, and sale of electric energy" across multiple states and instructed FERC to "promote and encourage such interconnection and coordination." *Id.* §824a(a).

19.    Over time, more generators emerged to compete with vertically integrated utilities, and interconnected interstate-electric systems became increasingly prevalent and economical.  *See*

*S.C. Pub. Serv. Auth. v. FERC*, 762 F.3d 41, 49-50 (D.C. Cir. 2014). But local utilities attempted to use their control over their transmission lines to bar competition by refusing to deliver wholesale energy produced by these emerging generators or by making their lines available to competitors "only on inferior terms." *Id.* at 50.

20.    FERC responded with a series of orders to combat these monopolistic tendencies and promote the development of competitive interstate markets. In 1996, FERC promulgated Order No. 888, which ordered any facility that connects to the interstate grid to unbundle its wholesale generation and transmission services and allow access to its transmission lines on a non-discriminatory basis. *See Promoting Wholesale Competition Through Open Access Non-discriminatory Transmission Services by Public Utilities; Recovery of Stranded Costs by Public Utilities and Transmitting Utilities*, 75 FERC ¶61,080, 61 Fed. Reg. 21,540 (Apr. 24, 1996). Order No. 888 also promoted the concept of an independent system operator ("ISO") that would independently operate the transmission systems of multiple transmission owners in a geographic area. 61 Fed. Reg. at 21,551-52, 21,560, 21,593-97.

21.    In 1999, FERC built on the ISO concept by issuing Order No. 2000, which encouraged owners of transmission facilities serving interstate commerce to voluntarily form regional transmission organizations ("RTOs") that are similar to ISOs but have additional responsibilities. *See Regional Transmission Organizations*, 89 FERC ¶61,285 (Dec. 20, 1999). Both ISOs and RTOs are nongovernmental entities vested with authority, through FERC-approved agreements and tariffs, to operate interstate transmission grids on a regional basis. One of the key roles of an ISO or RTO is to conduct regional planning for the transmission within its footprint, ensuring the reliability of the system and providing transmission access to wholesale power at reasonable costs. *See* 18 C.F.R. §35.34(k)(7); FERC, *Electric Power Markets* (May 16, 2023),

https://archive.ph/wip/IsJlI.

22.    In 2010, FERC recommended additional reforms to "ensure that [interstate transmission] services are provided at rates, terms and conditions that are just and reasonable and not unduly discriminatory or preferential." *S.C. Pub. Serv. Auth.*, 762 F.3d at 52.  The next year, FERC issued its seminal Order No. 1000.  *Transmission Planning and Cost Allocation by Transmission Owning and Operating Public Utilities*, Order No. 1000, 136 FERC ¶61,051 (July 21, 2011) ("Order No. 1000"), *order on reh'g and clar.*, Order No. 1000-A, 139 FERC ¶61,132 (May 17, 2012), *order on reh'g and clar.*, Order No. 1000-B, 141 FERC ¶61,044 (Oct. 18, 2012).  Before Order No. 1000, FERC had allowed ISOs to include provisions in their tariffs permitting the owner of a facility to which a new interstate transmission line would connect a right of first refusal to build that new line.  Among other key reforms, Order No. 1000 required ISOs to eliminate some of those rights.

23.    Generally speaking, FERC divides new transmission projects into two categories: regional projects and local projects.  Whereas local projects predominantly serve the needs of local zones, regional projects address broader needs within the ISO's multi-state region, so some or all of their costs are allocated to customers across multiple states, even if a new line is located exclusively in one state.  While FERC did not disturb rights of first refusal for local projects, it decided to eliminate them for regionally cost-allocated projects.

24.    In doing so, FERC determined that leaving these "federal" (i.e., federally sanctioned) rights of first refusal in place would "deprive customers of the benefits of competition in transmission development, and associated potential savings," Order No. 1000 ¶285, as they "allow practices that have the potential to undermine the identification and evaluation of a more efficient or cost-effective solution to regional transmission needs, which in turn can result in rates

for Commission-jurisdictional services that are unjust and unreasonable or otherwise result in undue discrimination by public utility transmission providers," *id.* ¶7.  FERC therefore concluded that these ROFRs must be eliminated to ensure "rates, terms and conditions that are just and reasonable and not unduly discriminatory or preferential." *Id.* ¶30.

25.     In their stead, FERC established a new regime under which the ISO conducts a competitive process to decide who will construct certain regional projects, assessing proposals based on financial and technical qualification criteria that Order No. 1000 charged them with establishing. *Id.* ¶323.  In addition to opening transmission projects up to greater competition, Order No. 1000 mandated the establishment of a regional qualification process to determine which entities are eligible to be assigned a regionally planned, Order No. 1000 project. *Id.*

26.     Order No. 1000 catalogued the numerous comments supporting the elimination of rights of first refusal.  For example, the Federal Trade Commission opined that "the existence of a federal right of first refusal … reduces capital investment opportunities for potential nonincumbent developers by increasing their risk, encourages free ridership among incumbent developers, and creates a barrier to entry." *Id.* ¶231.  And several "state utility commissions and consumer advocates" agreed that right-of-first-refusal provisions "impede transmission development and that removing the provisions would provide a level playing field for incumbent and non-incumbent transmission developers." *Id.*

27.     Unsurprisingly, many of the incumbent transmission owners opposed Order No. 1000 and its efforts to bring the benefits of competition to ratepayers. *Id.* ¶¶239-40.  Among other things, many of these incumbent owners argued that Order No. 1000 conflicted with state-law requirements that they claimed dictate what transmission facilities should be built and where. *Id.* ¶¶248, 276-77.  FERC responded by clarifying that its focus was on the detrimental impact of

rights of first refusal on rates subject to its jurisdiction, and that "[n]othing in this Final Rule is intended to limit, preempt, or otherwise affect state or local laws or regulations with respect to construction of transmission facilities, including but not limited to authority over siting or permitting of transmission facilities." *Id.* ¶287.

28.    Federal courts rebuffed numerous challenges to Order No. 1000, consistently upholding FERC's authority to eliminate rights of first refusal and recognizing in no uncertain terms that rights of first refusal impede competition, increase energy costs across state lines, and harm the public interest.  For instance, in *South Carolina Public Service Authority v. FERC*, the D.C. Circuit affirmed FERC's authority to order removal of rights of first refusal from tariff agreements, finding that "basic economic principles make clear that rights of first refusal are likely to have a direct effect on the costs of transmission facilities because they erect a barrier to entry: namely, non-incumbents are unlikely to participate in the transmission development market because they will rarely be able to enjoy the fruits of their efforts."  762 F.3d at 74.  And several courts rejected incumbents' arguments that these rights were contractually protected.  *See Okla. Gas & Electric Co. v. FERC*, 827 F.3d 75 (D.C. Cir. 2016); *Emera Maine v. FERC*, 854 F.3d 662 (D.C. Cir. 2017); *MISO Transmission Owners v. FERC*, 819 F.3d 329 (7th Cir. 2016), *cert. denied sub nom. Ameren Servs. Co. v. FERC*, 580 U.S. 1171 (2017).

**B.    MISO Responds to Order No. 1000.**

29.    Indiana is served by two regional grid operators:  MISO, which spans much of the Midwestern United States and parts of Canada and stretches all the way down to Louisiana, Mississippi, and East Texas; and PJM, which covers the Mid-Atlantic Region from New Jersey to eastern North Carolina and reaches as far west as northern Illinois.  MISO covers most of Indiana, while PJM covers portions of northern Indiana.



FERC, *Regions Map Printable Version Order No. 1000*, https://tinyurl.com/jwuwjuv8.

30.     In compliance with Order No. 1000 (and over the objections of its incumbent transmission owners), MISO filed revisions to its Transmission Owner Agreement and Open Access Tariff to remove right-of-first-refusal provisions for projects covered by Order No. 1000. MISO also created rules governing cost allocation for new projects, under which the costs of a regionally planned MISO project that is located entirely within a single state in MISO (including Indiana) can be allocated across all or a substantial part of the MISO region.  And MISO created a competitive solicitation process to choose developers for new transmission projects selected for regional cost allocation and competition.

31.     MISO's tariff categorizes projects based on need, dollar value, and size.  Consistent with Order No. 1000, MISO does not require regional cost allocation or competition for smaller projects that principally serve local needs.  But three types of projects are subject to system-wide cost sharing and competitive bidding: multi-value projects; long range transmission projects; and market efficiency projects.

32.     Multi-value projects support a range of system-wide public policies (e.g., promoting renewable energy) and/or provide widespread reliability, public-policy, and economic benefits across the MISO footprint.   The costs of these projects accordingly are allocated throughout all 15 states in the MISO region (including Indiana).  *See* MISO, FERC Electric Tariff, Attachment FF, §III.A.2.g, (Sept. 26, 2024), https://tinyurl.com/mr2ha47c ("MISO Tariff").

33.     Many of the projects in MISO's LRTP initiative are similar to multi-value projects, but they focus on—and their costs will be allocated over—only the MISO Midwest Subregion, which includes parts of Illinois, Indiana, Iowa, Michigan, Minnesota, Missouri, North Dakota, South Dakota, and Wisconsin.  *See* MISO, Press Release, *MISO Board Approves $10.3B in Transmission Projects: Tranche 1 Portfolio Focused on Midwest Subregion* (July 25, 2022), https://tinyurl.com/n9vbrrjh.  Accordingly, the estimated $21 billion cost of the new projects in Tranche 2.1 will be borne by consumers across these nine states.

34.     Market efficiency projects seek to reduce market congestion, which tends to be localized, but can still impact the grid as a whole.  MISO's tariff therefore recognizes that they "have regional benefits" and allows for their costs to be allocated to consumers in multiple states. *See* MISO Tariff, Attachment F, §§II.B, III.A.2.f.

35.     Consistent with Order No. 1000, MISO eliminated right-of-first-refusal provisions for these regionally cost-allocated projects.  But MISO proposed adding language to its tariff preserving the application of any rights of first refusal that may be created by state law—even for projects that FERC said must be open to competition to ensure just and reasonable rates.   In particular, MISO proposed the following language:

> **State or Local Rights of First Refusal.** The Transmission Provider shall comply with any Applicable Laws and Regulations granting a right of first refusal to a Transmission Owner.  The Transmission Owner will be assigned any transmission project within the scope,

and in accordance with such terms, of any Applicable Laws and Regulations granting such a right of first refusal.  These Applicable Laws and Regulations include, but are not limited to, those granting a right of first refusal to the incumbent Transmission Owner(s) or governing the use of existing developed and undeveloped right of way held by an incumbent utility.

36.    FERC initially rejected MISO's effort to reintroduce rights of refusal via state law. But FERC then did a 180 and permitted MISO to bind itself to state or local laws or regulations when deciding whether to require competition for new regional transmission facilities.  *Midwest Indep. Transmission Sys. Operator and MISO Transmission Owners, Order on Rehearing and Compliance Filings*, 150 FERC ¶61,037, ¶¶12, 25 (Jan. 22, 2015).

37.    In doing so, FERC did not purport to decide whether such laws are constitutional. It instead found only that it would be inefficient for MISO to have to hold a competitive solicitation process if, under state or local laws, the project would still end up having to be automatically assigned to the incumbent.  *Id.* ¶26.  And then-Chairman Norman Bay filed a concurring opinion in which he made clear that "[t]he Commission's order today does not determine the constitutionality of any particular state right-of-first-refusal law," and that any such determination "lies with a different forum, whether state or federal court."  150 FERC at ¶61,195.  He also questioned the constitutionality of such laws, observing that "[s]tate laws that discriminate against interstate commerce—that protect or favor in-state enterprise at the expense of out-of-state competition—may run afoul of the dormant commerce clause."  *Id.*[1]

38.    While MISO's tariff indicates that MISO will give effect to "duly promulgated" state laws purporting to reintroduce rights of first refusal, the tariff also obligates MISO to comply

---

[1] FERC acted similarly with respect to PJM, whose post-Order No. 1000 tariff similarly eliminates rights of first refusal but then purports to bind PJM to state laws re-imposing them.  *See PJM Interconnection, L.L.C. Indicated PJM Transmission Owners and PJM Interconnection, L.L.C. Pub. Serv. Elec. & Gas Co.*, 147 FERC ¶61,128, ¶¶132-33 (2014).

with "judgments," "orders," and "directives" from any court having jurisdiction over "market participants" (such as LSP Midcontinent and LS Power Grid) and the transmission customers they serve.  MISO Tariff, Module A, §II.1.A (Definitions – A) (69.0.0) (defining "Applicable Laws and Regulations"); *see id.* §II.1.M (Definitions – M) (78.0.0); *id.* §II.1.P (Definitions – P) (66.0.0). Accordingly, MISO has made clear that, when awarding new transmission projects, it will not recognize a state-law right of first refusal that a court has held invalid.  *See* Br. of Amicus Curiae MISO at 20-21, *LS Power Midcontinent, LLC v. Iowa*, No. 24-0641 (Iowa July 2, 2024) ("MISO Amicus Br.").

      **C.**      **LSP Aggressively and Successfully Pursues Competitive Opportunities Opened Up by Order No. 1000, While States Try to Override FERC's Competition Mandate.**

      39.      Plaintiffs and their subsidiaries and affiliates develop, compete for, and own transmission projects throughout the United State.  LSP has a long history of active development of new electric transmission, partnering with communities across the country to create lower-cost, cleaner energy solutions.  Since their inception, Plaintiffs and their affiliates have developed, constructed, managed, and acquired more than 47,000 megawatts of competitive power generation and more than 780 miles of long-distance, high-voltage transmission infrastructure in the United States, for which they have collectively raised over $60 billion in debt and equity financing.  More than 350 miles of additional transmission projects are currently under construction.

      40.      LSP has several affiliates that have qualified to compete for and be awarded Order No. 1000 projects.  Four of them—Verdant Plains Electric, LLC, Republic Transmission, LLC, Cardinal Point Electric, LLC, and LSP Midcontinent, LLC (a plaintiff in this case)—are qualified

in MISO, while Central Transmission (also a plaintiff) is qualified in PJM.[2]  That is no mean feat.  The qualification process is extensive, requiring prospective transmission developers to demonstrate rigorous technical, managerial, and financial capabilities to qualify.[3]

41.    In competitive solicitations held since Order No. 1000 took effect, several LSP subsidiaries or affiliates have been selected as the most efficient and/or cost-effective transmission developer for new transmission projects.  That includes winning the first competitive solicitations in both PJM and MISO, which together serve more than 100 million people across more than 25 states.  LSP subsidiaries or affiliates have also been awarded competitive projects by the New York Independent System Operator ("NYISO") and the California Independent System Operator ("CAISO").

42.    Many of these successful proposals contained legally binding cost caps, innovative technology, and/or other cost-reduction factors beneficial to ratepayers.  For example, the very first project that MISO competitively awarded, the Duff-Coleman EHV 345kV transmission project running from southern Indiana to western Kentucky, was awarded to LSP affiliate Republic.  In selecting Republic's proposal, MISO found that it provided the greatest overall value out of 11 comprehensive proposals—including five from Indiana incumbents.  *See* MISO, *Selection Report: Duff-Coleman 345 EHV kV Competitive Transmission Project* (Dec. 20, 2016), https://tinyurl.com/7khvstjy.  Republic backed the project with a below-estimate cost cap and other binding cost-containment provisions, and it energized the line in June 2020, six months ahead of MISO's schedule.

---

[2]    *See, e.g.*, MISO, *Qualified Transmission Developers* (Mar. 18, 2024), https://tinyurl.com/ycxrzd29.

[3] *See, e.g.*, MISO, *Competitive Transmission Administration*, https://tinyurl.com/52m9w7sh (last visited Sept. 30, 2024).

43.     In short, Plaintiffs have shown that they are willing, capable, and competitive players in the transmission-development field and that they consistently deliver significant benefits to ratepayers when given the opportunity to compete.

44.     But not everyone has viewed competition as a benefit.  A number of states have considered enacting legislation that would preclude the competition that Order No. 1000 sought to usher in by purporting to grant incumbents essentially the same rights of first refusal for Order No. 1000 projects that FERC found to impede just and reasonable rates for interstate transmission. Many of these proposals have been rejected.  Earlier this year, for example, the Wisconsin legislature declined to enact proposed AB-470—a ROFR bill whose "primary support c[ame] from the largest electric utilities in the state."  Erik Gunn, *Controversial Power Line Bill's Opponents Win a Round as Measure Dies*, Wisc. Examiner (Mar. 18, 2024), https://archive.ph/wip/bYYXf. Last year, the Governor of Illinois vetoed a similar ROFR bill, explaining that the bill would harm consumers because "[e]liminating competition" for multibillion-dollar transmission projects "will cause rates to increase in the MISO region."  Office of the Governor of Illinois, Press Release, *Gov. Pritzker Vetoes Legislation* (Aug. 16, 2023), https://archive.ph/wip/1wBnd.

45.     Other states, however, have forged ahead with these controversial (and constitutionally dubious) measures.  *See, e.g.*, Tex. Util. Code Ann. §§37.051(a), 37.056(e)-(g) (2020); Iowa Code §478.16 (2020); Minn. Stat. §216B.246 (2020).  And absent judicial intervention, the mere existence of these state laws can halt competition for those projects in its tracks.  *See* MISO Tariff, Attachment FF §VIII.A.1 (91.0.0).

46.     LSP has been at the forefront of efforts to challenge these anti-competitive laws. For example, supported by the U.S. Department of Justice, LSP and other non-incumbent transmission developers sued to block enforcement of Texas' ROFR law, arguing that it violates

the Commerce Clause.[4]  The Fifth Circuit agreed that the law facially discriminates against out-of-state competitors by imposing a "local-presence requirement"; "incumbent," the court explained, "is just another word for an entity that already has a presence" in the state.  *NextEra*, 48 F.4th at 325.

47.    Indeed, the Fifth Circuit held that Texas' ROFR law facially discriminates not only against *out-of-state* commerce, but against *interstate* commerce as well:  Transmission lines, even if "entirely within" a state, are "instrumentalities of interstate commerce" because "electricity that enters the grid immediately becomes part of a vast pool of energy that is constantly moving in interstate commerce." *Id.* at 321.  The Fifth Circuit further held that the plaintiffs' discriminatory-purpose, discriminatory-effects, and undue-burden claims were plausible and must proceed.  *Id.* at 327-28.   The Texas case remains pending on remand in the district court, after Texas unsuccessfully sought Supreme Court review.  *See NextEra Energy Cap. Holdings, Inc. v. Walker*, No. 19-cv-626 (W.D. Tex. filed June 17, 2019).

48.    LSP also brought challenges to Minnesota's and Iowa's laws, *see LSP Transmission Holdings, LLC v. Sieben*, 954 F.3d 1018 (8th Cir. 2020); *LS Power Midcontinent, LLC v. State*, 988 N.W.2d 316 (Iowa 2023), and it has been at the forefront of efforts to defeat proposed legislation creating such rights, explaining that they are both unconstitutional and bad

---

[4] *See* LSP Transmission Holdings II, LLC's Mot. to Intervene, *NextEra Energy Cap. Holdings, LLC v. Paxton*, No. 19-cv-626 (W.D. Tex. July 12, 2019), ECF No. 33; Statement of Interest of the United States of America, *NextEra Energy Cap. Holdings, LLC v. Paxton*, No. 19-cv-626 (W.D. Tex. Sept. 20, 2019), ECF No. 110; *see also* Letter from Daniel Haar, Acting Chief, Competition Pol'y & Advocacy Sec., Antitrust Div., U.S. Dep't of Justice to Travis Clardy, State Rep., Tex. House of Rep., at 4 n.16 (April 19, 2019), https://tinyurl.com/8ps3rap3 (explaining that it is "the view of the United States that state ROFR laws are not protected by a general exception to the dormant Commerce Clause and do not have the approval of the federal government," and noting that a state law providing that "companies must [already] own a facility in the state to benefit" amounts to a "restrictive in-state presence requirement" that is the "concern[]" of "the dormant Commerce Clause").

policy.  Notably, the Iowa Supreme Court recently reinstated an injunction blocking Iowa's ROFR law pending further review.  *See* Order, *LS Power Midcontinent, LLC v. Iowa*, No. 24-0641 (Iowa Aug. 7, 2024).

### D.    The Regulation of Transmission in Indiana

49.    Following FERC Order No. 1000, Indiana recognized the rights of new entrants to own and operate transmission facilities.  By legislation enacted in 2013, Indiana law defines a "new electric transmission owner" as one that "does not own, operate, or maintain an electric transmission facility located in whole or in part in Indiana."  Ind. Code §8-1-38-4(1).  And it requires the Indiana Utility Regulatory Commission to "grant a new electric transmission owner authority to operate as a public utility" so long as the Commission finds that the owner has "the financial, managerial, and technical capability to construct, own, operate, and maintain an electric transmission facility"; an "ability and intent to comply with all statutes, rules, and regulations enforced by the commission"; and "the intent to construct, own, operate, and maintain an electric transmission facility that is under consideration by an applicable regional transmission organization."  *Id.* §8-1-38-7(a).

50.    Under that statute as originally enacted, Indiana granted each "incumbent electric transmission owner" limited ROFR rights, extending only to "the right to construct, own, [and] operate" any "local reliability electric transmission facility that connects to an electric transmission facility" it already owns, as well as "[u]pgrades to an[y] existing electric transmission facility" it already owns.  2013 Ind. Legis. Serv. P.L. 174, §§2, 3, 9.  An "incumbent electric transmission owner" was (and is) defined as a "public utility that owns, operates, and maintains an electric transmission facility in whole or in part in Indiana."  *Id.* §2; *accord* Ind. Code §8-1-38-2.

51.    Because it was cabined to upgrades and "local reliability" projects, the 2013 law did not preclude out-of-state entities from competing for regional transmission projects in Indiana

overseen by MISO and PJM. Thus, after being awarded the Duff-Coleman project by MISO in 2016, LSP affiliate Republic—despite having no prior presence in Indiana—became certified by the Commission as a public utility in Indiana and completed construction of the transmission line.

52.    In 2023, however, the state replaced this (mostly) open, competitive system with a protectionist, anti-competitive one by enacting HEA 1420.

53.    HEA 1420 drastically expands the scope of rights of first refusal granted to incumbents in Indiana, to the detriment of all out-of-state competitors, including Plaintiffs, as well as consumers across the region. Now, "[a]n incumbent electric transmission owner has the right to construct, own, operate, and maintain" any "electric transmission facility that has been approved for construction through a regional organization planning process"—i.e., by an ISO managing the *inter*state grid—whenever the new project "connects to an electric transmission facility owned by the incumbent." *Id.* §8-1-38-9. Only if the incumbent "gives notice of [its] intent not to construct the approved electric transmission facility" may the relevant ISO (i.e., MISO or PJM) award the new project through the competitive process described in its FERC-approved tariff. *Id.* §8-1-38-9(c). Unsurprisingly, incumbents nearly always elect to build new facilities when given the opportunity to do so without facing competition. *See MISO Transmission Owners*, 819 F.3d at 334 (noting that incumbents are "sophisticated enough to understand the benefits" of right-of-first-refusal provisions).

54.    HEA 1420 will primarily benefit just a handful of entities that have a particularly large and significant physical presence in Indiana—namely, those that own electricity substations. While companies that own transmission lines, but not substations, in Indiana may enjoy some rights of first refusal under HEA 1420, most new approved transmission lines begin or end at— and thus unquestionably "connect to"—an existing substation. *See* Ind. Code §8-1-38-9; *cf.* MISO,

19

*LRTP Tranche 2.1 Portfolio Update* 2 (Sept. 24, 2024), https://tinyurl.com/4v7ky4xf.

55.     LSP affiliate Republic illustrates just how discriminatory the new law is.  As noted above, the Commission has certified Republic as an Indiana public utility, and Republic recently constructed a new transmission line in the state.  But Republic is barred from competing for a host of new MISO- or PJM-approved projects in Indiana that do not happen to connect to Republic's existing transmission lines, *even though Republic has already been certified by the state and has already demonstrated its effectiveness as a provider in the state*.

56.     In practical effect, then, HEA 1420 exclusively benefits those with a substantial existing presence in Indiana by giving them the right to build and operate new transmission lines in Indiana that are planned by a FERC-regulated ISO and serve (and are paid for by) consumers across multiple states.  Indeed, by its terms, HEA 1420 applies *only* to these federally regulated instrumentalities of interstate commerce.  In other words, the law squelches the very competition Order No. 1000 sought to usher in.

57.     HEA 1420 took effect on July 1, 2023.  It is enforced by the Commission.  *See* Ind. Code §8-1-2-115.

**E.      Plaintiffs Are Foreclosed From Pursuing New Business in Indiana, Including in a Massive Wave of New Transmission Investment by MISO**

58.     From its inception, HEA 1420 has posed a looming threat to Plaintiffs' aspirations to build new MISO- or PJM-approved transmission facilities in Indiana that would be subject to competitive bidding but for Indiana's new law.  Now that several such projects are on the verge of approval, that threat is poised to come to fruition.

59.     To address ballooning energy demands and weaknesses in the existing electric grid, MISO is currently engaged in a long-term wave of investment through the LRTP initiative.  The

plan has four announced Tranches.[5]

60.     Tranche 1 was an unprecedented investment in grid transmission in MISO territory, including $10.3 billion devoted to boosting reliability of the electric grid in the Midwest and surrounding region.  In Tranche 1, MISO awarded five projects through competitive bids.  The first of these projects, the Hiple to Indiana/Michigan State Border project ("Hiple"), was the only one in Indiana.  MISO received seven proposals, and in May 2023, it selected Republic's, finding that it "had a well-supported project implementation cost estimate, a superior revenue requirement commitment, and a well-reasoned routing strategy."  MISO, *Selection Report: Hiple to IN/MI State Border 345 kV Competitive Transmission Project* at i (May 11, 2023), https://tinyurl.com/5ac378zx.  Because Indiana's new ROFR law did not take effect until a few weeks after the Hiple project was awarded (July 1, 2023), Republic was able to proceed with it.

61.     Tranche 1's multibillion-dollar investment pales in comparison to the investment still to come in MISO.  Tranche 2.1 is set to be roughly double the size of Tranche 1, with approximately *$21 billion* of overall investment.[6]  And a substantial portion of that new development will be located in Indiana.

62.     The MISO Board is scheduled to approve the Tranche 2.1 portfolio on December 10-12, 2024.  But as a result of HEA 1420, projects in Indiana that MISO would otherwise award competitively—selecting the developer based on benefits and costs to energy consumers across the region—will instead be made available only to whoever already owns the facility (in Indiana) to which the new transmission line connects.  Absent judicial intervention, MISO will thus be

---

[5] *See* MISO, *Long Range Transmission Planning*, https://tinyurl.com/3hct4dae (last visited Sept. 30, 2024.

[6] MISO, Sys. Planning Comm. of the Bd. of Dirs., *Reliability Imperative: Long Range & Interregional Transmission Planning* 11 (Sept. 17, 2024), https://tinyurl.com/2t3y59y8.

required to award all Indiana projects in the tranche to companies with an existing physical presence in the state, precluding out-of-state entities from entering the Indiana portions of the interstate market and increasing energy costs for consumers in *all* MISO states.

63.    That is no accident.  HEA 1420 was passed for the purpose of discriminating against out-of-state entities in favor of in-state ones.  The sponsor of HEA 1420, Rep. Edmond Soliday, repeatedly explained that the law gives new transmission projects to "Hoosiers we know" as opposed to companies from "somewhere else," like "Florida."  *Hearing on HEA 1420 Before S. Utils. Comm.*, 2023 Leg. 2:35:50-36:15 (Ind. Apr. 13, 2023), https://tinyurl.com/yc56r2az; *see also, e.g.*, *id.* at 26:40-55 (Sen. Yoder: "[HEA] 1420 is just giving a priority to players that we know, correct?"  Rep. Soliday: "Yes.").  Other legislators similarly stated that they supported the ROFR law because they would rather have "folks from Indiana" build and own new transmission lines, instead of people "from who knows where," in part because (they surmised) incumbent entities would be "more likely to have individuals from Indiana … working … on these lines." *Id.* at 2:52:30-57 (Sen. Byrne); *see also id.* at 2:01:35-50 (local union members who "work side-by-side with [incumbent] utility companies" asserting that HEA 1420 would support "local workers" and the "local economy").  These statements underscore what is already evident from the law's plain language:  HEA 1420 is a textbook example of "the protectionism that the Commerce Clause guards against."  *Lake*, 48 F.4th at 326.  And, left standing, HEA 1420 will achieve that protectionist objective, diverting billions of dollars of investment *in an interstate grid* toward a select group of in-state incumbents—at the direct expense of consumers across state lines.

64.    LSP's track record makes clear that Plaintiffs would, absent ROFR provisions, be well-positioned to compete for Tranche 2.1 projects in Indiana.  Indeed, an LSP affiliate won both the Duff-Coleman competitive solicitation in Indiana and the Hiple project, the only competitive

Tranche 1 project located in Indiana.  But HEA 1420 will foreclose LSP Midcontinent, Central Transmission, and other qualified transmission-development companies from competing for MISO and PJM Order No. 1000 projects, solely because they do not already own facilities that "connect to" the planned transmission lines.

65.    HEA 1420 thus is causing undeniable harm to Plaintiffs by interfering with their ability to plan, invest in, conduct, and grow their business operations in Indiana.  And that is to say nothing of the substantial harms that the law is inflicting on interstate commerce.  By diverting the state's share of $20 billion of investment to in-state incumbents and away from lower-cost, out-of-state prospective entrants like Plaintiffs, HEA 1420 will ultimately harm energy consumers in the interstate market, who will be forced to bear the costs of Indiana's blatant protectionism.

## FIRST CAUSE OF ACTION
### (COMMERCE CLAUSE)

66.    Plaintiffs reallege paragraphs 1 through 65 as though fully set forth therein.

67.    "One of the major defects of the Articles of Confederation" was that they "essentially left the individual States free to burden commerce both among themselves and with foreign countries very much as they pleased."  *Michelin Tire Corp. v. Wages*, 423 U.S. 276, 283 (1976).  "[E]conomic protectionism—that is, regulatory measures designed to benefit in-state economic interests by burdening out-of-state competitors," *Dep't of Revenue of Ky. v. Davis*, 553 U.S. 328, 337-38 (2008)—was "cutting off the very life-blood of the nation." *Tenn. Wine & Spirits Retailers Ass'n v. Thomas*, 588 U.S. 504, 515 (2019) (quoting Max Farrand, *The Framing of the Constitution of the United States* 7 (1913)).  Accordingly, "[c]urbing state protectionism" and "fostering free trade among the states" were among the "principal reason[s] for the adoption of the Constitution." *Id.* at 515-16.

68.    As an original matter, the Framers may have expected that these objectives would

be accomplished through the Import-Export Clause, "which generally prohibits a state from 'lay[ing] any Imposts or Duties on Imports or Exports,'" and the Privileges and Immunities Clause, "which provides that '[t]he Citizens of each State shall be entitled to all Privileges and Immunities of Citizens in the several States.'" *Id.* at 516 (alterations in original) (quoting U.S. Const. art. I, §10, cl.2, U.S. Const. art. IV, §2); *accord Nat'l Pork Producers Council v. Ross*, 598 U.S. 356, 370 (2023). Over the past two-and-a-half centuries, however, the Supreme Court has limited the scope of those two constitutional provisions and instead treated "the Commerce Clause as the primary safeguard against state protectionism." *Tenn. Wine & Spirits*, 588 U.S. at 516-17; *see* U.S. Const. art. I, §8, cl. 3 (empowering Congress "[t]o regulate Commerce … among the several States").

69.    Under the Supreme Court's "dormant Commerce Clause" precedents, a state statute that discriminates against interstate commerce in favor of in-state commerce "is 'virtually *per se* invalid.'" *Davis*, 553 U.S. at 338 (quoting *Or. Waste Sys., Inc. v. Dep't of Env't Quality of Or.*, 511 U.S. 93, 99 (1994)). That is true whether the discrimination is found on the face of the statute, in its effect, or in its purpose. *See Tenn. Wine & Spirits*, 588 U.S. at 539.

70.    HEA 1420 plainly regulates interstate commerce and its instrumentalities. By its terms, HEA 1420 applies *exclusively* to an "electric transmission facility that has been approved for construction through a regional transmission organization planning process," Ind. Code §8-1-38-9, i.e., a project that has been approved through a federally mandated ISO planning process and will form a part of multi-state transmission grid. The ROFR law applies even when those projects cross state lines, and even when they are selected for regional (i.e., multi-state) cost allocation. Thus, whether or not they "run entirely within" Indiana, the new lines that HEA 1420 covers are "instrumentalities of interstate commerce" used for the provision of interstate services. *Lake*, 48 F.4th at 321.

Case 1:24-cv-01722-TWP-MKK    Document 3    Filed 10/02/24    Page 25 of 34 PageID #: 29

71.     HEA 1420 facially discriminates against out-of-state entities like Plaintiffs and their affiliates by effectively prohibiting them from building transmission lines in Indiana. The law contains restrictive in-state-presence requirements, limiting new transmission development to "incumbent transmission owner[s]"—that is, "public utilit[ies]" that already "own[], operate[], and maintain[]" "electric transmission facilit[ies] in whole or in part *in Indiana*." Ind. Code §8-1-38-2 (emphasis added). In other words, HEA 1420 bestows special, exclusive benefits on those who already own transmission facilities in Indiana, to the detriment of all potential out-of-state competitors. *See id.* §8-1-38-9. By granting those benefits only to those with an existing physical presence in Indiana, HEA 1420 "discriminates against interstate commerce." *Lake*, 48 F.4th at 325; *see Lewis v. BT Inv. Managers, Inc.*, 447 U.S. 27, 42 n.9 (1980) ("[D]iscrimination based on the extent of local operations is itself enough to establish the kind of local protectionism" that implicates the Commerce Clause.).

72.     Such discriminatory laws are unconstitutional "in all but the narrowest circumstances," as they pose an existential threat to the "the foundations of the Union." *Granholm v. Heald*, 544 U.S. 460, 472 (2005). This is not the exceedingly rare case where a departure from the basic principle of equality among the states might be justified. *Cf.* Donald L. R. Goodson, *Toward A Unitary Commerce Clause: What the Negative Commerce Clause Reveals About the Commerce Power*, 61 Clev. St. L. Rev. 745, 766 (2013) ("*Maine v. Taylor* [477 U.S. 131 (1986)] is the only instance in which such a discriminatory measure survived judicial challenge." (footnote omitted)).

73.     Indiana already requires all entities certified as Indiana public utilities to meet the necessary reliability and safety protocols to build and operate transmission lines in the state. If the state does not think those requirements are sufficient, it could evenhandedly change the threshold

for certification as a public utility.  Instead, HEA 1420 nakedly favors in-state entities over out-of-state competitors without regard to their qualifications, violating the "antidiscrimination principle [that] lies at the very core" of the Supreme Court's "dormant Commerce Clause jurisprudence." *Pork Producers*, 598 U.S. at 369.

74.    Indiana's discrimination thus is not justified by any valid public-welfare, consumer-protection, or other legitimate public purpose unrelated to economic protectionism.  It is instead an "avowedly protectionist economic polic[y]." *Id.* at 373.

75.    In addition, HEA 1420 imposes undue burdens on interstate commerce by restricting entry to the transmission market in Indiana, thus walling off the state from new market participants. *See Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142 (1970).

76.    Any purported local benefits from that law are insignificant to the point of illusory, confirming that they are a mere pretext for discrimination against out-of-state transmission developers.  As numerous courts have found, basic economic principles compel the conclusion that wholesale transmission competition benefits the markets and consumers.  Accordingly, the burden on interstate commerce is clearly excessive in relation to any purported local benefits.

77.    This legislation has injured and will continue to injure Plaintiffs by preventing them from competing in the Indiana transmission-development marketplace as regulated public utilities and by interfering with their ability to plan, invest in, and conduct their business operations as MISO- and PJM-qualified entities.

78.    The legislation further harms the interests of electric consumers in Indiana, as well as consumers throughout the MISO and PJM footprint, because it makes transmission projects funded by utility ratepayers more expensive.

79.    This legislation, as enacted and as applied, should be declared unconstitutional, and

its enforcement should be enjoined, as it threatens Plaintiffs with irreparable injury for which there is no adequate remedy at law.

## SECOND CAUSE OF ACTION
### (PREEMPTION)

80.     Plaintiffs reallege paragraphs 1 through 65 as though fully set forth therein.

81.     The Supremacy Clause provides that "the Laws of the United States … shall be the supreme Law of the Land … any Thing in the Constitution or Laws of any State to the Contrary notwithstanding."  U.S. Const. art. VI, cl. 2.  A state law that is contrary to a valid federal law is void, and its enforcement should be enjoined.  *See Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 326 (2015).

82.     The Federal Power Act ("FPA") "vests in the Federal Energy Regulatory Commission (FERC) exclusive jurisdiction over wholesale sales of electricity in the interstate market."  *Hughes v. Talen Energy Mktg., LLC*, 578 U.S. 150, 153 (2016).

83.     By purporting to control the selection process for development of interstate transmission lines, Indiana has intruded on that exclusive power, in effect substituting its own judgment of which developer should build federally regulated instrumentalities of interstate commerce for that of the actual federally regulated interstate entities, MISO and PJM, that manage them pursuant to the FPA.

84.     The effect of that state policy is to set an interstate wholesale rate, as the costs of insulation from competition are borne directly by consumers across state lines.  A substantial fraction of development costs—from projects that would otherwise be subject to competition—is shared by energy consumers across the entire region.

85.     HEA 1420 thus directly regulates the "interstate wholesale rate, contravening the FPA's division of authority between state and federal regulators."  *Hughes*, 578 U.S. at 163.

86. Indeed, FERC has already concluded that by "allow[ing] practices that have the potential to undermine the identification and evaluation of a more efficient or cost-effective solution to regional transmission needs," rights of first refusal "can result in rates … that are unjust and unreasonable or otherwise result in undue discrimination by public utility transmission providers."  Order No. 1000 ¶7.

87. "Federal regulations have no less pre-emptive effect than federal statutes." *Fidelity Fed. Savings Loan Ass'n v. de la Cuesta*, 458 U.S. 141, 153 (1982).  Yet HEA 1420 nonetheless reinstates the precise mechanism that FERC (correctly) determined would produce unjust and unreasonable interstate transmission rates.

88. Pursuant to *Ex parte Young*, 209 U.S. 123, the Commissioners should be enjoined from enforcing HEA 1420 because it threatens Plaintiffs with irreparable injury for which there is no adequate remedy at law.

### THIRD CAUSE OF ACTION
### (INDIANA PRIVILEGES AND IMMUNITIES CLAUSE)

89. Plaintiffs reallege paragraphs 1 through 65 as though fully set forth therein.

90. Section 23 of the Indiana Constitution provides that "[t]he General Assembly shall not grant to any citizen, or class of citizens, privileges or immunities which, upon the same terms, shall not equally belong to all citizens."  Ind. Const. art. I, §23.  The Indiana Supreme Court has held that this provision should be interpreted and applied independently of the U.S. Constitution. *Collins v. Day*, 644 N.E.2d 72, 75 (Ind. 1994); *see also id.* at 80 (explaining that Section 23 "appl[ies] fully, equally, and without diminution to prohibit any and all improper grants of unequal privileges or immunities, including not only those grants involving suspect classes or impinging upon fundamental rights but other such grants as well").

91. "Properly interpreting a particular provision of the Indiana Constitution involves a

search for the common understanding of both those who framed it and those who ratified it." *Id.* at 75-76. As the Indiana Supreme Court has explained, Section 23 was "intended to prohibit the Legislature from establishing monopolies, or granting special privileges." *Id.* at 77 (quoting 2 *Report of the Debates and Proceedings of the Convention for the Revision of the Constitution of the State of Indiana* 1395 (1850) ("*Report*"); *accord Ind. Gaming Comm'n v. Moseley*, 643 N.E.2d 296, 303 (Ind. 1994) ("[A]n original purpose of" the Clause "was to prohibit the legislature from granting special privileges to private commercial enterprises.").

92.     Early decisions applying Section 23 are instructive. In *Graffty v. City of Rushville*, for instance, the Indiana Supreme Court struck down a municipal ordinance that imposed onerous licensing requirements on non-residents who sold goods that were not grown or manufactured locally, but exempted city residents from those requirements. 8 N.E. 609, 609 (Ind. 1886). The court explained that Section 23 prohibited the city from granting such special privileges to its own residents and discriminating against non-locally produced goods. *Id.* at 611-12. The court further held that the ordinance independently violated the Commerce Clause. *Id.* at 612.

93.     Similarly, in *City of Indianapolis v. Bieler*, the Indiana Supreme Court invalidated a local law that required all "breweries," "distilleries," and "wholesale dealers in malt liquors" operating in the Indianapolis area to pay a steep annual fee, but exempted "any [Indianapolis] resident engaged in the wholesale business of bottling or bottling and vending bottled beer." 36 N.E. 857, 858 (Ind. 1894). The court again identified a Commerce Clause violation—noting that the city had arrested and fined an agent of an out-of-state company—as well as an independent, "very clear" violation of Section 23. *Id.* at 859-60. On the latter point, the court explained: "[T]he ordinance is void because it makes unjust and illegal discriminations between those engaged in the same business, and tends to create monopolies." *Id.* at 859.

94.    Consistent with the original meaning of the Indiana Constitution, as elucidated by these 19th-century decisions, Indiana courts apply a "two-part standard for determining a statute's validity under Section 23." *Paul Stieler Enters., Inc. v. City of Evansville*, 2 N.E.3d 1269, 1273 (Ind. 2014). "First, the disparate treatment accorded by the legislation must be reasonably related to inherent characteristics which distinguish the unequally treated classes." *Id.* (quoting *Collins*, 644 N.E.2d at 80). "Second, the preferential treatment must be uniformly applicable and equally available to all persons similarly situated." *Id.* (quoting *Collins*, 644 N.E.2d at 80). "Compliance with both elements is required to satisfy the constitutional requirement." *Id.*

95.    In *Paul Stieler*, for example, the Indiana Supreme Court reviewed a city ordinance that prohibited smoking in all "land-based bars and clubs" but allowed smoking "in floating bars with gambling." *Id.* at 1274. As the court explained, the law provided a "special privilege"—namely, an exemption from the city's smoking ban—to "riverboat casinos." *Id.* at 1274-75. The court held that the law ran afoul of Section 23 because its disparate treatment of bars was not "reasonably related to" any "inherent difference[]" between the regulated classes—namely "(1) whether the establishment is floating or land-based and (2) whether the establishment conducts gambling under the Riverboat Gambling statutes." *Id.* Further, upholding the law would "snub[ the] framers' intent" by granting an "exclusive privilege" to a favored corporation, to the detriment of competitors and consumers alike. *Id.* at 1276; *see also* 1 *Report* at 646 (describing state-sanctioned monopolies as "robbery upon the citizens").

96.    Similarly, the Indiana Supreme Court in *Myers v. Crouse-Hinds Division of Cooper Industries, Inc.*, 53 N.E.3d 1160 (Ind. 2016), invalidated a statute treating "plaintiffs injured by defendants who both mined and sold raw asbestos" more favorably than "asbestos plaintiffs who were injured by defendants outside that category." *Id.* at 1164-65. The court held that the statute

"violat[ed] the Equal Privileges and Immunities Clause of Article 1, Section 23 of the Indiana Constitution on two separate and independent bases." *Id.* at 1166 (footnote omitted). First, the law created two classes of asbestos victims based not on any "inherent" characteristic of their own, but on an irrelevant detail about the tortfeasor that injured them. *Id.* at 1165-66. Second, the law gave "preferential treatment" to one "class[] of asbestos victims," even though both classes were "similarly situated" as "victims of asbestos illness or disease." *Id.* at 1166.

97.     Like the statute invalidated in *Myers*, HEA 1420 violates Section 23 of the Indiana Constitution twice over.

98.     For one thing, the statutory grant of rights of first refusal to incumbent transmission owners is not reasonably related to any "inherent difference[]" between those incumbents and other qualified electric transmission providers. *Cf. Paul Stieler*, 2 N.E.3d at 1273-78. The only "difference[] between the divergently-treated classes," *id.* at 1278, is that members of the favored class own facilities that happen to "connect[] to" new MISO- or PJM-approved projects, Ind. Code §8-1-38-9, while those in the disfavored class—including other Commission-certified public utilities, such as Republic—do not. That is not an "inherent distinguishing difference" at all; it is mere "happenstance." *Cf. Myers*, 53 N.E.3d at 1165-66. And the mere fact that an incumbent entity owns a facility that connects to a planned new transmission line has no bearing on whether that entity is the best candidate to build, own, and maintain the new line. As FERC has explained, *non*-incumbent transmission companies often provide "more efficient or cost-effective solution[s] to regional transmission needs" than incumbents. Order No. 1000 ¶7. Republic's selection (through MISO's competitive process) and execution of the Duff-Coleman project provides a perfect illustration. *See* ¶42, *supra*. HEA 1420 thus confers precisely the type of "arbitrary" and "[un]reasonable" benefit that Section 23 forbids. *See Collins*, 644 N.E.2d at 79.

99.    In addition, HEA 1420 violates the requirement that governmental benefits—here, the opportunity to compete for new transmission projects—"must be … equally available to all persons similarly situated." *Myers*, 53 N.E.3d at 1166 (quoting *Collins*, 644 N.E.2d at 80).  All Commission-certified entities are similarly situated to compete for new projects, as they have been found to "ha[ve] the financial, managerial, and technical capability to construct, own, operate, and maintain an electric transmission facility" in Indiana and "the ability and intent to comply with all statutes, rules, and regulations enforced by the [C]omission."  Ind. Code §8-1-38-7(a)(1)-(2).  Yet HEA 1420 "creates a preference" for a handful of established incumbents, and thus "establishes an inequality among a class of citizens all of whom are equally meritorious." *Myers*, 53 N.E.3d at 1166 (quoting *Collins*, 644 N.E.2d at 79).  Indeed, the ROFR has effect *only* when an interstate organization like MISO or PJM would otherwise determine that a different, new operator would provide superior service to energy consumers at a superior cost.  Again, that is a textbook violation of Section 23.

100.    HEA 1420 thus violates the Indiana Privileges and Immunities Clause, and its enforcement should be enjoined, because it arbitrarily grants special privileges to incumbent transmission owners, and because it threatens Plaintiffs with irreparable injury for which there is no adequate remedy at law.

**FOURTH CAUSE OF ACTION**
**(DECLARATORY RELIEF)**

101.    Plaintiff realleges paragraphs 1 through 100 as though fully set forth therein.

102.    "In a case of actual controversy … any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought."  28 U.S.C. §2201(a).  HEA 1420 violates the Commerce Clause, is preempted by the Federal Power Act, and violates

the Indiana Privileges and Immunities Clause.

103.    Enforcing HEA 1420 would create a genuine, credible, and immediate threat of harm to Plaintiffs and interstate commerce, by preventing new transmission-development entities from entering the Indiana market and competing on equal terms with incumbents.

104.    Plaintiffs seek a declaration that HEA 1420 thus is void under the Commerce Clause and Supremacy Clause of the United States Constitution, as well as the Privileges and Immunities Clause of the Indiana Constitution.

## RELIEF REQUESTED

Based on the foregoing, Plaintiffs hereby respectfully request that the Court grant the following relief:

a.  an order pursuant to 28 U.S.C. §2201 declaring that Indiana Code §8-1-38-9, as amended by HEA 1420, is unconstitutional, invalid, and unenforceable to the extent it grants in-state transmission owners the right of first refusal to build or acquire transmission lines in Indiana;

b.  an order enjoining Defendants from enforcing Indiana Code §8-1-38-9, as amended by HEA 1420;

c.  an order awarding Plaintiffs the costs and expenses incurred in the instant litigation, including its reasonable attorneys' fees pursuant to 42 U.S.C. §1988(b); and

d.  an order for such other relief, including preliminary injunctive relief, and further relief as may be just and appropriate under the circumstances.

*Signature page follows.*

Dated: October 2, 2024                          Respectfully submitted,


                                                /s/ Todd A. Richardson
PAUL D. CLEMENT*                                TODD A. RICHARDSON
ERIN E. MURPHY*                                 JAMES E. ZOCCOLA
MATTHEW D. ROWEN*                               THOMAS JONES
JOSEPH J. DEMOTT*                               LEWIS KAPPES, P.C.
CLEMENT & MURPHY, PLLC                          One American Square
706 Duke Street                                 Suite 2500
Alexandria, VA 22314                            Indianapolis, IN 46282
(202) 742-8900                                  (317) 639-1210
                                                TRichardson@lewis-kappes.com
                                                JZoccola@lewis-kappes.com
                                                TJones@lewis-kappes.com

*Pro hac vice application forthcoming


                          Counsel for Plaintiffs