**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF INDIANA**

| | | |
|---|---|---|
| LSP TRANSMISSION HOLDINGS II, LLC, LS POWER MIDCONTINENT, LLC, CENTRAL TRANSMISSION, LLC, and LS POWER GRID DRS HOLDINGS, LLC, | ) ) ) ) ) | |
| *Plaintiffs*, | ) ) | |
| v. | ) ) ) | No. 1:24-cv-01722-TWP-MG |
| JAMES F. HUSTON, Chairman, Indiana Utility Regulatory Commission, WESLEY R. BENNETT, Commissioner, Indiana Utility Regulatory Commission, SARAH E. FREEMAN, Commissioner, Indiana Utility Regulatory Commission, DAVID E. VELETA, Commissioner, Indiana Utility Regulatory Commission, and DAVID E. ZIEGNER, Commissioner, Indiana Utility Regulatory Commission, each in his or her official capacity, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) | |
| *Defendants*. | ) ) | |

**MEMORANDUM IN SUPPORT OF**
**PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................. iii

INTRODUCTION ............................................................................................................... 1

BACKGROUND ................................................................................................................. 4

    A.    The Federal Government Adopts Policies to Promote Competition in the Transmission of Electricity ............................................................ 4

    B.    LSP Successfully Competes for and Carries Out Regionally Planned Transmission Projects in Indiana and Beyond ........................................... 7

    C.    Indiana Attempts to Insulate In-State Transmission Owners from Out-of-State Competition by Enacting HEA 1420 ........................................... 8

    D.    MISO Prepares to Approve a Massive Tranche of New Electric Transmission Projects, Including Numerous Projects in Indiana ......................... 11

ARGUMENT ................................................................................................................... 12

I.    Plaintiffs Are Highly Likely To Succeed On Their Commerce Clause Claim ................. 13

    A.    HEA 1420 Discriminates Against Interstate Commerce on Its Face, in Its Effects, and in Its Purpose ............................................................... 13

    B.    HEA 1420 Cannot Survive Strict Judicial Scrutiny ..................................... 18

II.    Plaintiffs Will Be Irreparably Injured If They Are Barred From Competing For New Projects in Indiana ......................................................................... 21

III.    The Remaining Factors Overwhelmingly Weigh In Favor Of Injunctive Relief .............. 23

CONCLUSION ................................................................................................................. 24

# TABLE OF AUTHORITIES

**Cases**

*ACLU of Ill. v. Alvarez,*
   679 F.3d 583 (7th Cir. 2012) ................................................................ 24

*Am. Libr. Ass'n v. Pataki,*
   969 F.Supp. 160 (S.D.N.Y. 1997) ........................................................ 23

*Bacchus Imports, Ltd. v. Dias,*
   468 U.S. 263 (1984) ................................................................... 13, 17

*BST Holdings, LLC v. OSHA,*
   17 F.4th 604 (5th Cir. 2021) ................................................................. 22

*C&A Carbone, Inc. v. Town of Clarkstown,*
   511 U.S. 383 (1994) ................................................................... 15, 16

*Camps Newfound/Owatonna, Inc. v. Town of Harrison,*
   520 U.S. 564 (1997) .......................................................... 2, 13, 17, 19

*Citicorp Servs., Inc. v. Gillespie,*
   712 F.Supp. 749 (N.D. Cal. 1989) ........................................................ 23

*City of Philadelphia v. New Jersey,*
   437 U.S. 617 (1978) ............................................................................ 1

*Dennis v. Higgins,*
   498 U.S. 439 (1991) .......................................................................... 23

*Dobbin Plantersville Water Supply Corp. v. Lake,*
   108 F.4th 320 (5th Cir. 2024) ............................................................. 22

*Doe v. Univ. of Cincinnati,*
   872 F.3d 393 (6th Cir. 2017) .............................................................. 22

*Eli Lilly & Co. v. Cochran,*
   526 F.Supp.3d 393 (S.D. Ind. 2021) .................................................... 23

*Emera Me. v. FERC,*
   854 F.3d 662 (D.C. Cir. 2017) ............................................................ 24

*Fam. Winemakers of Cal. v. Jenkins,*
   592 F.3d 1 (1st Cir. 2010) .................................................................. 17

*FERC v. Elec. Power Supply Ass'n,*
   577 U.S. 260 (2016) ............................................................................ 4

*Fort Gratiot Sanitary Landfill, Inc. v. Mich. Dep't of Nat. Res.*,
    504 U.S. 353 (1992) ........................................................................... 16

*Fulton Corp. v. Faulkner*,
    516 U.S. 325 (1996) ........................................................................... 13

*Gerling Glob. Reinsurance Corp. of Am. v. Low*,
    240 F.3d 739 (9th Cir. 2001) ........................................................... 3, 22

*Gov't Suppliers Consolidating Servs., Inc. v. Bayh*,
    734 F.Supp. 853 (S.D. Ind. 1990) ...................................................... 23

*Granholm* or *Dean Milk Co. v. City of Madison*,
    340 U.S. 349 (1951) ........................................................................... 15

*Granholm v. Heald*,
    544 U.S. 460 (2005) ........................................................................ 1, 19

*Hernandez v. Sessions*,
    872 F.3d 976 (9th Cir. 2017) ............................................................. 22

*Hughes v. Oklahoma*,
    441 U.S. 322 (1979) ............................................................................. 1

*Ill. Republican Party v. Pritzker*,
    973 F.3d 760 (7th Cir. 2020) ............................................................. 12

*Ind. Fine Wine & Spirits, LLC v. Cook*,
    459 F.Supp.3d 1157 (S.D. Ind. 2020) ................................. 2, 3, 22, 23

*Karem v. Trump*,
    960 F.3d 656 (D.C. Cir. 2020) ........................................................... 23

*Kendall-Jackson Winery, Ltd. v. Branson*,
    82 F.Supp.2d 844 (N.D. Ill. 2000) ..................................................... 23

*Lebamoff Enters., Inc. v. Rauner*,
    909 F.3d 847 (7th Cir. 2018) ............................................................. 19

*Lewis v. BT Inv. Managers, Inc.*,
    447 U.S. 27 (1980) ............................................................................. 14

*Lewis v. Clarke*,
    581 U.S. 155 (2017) ........................................................................... 22

*LSP Transmission Holdings, LLC v. Sieben*,
    954 F.3d 1018, 1028 (8th Cir. 2020) ................................................. 14

*Maine v. Taylor*,
    477 U.S. 131 (1986) ................................................................ 21

*MISO Transmission Owners v. FERC*,
    819 F.3d 329 (7th Cir. 2016) ................................................ *passim*

*Morehouse Enters., LLC v. ATF*,
    78 F.4th 1011 (8th Cir. 2023) ................................................ 23

*NA Main St. LLC v. Cook*,
    508 F.Supp.3d 320 (S.D. Ind. 2020) ....................... 2, 3, 22, 23

*Nat'l Pork Producers Council v. Ross*,
    598 U.S. 356 (2023) ................................................................ 21

*NextEra Energy Cap. Holdings, Inc. v. Lake*,
    48 F.4th 306 (5th Cir. 2022) ................................................ *passim*

*Nken v. Holder*,
    556 U.S. 418 (2009) ................................................................ 23

*Okla. Gas & Elec. Co. v. FERC*,
    827 F.3d 75 (D.C. Cir. 2016) ................................................ 24

*Or. Waste Sys., Inc. v. Dep't of Env't Quality of Or.*,
    511 U.S. 93 (1994) ................................................................ 13

*Preston v. Thompson*,
    589 F.2d 300 (7th Cir. 1978) ................................................ 22

*Regan v. City of Hammond*,
    934 F.3d 700 (7th Cir. 2019) ................................................ 16

*S.C. Pub. Serv. Auth. v. FERC*,
    762 F.3d 41, 68 (D.C. Cir. 2014) ......................................... 3, 5

*Tenn. Wine & Spirits Retailers Ass'n v. Thomas*,
    588 U.S. 504 (2019) ........................................................ 13, 15

*W. Lynn Creamery, Inc. v. Healy*,
    512 U.S. 186 (1994) ................................................................ 13

*Winter v. Nat. Res. Def. Council*,
    555 U.S. 7 (2008) ................................................................... 12

**Constitutional Provision**

U.S. Const. art. I, §8, cl.3 ................................................................ 13

**Statutes and Regulations**

16 U.S.C. §824(b)(1) ................................................................................ 4

Ind. Code §8-1-2-4 ................................................................................ 19

Ind. Code §8-1-38-2 ...................................................................... 1, 14, 16

Ind. Code §8-1-38-7 ................................................................................ 9

Ind. Code §8-1-38-9 .................................................................. 1, 10, 13, 14

Ind. Code §8-1-38-9(a) ......................................................................... 10

Ind. Code §8-1-38-9(c) ......................................................................... 10

Ind. Code §8-1-38-9(d) ......................................................................... 20

2013 Ind. Legis. Serv. P.L. 174, §§2, 3, 9 .......................................... 9

18 C.F.R. §35.34(k)(7) ......................................................................... 5

170 Ind. Admin. Code 4-1-23 .............................................................. 20

**Other Authorities**

FERC, *Electric Power Markets* (May 16, 2023), https://archive.ph/wip/IsJlI .............................. 5

Donald L. R. Goodson, *Toward a Unitary Commerce Clause: What the Negative Commerce Clause Reveals About the Commerce Power*, 61 Clev. St. L. Rev. 745 (2013) ........................................................................... 21

*Hearing on HEA 1420 Before S. Utils. Comm.*, 2023 Leg. (Ind. Apr. 13, 2023), https://tinyurl.com/yc56r2az ........................................ 17, 19, 20

*Midcontinent Independent System Operator*, 172 FERC ¶61,095 (July 20, 2020) ............... 20, 21

*Midcontinent Independent System Operator, Inc.*, 142 FERC ¶61,215 (Mar. 22, 2013) ........................................................................... 6

MISO, *Competitive Transmission Administration*, https://tinyurl.com/52m9w7sh (last visited Sept. 30, 2024) ................................................................ 7

MISO, FERC Electric Tariff (Sept. 26, 2024), https://tinyurl.com/mr2ha47c ............... 6, 9, 20, 22

MISO, *Long Range Transmission Planning*, https://tinyurl.com/3hct4dae (last visited Sept. 30, 2024) ................................................................ 11

MISO, *LRTP Tranche 2.1 Portfolio Update* 2 (Sept. 24, 2024),
https://tinyurl.com/5xdwrum3 ................................................................. 10, 12, 21, 22

MISO, Press Release, *MISO Board Approves $10.3B in Transmission Projects:
Tranche 1 Portfolio Focused on Midwest Subregion* (July 25, 2022),
https://tinyurl.com/n9vbrrjh ............................................................................... 7, 11

MISO, *Selection Report: Duff-Coleman EHV 345 kV Competitive Transmission
Project* (Dec. 20, 2016), https://tinyurl.com/7khvstjy ........................................... 18

MISO, *Selection Report: Hiple to IN/MI State Border 345 kV Competitive
Transmission Project* at i (May 11, 2023), https://tinyurl.com/5ac378zx ........................ 8, 18

MISO, Sys. Planning Comm. of the Bd. of Dirs., *Reliability Imperative: Long
Range & Interregional Transmission Planning* (Sept. 17, 2024) ............................... 11, 12, 21

PJM Inside Lines, *Artificial Island Project Nears Completion* (Apr. 2, 2021),
https://archive.ph/wip/ofSkv ..................................................................................... 7

*Promoting Wholesale Competition Through Open Access Non-discriminatory
Transmission Services by Public Utilities; Recovery of Stranded Costs by
Public Utilities and Transmitting Utilities*, 75 FERC ¶61,080, 61 Fed. Reg.
21,540 (Apr. 24, 1996) ............................................................................................... 4

*Regional Transmission Organizations*, 89 FERC ¶61,285 (Dec. 20, 1999) ................................... 4

Corina Rivera-Linares, *MISO: Republic Transmission Energized 345-kV Duff to
Coleman Line on June 11*, T&D World (June 12, 2020),
https://archive.ph/wip/aCkj3 ....................................................................................... 8

Casey Smith, *In Close Vote, Indiana Senate Committee Advances "Right of First
Refusal" Utilities Bill*, Ind. Cap. Chron. (Apr. 14, 2023),
https://tinyurl.com/yc3zh9zc ........................................................................................ 9

*Transmission Planning and Cost Allocation by Transmission Owning and
Operating Public Utilities*, Order No. 1000, 136 FERC ¶61,051
(July 21, 2011) .............................................................................................. 5, 6, 23

## INTRODUCTION

Indiana House Enrolled Act 1420 of 2023 ("HEA 1420") expressly reserves lucrative business opportunities in interstate markets for entities with an existing physical presence in Indiana, to the detriment of all out-of-state competitors.  The very terms of HEA 1420 openly discriminate against interstate commerce:  The statute gives an "incumbent electric transmission owner"—defined as a company that already "owns, operates, and maintains an electric transmission facility in whole or in part in Indiana"—the exclusive "right to construct, own, operate, and maintain" any new transmission facility that has been approved by a federally regulated manager of a multistate power grid and that will "connect[] to" one of the incumbent's existing facilities.  Ind. Code §§8-1-38-2, 8-1-38-9.  In effect, HEA 1420 insulates Indiana's favored few public utilities from out-of-state competition, ensuring that in-state entities will obtain *billions* of dollars' worth of projects to build new *interstate* transmission lines over the next several years.  That is no accident; it is exactly what the Indiana legislature intended.  HEA 1420's proponents openly touted the bill as funneling business to "Hoosiers" instead of outsiders from "who knows where."  In short, HEA 1420 is an avowedly protectionist measure that plainly discriminates against interstate commerce on its face, in its effects, and in its purpose.  In fact, the Fifth Circuit recently held that a Texas law creating a nearly identical right of first refusal "discriminates against interstate commerce."  *See NextEra Energy Cap. Holdings, Inc. v. Lake*, 48 F.4th 306, 320-26 (5th Cir. 2022), *cert. denied*, 144 S.Ct. 485 (2023).

Plaintiffs are thus overwhelmingly likely to prevail on their claim that HEA 1420 is unconstitutional.  "State laws that discriminate against interstate commerce face 'a virtually *per se* rule of invalidity,'" *Granholm v. Heald*, 544 U.S. 460, 476 (2005) (quoting *City of Philadelphia v. New Jersey*, 437 U.S. 617, 624 (1978)), and are "generally struck down … without further inquiry," *id.* at 487; *see Hughes v. Oklahoma*, 441 U.S. 322, 337 (1979) ("Such facial

discrimination by itself may be a fatal defect[.]").  To the extent any further inquiry is appropriate, discriminatory laws receive the "strictest scrutiny" and will be held unconstitutional unless the state carries the "extremely difficult burden" of proving that the law "advances a legitimate local purpose that cannot be adequately served by reasonable nondiscriminatory alternatives." *Camps Newfound/Owatonna, Inc. v. Town of Harrison*, 520 U.S. 564, 581-82 (1997).  Here, the state cannot come close to carrying that heavy burden.  Indeed, HEA 1420 fails to meaningfully advance *any* legitimate local objective.  *See MISO Transmission Owners v. FERC*, 819 F.3d 329, 333-35 (7th Cir. 2016) (concluding that a similar right-of-first-refusal law served only incumbents' interest in "protecting themselves from competition in transmission development," to the detriment of "consumers of electricity" and "society as a whole" (emphasis omitted)).  And even if one accepted the highly dubious premise that HEA 1420 promotes speedy construction or reliable maintenance of necessary transmission lines, Indiana could easily advance those interests without barring out-of-state entrants to the market.  After all, the vast majority of states manage to deliver reliable energy to their residents without discriminating against out-of-state interests by (as here under HEA 1420) reserving valuable opportunities to a favored cadre of in-state firms.  Accordingly, Plaintiffs are very likely to succeed on their claim that HEA 1420 is unconstitutional.

There is an acute need for immediate intervention:  Unless this Court enjoins HEA before December 10, 2024, Plaintiffs will suffer significant irreparable injury.  That conclusion flows directly from the merits analysis, of course, as "it is well-established that 'the existence of a continuing constitutional violation constitutes irreparable harm.'"  *NA Main St. LLC v. Cook*, 508 F.Supp.3d 320, 331 (S.D. Ind. 2020) (brackets omitted) (applying this principle to a Commerce Clause violation); *see also, e.g.*, *Ind. Fine Wine & Spirits, LLC v. Cook*, 459 F.Supp.3d 1157, 1170 (S.D. Ind. 2020) (same).  But the constitutional harm is not the only irreparable injury Plaintiffs

face—or the reason why time is of the essence. Midwest Independent Operator System ("MISO"), which manages the grid and wholesale power market for most of Indiana and portions of 14 other states, is slated to approve approximately $21 billion in new electric transmission projects— including a number of projects located wholly or partially in Indiana, collectively valued at about $2.7 billion—when its Board of Directors meets on December 10-12, 2024. Absent preliminary relief before that date, Plaintiffs will lose the ability to compete for those unique business opportunities—a textbook irreparable injury justifying preliminary injunctive relief. *See, e.g.*, *Gerling Glob. Reinsurance Corp. of Am. v. Low*, 240 F.3d 739, 754 (9th Cir. 2001) (plaintiffs "established a likelihood of irreparable harm" where statute would block them from doing business in California); *Ind. Fine Wine & Spirits*, 459 F.Supp.3d at 1170 (lost "opportunity to establish [a] store in Indiana" constituted irreparable harm); *NA Main St.*, 508 F.Supp.3d at 333 (similar).

Finally, the equities tilt decisively in favor of a preliminary injunction. HEA 1420's anticompetitive scheme harms not only companies (like Plaintiffs) that seek to compete for new transmission projects on the interstate grid, but tens of millions of consumers across the entire MISO region. Basic economic principles dictate that suppressing competition forces consumers to pay higher rates for less efficient services, whereas competitive bidding promotes efficiency and cost savings to the benefit of consumers—a fact that a chorus of appellate courts have resoundingly echoed in recent years, including in this very context. *See, e.g.*, *MISO Transmission Owners*, 819 F.3d at 333; *S.C. Pub. Serv. Auth. v. FERC*, 762 F.3d 41, 68, 70, 74 (D.C. Cir. 2014). It is therefore clearly in the public interest to allow Plaintiffs (and others) to compete for new transmission projects in Indiana during the pendency of this litigation.

## BACKGROUND

**A.    The Federal Government Adopts Policies to Promote Competition in the Transmission of Electricity.**

In the early 20th century, electricity markets largely "operat[ed] as vertically integrated monopolies in confined geographic areas." *FERC v. Elec. Power Supply Ass'n*, 577 U.S. 260, 267 (2016). Over time, however, an interstate market for electricity developed, with resource-rich states generating electricity to sell at wholesale for transmission across state lines to local retail distributors. Congress enacted the Federal Power Act in 1935 to regulate this burgeoning interstate market. The Act gives the Federal Energy Regulatory Commission ("FERC"), formerly known as the Federal Power Commission, exclusive authority to regulate transmission and wholesale sales of electricity in interstate commerce. *See* 16 U.S.C. §824(b)(1).

Over the past 30 years, FERC has enacted a series of reforms to promote the development of competitive markets. In 1996, FERC issued Order No. 888, which ordered any facility that connects to the interstate grid to unbundle its wholesale generation and transmission services and allow access to its transmission lines on a non-discriminatory basis. *See Promoting Wholesale Competition Through Open Access Non-discriminatory Transmission Services by Public Utilities; Recovery of Stranded Costs by Public Utilities and Transmitting Utilities*, 75 FERC ¶61,080, 61 Fed. Reg. 21,540 (Apr. 24, 1996). Order No. 888 also promoted the concept of an independent system operator ("ISO") that would independently operate the transmission systems of multiple transmission owners in a geographic area. 61 Fed. Reg. at 21,551-52, 21,560, 21,593-97. In 1999, FERC built on the ISO concept by issuing Order No. 2000, which encouraged owners of electric transmission systems in interstate commerce to voluntarily form regional transmission organizations ("RTOs") that are similar to ISOs but have additional responsibilities. *See Regional Transmission Organizations*, 89 FERC ¶61,285 (Dec. 20, 1999). Both ISOs and RTOs are

nongovernmental entities vested with authority, through FERC-approved agreements and tariffs, to operate interstate transmission grids on a regional basis. ISOs and RTOs are largely owned by the electric utilities serving the territories within their footprints, which have transferred operational control over their respective transmission assets to the ISO or RTO. One of the key roles of an ISO or RTO is to conduct regional planning for the transmission facilities within its footprint, ensuring the reliability of the system and providing transmission access to wholesale power at reasonable costs. *See* 18 C.F.R. §35.34(k)(7); FERC, *Electric Power Markets* (May 16, 2023), https://archive.ph/wip/IsJlI; *MISO Transmission Owners*, 819 F.3d at 332 ("Regional Transmission Organizations, such as MISO, emerged because transmitting the right amounts of electricity to the right places to serve consumers requires coordinating transmission throughout a region, and an independent system operator can coordinate the transmission system in a way that among other things promotes competition among the producers of electrical power.").

For more than a decade after FERC issued Order No. 2000, many federally regulated ISOs and RTOs had tariffs or agreements that included provisions—known as rights of first refusal—through which incumbent utilities gave themselves a right to construct any new transmission facilities in their service areas. *See S.C. Pub. Serv. Auth.*, 762 F.3d at 71-72. In July 2011, however, FERC issued Order No. 1000, which, among other things, required that any provision granting a right of first refusal for new regional transmission facilities be removed from FERC-approved tariffs and agreements. *See Transmission Planning and Cost Allocation by Transmission Owning and Operating Public Utilities*, Order No. 1000, 136 FERC ¶61,051 (July 21, 2011) ("Order No. 1000"), *order on reh'g and clar.*, Order No. 1000-A, 139 FERC ¶61,132 (May 17, 2012), *order on reh'g and clar.*, Order No. 1000-B, 141 FERC ¶61,044 (Oct. 18, 2012).

FERC determined in Order No. 1000 that leaving these "federal" (i.e., federally sanctioned) rights of first refusal in place "would allow practices that have the potential to undermine the identification and evaluation of a more efficient or cost-effective solution to regional transmission needs, which in turn can result in rates for [FERC]-jurisdictional services that are unjust and unreasonable." *Id.* ¶7. FERC further concluded that "federal rights of first refusal in favor of incumbent transmission providers deprive customers of the benefits of competition in transmission development, and associated potential savings." *Id.* ¶285. FERC also received numerous comments supporting the elimination of federal rights of first refusal. *See, e.g.*, *id.* ¶231 & n.202.

In compliance with Order No. 1000—and over the objections of incumbent transmission owners—RTOs and ISOs revised their transmission owner agreements and open access tariffs to remove right of first refusal provisions. *See, e.g.*, *Midcontinent Independent System Operator, Inc.*, 142 FERC ¶61,215, ¶¶1, 7 (Mar. 22, 2013). RTOs and ISOs also created competitive solicitation processes to select developers for new transmission projects and created rules governing system-wide cost allocation for new projects. *See, e.g.*, *id.* ¶¶334-44. Through these cost-allocation mechanisms, the costs of a regionally planned project that is located entirely within one state may be allocated across all or a substantial part of the grid operator's multistate region. Under the MISO tariff, for example, the costs of "Multi-Value Projects" are allocated across all 15 states in the MISO region because this type of project supports a range of system-wide public policies (e.g., promoting renewable energy) and provides widespread reliability, public-policy, and economic benefits across the MISO footprint. *See* MISO, FERC Electric Tariff, Attachment FF, §III.A.2.g (Sept. 26, 2024), https://tinyurl.com/mr2ha47c ("MISO Tariff"). The costs of certain other long range transmission projects are allocated over the nine states in MISO's Midwest Subregion—namely, Illinois, Indiana, Iowa, Michigan, Minnesota, Missouri, North Dakota, South

Dakota, and Wisconsin.  *See* MISO, Press Release, *MISO Board Approves $10.3B in Transmission Projects:    Tranche 1 Portfolio Focused on Midwest Subregion* (July 25, 2022), https://tinyurl.com/n9vbrrjh.

### B.    LSP Successfully Competes for and Carries Out Regionally Planned Transmission Projects in Indiana and Beyond.

In addition to opening transmission projects up to greater competition, Order No. 1000 mandated a qualification process through which entities may become eligible to be assigned a new transmission project by an ISO or RTO.  Many LSP subsidiaries and affiliates have completed that qualification process, which requires prospective transmission developers to clearly outline rigorous technical, managerial, and financial capabilities.  Decl. of Sharon K. Segner ("Ex. A") ¶¶3-5; *see, e.g.*, MISO, *Competitive Transmission Administration*, https://tinyurl.com/52m9w7sh (last visited Sept. 30, 2024).  LSP entities are currently qualified as transmission developers in nine planning regions encompassing dozens of states from New York to California.  Ex. A ¶4.  This includes both of the regions that serve Indiana:  Four LSP companies—Verdant Plains Electric, LLC, Republic Transmission, LLC ("Republic"), Cardinal Point Electric, LLC, and LSP Midcontinent, LLC (a plaintiff in this case)—are qualified in MISO, which serves most of Indiana, while Central Transmission (also a plaintiff) is qualified in PJM Interconnection, LLC ("PJM"), which serves portions of northern Indiana.  Ex. A ¶5.

What is more, LSP entities have been selected as the more efficient or cost-effective transmission developer for several new Order No. 1000 projects.  In July 2015, LSP affiliate Silver Run Electric won the first competitive solicitation in PJM—"a 230 kV line under the Delaware River from Artificial Island to Delaware and a new substation in Delaware."  PJM Inside Lines, *Artificial Island Project Nears Completion* (Apr. 2, 2021), https://archive.ph/wip/ofSkv.    In December 2016, LSP affiliate Republic was selected over 10 other bidders for the first competitive

transmission project in MISO: a 31-mile, 345 kV transmission line between southern Indiana and western Kentucky, known as the Duff-Coleman Project. Republic completed that project in June 2020—more than six months ahead of schedule. *See* Corina Rivera-Linares, *MISO: Republic Transmission Energized 345-kV Duff to Coleman Line on June 11*, T&D World (June 12, 2020), https://archive.ph/wip/aCkj3.

In May 2023, Republic won another competitive MISO transmission project in Indiana, known as the Hiple to Indiana/Michigan State Border project (or just the "Hiple project"). This time, MISO chose Republic's proposal over six others, concluding that Republic "had a well-supported project implementation cost estimate, a superior revenue requirement commitment, and a well-reasoned routing strategy." MISO, *Selection Report: Hiple to IN/MI State Border 345 kV Competitive Transmission Project* at i (May 11, 2023), https://tinyurl.com/5ac378zx.

In sum, LSP and its subsidiaries and affiliates have shown that they are willing, capable, and competitive players in the transmission development field and that they consistently deliver significant benefits to consumers when given the opportunity to compete under Order No. 1000, as compared to transmission projects where incumbents are assigned the project without competition.

**C.    Indiana Attempts to Insulate In-State Transmission Owners from Out-of-State Competition by Enacting HEA 1420.**

Incumbent utilities have not taken Order No. 1000's competitive transmission mandate lying down. Even before HEA 1420, Indiana utilities stretched Order No. 1000 for all it is worth. Electric transmission is complicated, and there are different types of projects subject to different rules and regulations. At one end of the spectrum are "multi-value projects, which are larger, have a regional focus, and benefit from regional cost sharing." *MISO Transmission Owners*, 819 F.3d at 335. At the other end of the spectrum are "baseline reliability projects," which are smaller and

have a more localized focus.  *Id.*  In between are "market efficiency projects," such as the Duff-Coleman project.  *See* MISO Tariff, Attachment F, §§II.B, III.A.2.f.  Despite "FERC's abrogation of the right of first refusal in the MISO Transmission Owners Agreement," "FERC has allowed the transmission companies … authorized to build [baseline reliability] projects"—those that are typically smallest and entirely within one state—"to retain a right of first refusal because the costs … to consumers are limited to the service area of the company that builds the project rather than allocated across an entire region."  *Id.*

In line with FERC's limited allowance, in 2013 the Indiana legislature passed a new law that provided a right of first refusal for a "local reliability electric transmission facility," but—consistent with Order No. 1000—not for multi-value projects or market efficiency projects.  2013 Ind. Legis. Serv. P.L. 174, §§2, 3, 9.  The 2013 law also provided a process for new transmission providers to compete for projects in Indiana, subject to being certified as a "public utility" under Indiana law.  *See* Ind. Code §8-1-38-7.  (That is how LSP-affiliate Republic came to be an Indiana public utility.)  But following Republic's successful bid for, and successful completion of, the Duff-Coleman project, Indiana utilities lobbied the Indiana legislature to go a crucial step further and help them stave off the increased competition fostered by FERC's recent actions.  *See, e.g.*, Casey Smith, *In Close Vote, Indiana Senate Committee Advances "Right of First Refusal" Utilities Bill*, Ind. Cap. Chron. (Apr. 14, 2023), https://tinyurl.com/yc3zh9zc.

Indiana lawmakers responded by enacting HEA 1420, which attempts to reverse the competitive system created by Order No. 1000 by granting incumbents essentially the same rights of first refusal for *all* Order No. 1000 projects, including those FERC has found to impede just and reasonable rates for interstate transmission.  Under HEA 1420, "[a]n incumbent electric transmission owner has the right to construct, own, operate, and maintain" any "electric

transmission facility that has been approved for construction through a regional transmission organization planning process"—i.e., by an ISO managing the *inter*state grid—whenever the new project "connects to an electric transmission facility owned by the incumbent."  Ind. Code §8-1-38-9(a).  An incumbent may take advantage of this right of first refusal by giving notice that it is exercising its (anticompetitive) right to the Indiana Utility Regulatory Commission, which then oversees the project until completion.  Only if the incumbent "gives notice of [its] intent not to construct the approved electric transmission facility" may the relevant ISO (i.e., MISO or PJM) award the new project through the competitive process described in its FERC-approved tariff.  *Id.* §8-1-38-9(c).

HEA 1420 will primarily benefit just a handful of entities that have a particularly large and significant physical presence in Indiana—namely, those that own electricity substations.  While companies that own transmission lines, but not substations, in Indiana may enjoy some rights of first refusal under HEA 1420, most new approved transmission lines begin or end at—and thus unquestionably "connect to"—an existing substation.  *See* Ind. Code §8-1-38-9; *cf.* MISO, *LRTP Tranche 2.1 Portfolio Update* 2 (Sept. 24, 2024) ("Ex.C"), https://tinyurl.com/5xdwrum3.

LSP affiliate Republic illustrates just how discriminatory HEA 1420 is.  As noted above, the Commission has certified Republic as an Indiana public utility, and Republic recently completed one new transmission line in southern Indiana and won a competitive bid for a second transmission line from northern Indiana to the Michigan border.  Republic is nevertheless barred from competing for a host of new MISO- or PJM-approved projects in Indiana that do not happen to connect to Republic's existing transmission lines, *even though Republic has already been certified by the state and has already demonstrated its effectiveness as a provider in the state*.

In practical effect, then, the statute exclusively benefits those with an existing physical presence in Indiana by giving them the right to build and operate new transmission lines in Indiana that are planned by a FERC-regulated ISO and serve (and are paid for by) consumers across multiple states. Indeed, by its terms, HEA 1420 applies *only* to these federally regulated instrumentalities of interstate commerce. In other words, the law squelches the very competition that Order No. 1000 sought to usher in.

### D.    MISO Prepares to Approve a Massive Tranche of New Electric Transmission Projects, Including Numerous Projects in Indiana.

HEA 1420 took effect on July 1, 2023. Ever since, it has posed a looming threat to Plaintiffs' interest in building new MISO- or PJM-approved transmission facilities that would be subject to competitive bidding but for Indiana's new law. But with several such projects on the verge of approval, that threat is now poised to come to fruition.

To address ballooning energy demands and weaknesses in the existing electric grid, MISO is currently engaged in a long-term wave of investment through its Long Range Transmission Planning ("LRTP") initiative. *See* MISO, *Long Range Transmission Planning*, https://tinyurl.com/3hct4dae (last visited Sept. 30, 2024). Shortly before HEA 1420 went into effect, MISO approved Tranche 1 of the LRTP—a slew of new projects worth approximately $10.3 billion, including the Hiple project that was competitively awarded to Republic. Ex.A ¶6; MISO, *MISO Board Approves $10.3B in Transmission Projects*, *supra*. MISO is now in the final stages of planning its Tranche 2.1 portfolio, which is expected to be even bigger than Tranche 1— approximately $21 billion of overall investment. MISO, Sys. Planning Comm. of the Bd. of Dirs., *Reliability Imperative: Long Range & Interregional Transmission Planning* 11 (Sept. 17, 2024) ("Ex.B"), https://tinyurl.com/2t3y59y8. MISO has indicated that on December 10-12, 2024, its

Board of Directors will approve the Tranche 2.1 portfolio, which includes approximately $2.7 billion of new projects wholly or partially located in Indiana.  Ex.A ¶7; Ex.B at 2, 13; Ex.C at 2.

As a result of HEA 1420, projects that MISO would otherwise award competitively—selecting the developer based on benefits and costs to energy consumers across the region—will instead be made available only to the select in-state entities that already own the facilities (in Indiana) to which the new transmission line connects.  Ex.A ¶8; MISO Tariff, Attachment FF, §VIII.A.1.  MISO will thus be required to award all Indiana projects in Tranche 2.1 to companies with an existing physical presence in the state, precluding out-of-state entities from entering the portion of the interstate market crossing Indiana and increasing energy costs for consumers in *all* MISO states.  Plaintiffs now move for a preliminary injunction that would allow them to compete for these (and other) new projects during the pendency of this litigation.

## ARGUMENT

"A plaintiff seeking a preliminary injunction must establish [1] that he is likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in his favor, and [4] that an injunction is in the public interest." *Ill. Republican Party v. Pritzker*, 973 F.3d 760, 762 (7th Cir. 2020) (quoting *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 20 (2008)).  All four factors point strongly in the same direction here. First and foremost, Plaintiffs are overwhelmingly likely to succeed on the merits, as HEA 1420 discriminates against interstate commerce and cannot survive the strict scrutiny such laws face. Second, Plaintiffs face a fast-approaching threat of irreparable injury:  Absent judicial intervention, LSP and its affiliates stand to be barred from competing for several new electric transmission projects in Indiana that MISO is slated to approve on December 10-12, 2024.  Finally, the remaining equitable factors weigh in favor of an injunction, as HEA 1420 harms not only out-of-state companies like LSP, but also millions of consumers who will bear the costs of Indiana's

anticompetitive scheme.  This Court should preliminarily enjoin HEA 14020 and allow Plaintiffs to compete for new projects during the pendency of this litigation.

## I.    Plaintiffs Are Highly Likely To Succeed On Their Commerce Clause Claim.

The Supreme Court has "long held" (and recently reaffirmed) that the Commerce Clause, U.S. Const. art. I, §8, cl.3, "prevents the States from adopting protectionist measures and thus preserves a national market for goods and services." *Tenn. Wine & Spirits Retailers Ass'n v. Thomas*, 588 U.S. 504, 514 (2019).  A state law that discriminates against interstate commerce— whether on its face, in its effects, or in its purpose—is "virtually *per se* invalid." *Fulton Corp. v. Faulkner*, 516 U.S. 325, 331 (1996) (quoting *Or. Waste Sys., Inc. v. Dep't of Env't Quality of Or.*, 511 U.S. 93, 99 (1994)); *see W. Lynn Creamery, Inc. v. Healy*, 512 U.S. 186, 194-97, 201-02 (1994); *Bacchus Imports, Ltd. v. Dias*, 468 U.S. 263, 270-71 (1984).  Such discriminatory laws receive the "strictest scrutiny" and will be held unconstitutional unless the state carries the "extremely difficult burden" of proving that the law "advances a legitimate local purpose that cannot be adequately served by reasonable nondiscriminatory alternatives." *Camps Newfound*, 520 U.S. at 581-82.  Here, Plaintiffs are overwhelmingly likely to succeed on the merits of their Commerce Clause claim because HEA 1420 openly discriminates against interstate commerce and does not serve any legitimate purpose—let alone a legitimate purpose that cannot be achieved any other way.

### A.    HEA 1420 Discriminates Against Interstate Commerce on Its Face, in Its Effects, and in Its Purpose.

HEA 1420 plainly regulates interstate commerce and its instrumentalities, as the law by its terms applies *exclusively* to an "electric transmission facility that has been approved for construction through a regional organization planning process," Ind. Code §8-1-38-9—i.e., a project that has been approved through a federally mandated ISO/RTO planning process and will

form a part of multi-state transmission grid. The law applies even when those projects cross state lines, and even when (as is often the case) the costs of those projects are allocated among consumers across multiple different states. Thus, whether or not they "run entirely within" Indiana, the new lines that HEA 1420 covers are "instrumentalities of interstate commerce" used for the provision of interstate services. *Lake*, 48 F.4th at 321.

HEA 1420 facially discriminates against out-of-state entities like Plaintiffs and their affiliates by effectively prohibiting them from building transmission lines in Indiana. The statute contains restrictive in-state presence requirements, explicitly limiting new transmission development to "incumbent transmission owner[s]"—that is, "public utilit[ies]" that already "own[], operate[], and maintain[]" "electric transmission facilit[ies] in whole or in part *in Indiana*." Ind. Code §8-1-38-2 (emphasis added). In other words, HEA 1420 bestows special, exclusive benefits on those who already own transmission facilities in Indiana, to the detriment of all potential out-of-state competitors. *See id.* §8-1-38-9. By granting such benefits to those with an existing physical presence in Indiana, HEA 1420 facially "discriminates against interstate commerce"—as the Fifth Circuit recently held when faced with a nearly identical Texas law. *Lake*, 48 F.4th at 325; *see Lewis v. BT Inv. Managers, Inc.*, 447 U.S. 27, 42 n.9 (1980) ("[D]iscrimination based on the extent of local operations is itself enough to establish the kind of local protectionism" that implicates the Commerce Clause.).[1]

HEA 1420 is not materially different in this respect from the Tennessee law that the

---

[1] The Eighth Circuit reached a contrary conclusion in *LSP Transmission Holdings, LLC v. Sieben*, holding a similar Minnesota right-of-first-refusal law not facially discriminatory on the theory that it "applie[d] evenhandedly to all entities, regardless of whether they are Minnesota-based entities or based elsewhere." 954 F.3d 1018, 1028 (8th Cir. 2020). As the Fifth Circuit explained in *Lake*, however, the Eighth Circuit's "focus on where a company is 'based,' which could mean either where it is incorporated or headquartered, is irreconcilable with Supreme Court dormant Commerce Clause jurisprudence addressing physical-presence requirements." 48 F.4th at 323-34.

Supreme Court held unconstitutional in *Tennessee Wine*. That law "plainly favor[ed] Tennesseans over nonresidents" by requiring companies that wanted to own or operate a liquor store in Tennessee to first establish an in-state presence. 588 U.S. at 518. HEA 1420 similarly favors Indiana entities over out-of-staters by requiring companies that want to own or operate a new transmission line in Indiana to already have an in-state presence. Indeed, the discrimination here is even more blatant than in *Tennessee Wine*, because Tennessee at least allowed out-of-staters to establish an in-state presence, whereas HEA 1420 effectively boxes out all transmission providers who are not already present in Indiana. *Cf. Lake*, 48 F.4th at 324-25 ("[A]n incumbency requirement is a more anticompetitive version of the in-state presence requirements held unconstitutional in *Granholm* or *Dean Milk* [*Co. v. City of Madison*, 340 U.S. 349 (1951)]."). And nothing about the Commerce-Clause-violating discrimination (as opposed to the possible Twenty-first-Amendment-based justification) in *Tennessee Wine* was limited to alcohol. The Supreme Court found it obvious that Tennessee's law "could not be sustained if it applied across the board to all those seeking to operate any retail business in the State." *Tenn. Wine*, 588 U.S. at 539. And the impact on interstate commerce here is even more pronounced than in cases involving run-of-the-mill retail businesses. After all, "transmission lines that are part of an interstate grid are much closer to the heartland of interstate commerce than the wine stores, dairies, or waste processing facilities that have faced dormant Commerce Clause scrutiny." *Lake*, 48 F.4th at 321.

HEA 1420 also runs headlong into the Supreme Court's numerous Commerce Clause cases invalidating state or municipal "flow control" laws. In *C&A Carbone, Inc. v. Town of Clarkstown*, 511 U.S. 383 (1994), for example, a local law required all solid waste collected in the town to be delivered to a designated in-town transfer station or processing facility, which the town justified on the ground that the economic viability of the facility depended on an adequate supply of waste.

*Id.* at 386.  The Court invalidated the law, holding that laws that grant an absolute preference to a particular local interest at the expense of all others violate the Commerce Clause because they "depriv[e] competitors, including out-of-state firms, of access to a local market."  *Id.*; *see also Fort Gratiot Sanitary Landfill, Inc. v. Mich. Dep't of Nat. Res.*, 504 U.S. 353, 361 (1992).  Again, HEA 1420 is even more problematic, as it attempts to reserve the actual instrumentalities of interstate commerce to in-state interests.  If states and localities cannot enact facially protectionist laws to protect the waste-disposal or alcohol industries, then *a fortiori* they cannot enact facially protectionist laws when it comes to actual instrumentalities of interstate commerce.  *Lake*, 48 F.4th at 321-22.

While that facial discrimination itself suffices to render the statute virtually *per se* invalid, HEA 1420 is one of the rare state laws that is unconstitutional three ways over.  In addition to discriminating by its plain terms, HEA discriminates in its effects and purpose.  *See Regan v. City of Hammond*, 934 F.3d 700, 703 (7th Cir. 2019) (even facially neutral laws are "subject to the same demanding scrutiny" as facially discriminatory laws if they "bear more heavily on interstate than local commerce").  Start with effects.  HEA 1420's discriminatory effects flow directly and inexorably from its facially discriminatory terms:  By granting special privileges to those who already "own[], operate[], and maintain[]" "electric transmission facilit[ies] in whole or in part in Indiana," Ind. Code §8-1-38-2, the statute diverts billions of dollars of investment to a select group of in-state incumbents—at the direct expense of consumers across state lines.  Put differently, the natural consequence of HEA 1420's textual in-state presence requirement is that the beneficiaries of HEA 1420 *will all be* in-state actors in the relevant sense.  *See Lake*, 48 F.4th at 322-25 (so concluding as to similar Texas statute).  After all, the only entities that benefit from HEA 1420 are ones that have local facilities, local employees, and distinct access to local governments and state

legislators.  HEA 1420 is thus no different from a requirement that, to obtain some valuable benefit, a company own in-state property or conduct a qualifying amount of in-state business.  Once again, that is textbook discrimination.  *See Camps Newfound*, 520 U.S. at 581; *Fam. Winemakers of Cal. v. Jenkins*, 592 F.3d 1, 10-11 (1st Cir. 2010) (finding law that principally benefited in-state market discriminatory even though it benefited some out-of-state companies).

HEA 1420 was also passed for the express purpose of discriminating against out-of-state entities in favor of in-state ones.  *Cf. Bacchus Imports*, 468 U.S. at 270-71.  Indeed, its entire design is to prohibit those without an in-state presence from owning, operating, or maintaining transmission lines in the state.  The sponsor of HEA 1420, Rep. Edmond Soliday, repeatedly explained that the law gives new transmission projects to "Hoosiers we know" as opposed to companies from "somewhere else," like "Florida."  *Hearing on HEA 1420 Before S. Utils. Comm.*, 2023 Leg. 2:35:50-36:15 (Ind. Apr. 13, 2023), https://tinyurl.com/yc56r2az; *see also, e.g.*, *id.* at 26:40-55 (Sen. Yoder: "[HEA] 1420 is just giving a priority to players that we know, correct?" Rep. Soliday: "Yes.").  Other legislators explained that they were voting in favor of the law because they would rather have "folks from Indiana" build and own transmission lines, instead of people "from who knows where," because they surmised that in-state entities would be "more likely to have individuals from Indiana… working … on these lines."  *Id.* at 2:52:30-57 (Sen. Byrne); *see also id.* at 2:01:35-50 (local union members who "work side-by-side with [incumbent] utility companies" asserting that HEA 1420 would support "local workers" and the "local economy").

It also is telling that HEA 1420 was passed shortly after MISO began awarding competitive transmission projects in Indiana to transmission developers with no previous in-state presence.  In December 2016, for example, Republic was selected to build the very first new project that MISO competitively awarded in Indiana under FERC Order No. 1000, known as the Duff-Coleman

project. Ex.A ¶6. MISO evaluated comprehensive proposals from 11 companies—including five Indiana incumbents—according to four FERC-approved criteria: cost and design, project implementation, operations and maintenance, and transmission planning participation. MISO, *Selection Report: Duff-Coleman EHV 345 kV Competitive Transmission Project* 4 (Dec. 20, 2016), https://tinyurl.com/7khvstjy. MISO concluded that Republic was "the clear and decisive winner"; it scored "95 out of a possible 100 points," while "the other [10] proposals scored between 80 and 41 points." *Id.* at 3-4.

Similarly, in May 2023, Republic was selected to construct the Hiple to Indiana/Michigan State Border project, which was first new project that MISO competitively awarded in Indiana through Tranche 1 of its LRTP initiative. Ex.A ¶6. This time, Republic's proposal scored 93 out of a possible 100 points, while the six competing proposals from other transmission developers scored between 64 and 81 points. MISO, *Selection Report: Hiple to IN/MI State Border*, *supra*, at 6. MISO concluded that Republic's winning bid "had a well-supported project implementation cost estimate, a superior revenue requirement commitment, and a well-reasoned routing strategy." *Id.* at i. That very same month, Governor Holcomb signed HEA 1420 into law, thus barring this type of competition going forward.

In sum, both the legislative debate on HEA 1420 and the circumstances surrounding its enactment underscore what is already evident from the law's plain language: Indiana's law, like the nearly identical Texas law at issue in *Lake*, embodies exactly the kind of "protectionism that the Commerce Clause guards against." 48 F.4th at 326.

**B.    HEA 1420 Cannot Survive Strict Judicial Scrutiny.**

By demonstrating that HEA 1420 discriminates against interstate commerce, Plaintiffs have necessarily established that they are likely to succeed on their Commerce Clause claim. Laws that discriminate against interstate commerce are unconstitutional "in all but the narrowest

circumstances" and are "generally struck down … without further inquiry." *Granholm*, 544 U.S. at 472, 487; *see, e.g.*, *Lebamoff Enters., Inc. v. Rauner*, 909 F.3d 847, 851-52 (7th Cir. 2018). This is not one of those narrow circumstances. Defendants cannot carry their "extremely difficult burden" of demonstrating that HEA 1420 "advances a legitimate local purpose that cannot be adequately served by reasonable nondiscriminatory alternatives." *Camps Newfound*, 520 U.S. at 581-82.

As discussed, HEA 1420 was motivated by economic protectionism—the constitutionally *illegitimate* objective of giving business to "Hoosiers we know" instead of competitors from "somewhere else." *Hearing on HEA 1420* at 2:35:50-36:15; *see, e.g.*, *id.* at 2:45:30-40 (Sen. Hunley) ("What this bill really boils down to is one thing—arguing between market share for [in-state incumbents] and [out-of-state] transmission companies."). While HEA 1420's proponents gave lip service to other potentially legitimate goals, the law does not actually advance any of them. For example, the law's sponsor repeatedly urged legislators to vote for it on the ground that when transmission lines are damaged "by weather, or whatever, then it's *our* utilities [i.e., incumbents] who can restore them the most rapidly." *Id.* at 2:33:40-50 (Rep. Soliday); *see also, e.g.*, *id.* at 2:34:15-25 (Rep. Soliday) ("Do we want to, when there's a storm, go out and bid the maintenance? I don't think so."). But that rationale does not withstand the slightest scrutiny. When an out-of-state company obtains a MISO-approved project in Indiana, it enters the Indiana market, taking on the responsibility not only to build the new transmission line but also to own, operate, and maintain it in accordance with detailed federal and state regulations. Indeed, all new providers must be certified as Indiana public utilities, and all public utilities are already required by statute to furnish "reasonably adequate service and facilities," Ind. Code §8-1-2-4, and to comply with regulations addressing service interruptions, including those caused by natural

disasters, *see* 170 Ind. Admin. Code 4-1-23.  There is absolutely no reason to think that incumbents are categorically better equipped to discharge those responsibilities than new entrants to the market—especially when the statute defines "incumbents" so narrowly as to exclude in most cases companies like Republic that have already been qualified as Indiana public utilities.

As another example, the President of the Indiana Energy Association ("IEA")—the incumbent utilities' trade association—asserted that competitive bidding unduly delays time-sensitive projects.  *See Hearing on HEA 1420* at 2:04:40-05:15.  Not so:  FERC already allows MISO to exempt a project from the competitive bidding process if the project needs to be completed within 36 months of Board approval to "address an urgent reliability need." *Midcontinent Independent System Operator*, 172 FERC ¶61,095, ¶¶52, 61-64 (July 20, 2020); *see* MISO Tariff, Attachment FF, §VIII.A.3.  The projects that would be open to competition but for HEA 1420 typically take years to execute and many months to plan, which affords ample time for a competitive bidding process.  *See Hearing on HEA 1420* at 2:09:25-10:00 (testimony of former FERC official).  Moreover, incumbent utilities have no obligation to complete projects more quickly than out-of-state competitors.  Indeed, an incumbent that exercises a right of first refusal is only required to report on the project and provide estimated costs to the state regulatory commission by May of the following year.  *See* Ind. Code §8-1-38-9(d).

To the extent HEA 1420 advances any legitimate governmental interests, those interests could readily be achieved through other, nondiscriminatory alternatives.  If Indiana were truly concerned that existing regulations are not adequate to ensure rapid restoration of damaged transmission lines, it could simply impose heightened emergency preparedness requirements on all Commission-certified public utilities instead of barring new entrants to the market.  The IEA's professed concern about delaying time-sensitive projects likewise could be—and already has

been—addressed by measures far short of a blanket ban on out-of-state competition.  *See Midcontinent Independent System Operator*, 172 FERC ¶61,095, ¶¶52, 61-64.  Tellingly, the vast majority of states are able to deliver reliable energy to their residents without discriminating against interstate commerce.  *See Lake*, 48 F.4th at 326.

In short, this is not the exceedingly rare case where a state might be justified in departing from the "antidiscrimination principle [that] lies at the 'very core'" of the Supreme Court's "dormant Commerce Clause jurisprudence."  *Nat'l Pork Producers Council v. Ross*, 598 U.S. 356, 369 (2023); *see* Donald L. R. Goodson, *Toward a Unitary Commerce Clause: What the Negative Commerce Clause Reveals About the Commerce Power*, 61 Clev. St. L. Rev. 745, 766 (2013) ("*Maine v. Taylor*[, 477 U.S. 131 (1986)] is the only instance in which such a discriminatory measure survived judicial challenge.").  Because HEA 1420 has no realistic prospect of surviving strict judicial scrutiny, Plaintiffs are likely to succeed on their Commerce Clause claim.

## II.    Plaintiffs Will Be Irreparably Injured If They Are Barred From Competing For New Projects in Indiana.

LSP will suffer irreparable harm without an injunction.  MISO's Board of Directors has announced that it plans to approve approximately $21 billion in new electricity transmission projects—Tranche 2.1 of the LRTP initiative—when it meets on December 10-12, 2024.  Ex.A ¶7; Ex.B at 2, 11, 13.  Several of these projects—collectively worth approximately $2.7 billion— are wholly or partially located in Indiana.  Ex.A ¶7; Ex.C at 2.  This includes a new 765 kV transmission line from the Greentown substation in Howard County to the Sorenson substation in Huntington County; a new 765 kV transmission line from the Sorenson substation to a new substation (Lulu) in southeastern Michigan; a new 765 kV transmission line from the Reynolds substation in White County to the Woodford County substation in central Illinois; a new 345 kV transmission line from the Burr Oak substation in Marshall County to the Schahfer substation in

Jasper County; two new substations and new 345 kV transmission lines in southwest Indiana, crossing into Kentucky; and several 345 kV projects in southeast Indiana. Ex.A ¶7; Ex.C at 2. If HEA 1420 remains in effect on December 10, however, MISO will likely award all of these projects to incumbents, without giving Plaintiffs an opportunity to compete for them. Ex.A ¶8; *see* MISO Tariff, Attachment FF, §VIII.A.1.

Plaintiffs thus face an imminent threat of irreparable injury unless HEA 1420 is enjoined before December 10, 2024. Courts have repeatedly held that a company is irreparably harmed if it is disadvantaged in—let alone completely barred from—competing for business opportunities. *See, e.g.*, *Ind. Fine Wine & Spirits*, 459 F.Supp.3d at 1170 (plaintiff established irreparable harm where protectionist law threatened to deprive it of "the opportunity to establish its store in Indiana"); *Low*, 240 F.3d at 754 (similar). And Plaintiffs have no prospect of recovering damages for these lost opportunities because the Commission is a state agency that enjoys sovereign immunity and thus can be sued only for "prospective relief." *Dobbin Plantersville Water Supply Corp. v. Lake*, 108 F.4th 320, 325 (5th Cir. 2024); *see Lewis v. Clarke*, 581 U.S. 155, 162 (2017). That makes Plaintiffs' harm irreparable by definition for purposes of seeking preliminary injunctive relief. *See, e.g.*, *Ind. Fine Wine & Spirits*, 459 F.Supp.3d at 1170; *NA Main St.*, 508 F.Supp.3d at 332-33.

On top of that, Plaintiffs face irreparable injury in the form of the loss of constitutional rights. "[I]t is well-established that 'the existence of a continuing constitutional violation constitutes proof of an irreparable harm.'" *NA Main St.*, 508 F.Supp.3d at 333 (brackets omitted) (quoting *Preston v. Thompson*, 589 F.2d 300, 303 n.3 (7th Cir. 1978)); *see, e.g.*, *BST Holdings, LLC v. OSHA*, 17 F.4th 604, 618 (5th Cir. 2021); *Hernandez v. Sessions*, 872 F.3d 976, 994 (9th Cir. 2017); *Doe v. Univ. of Cincinnati*, 872 F.3d 393, 407 (6th Cir. 2017); *Karem v. Trump*, 960

F.3d 656, 667 (D.C. Cir. 2020); *Morehouse Enters., LLC v. ATF*, 78 F.4th 1011, 1017 (8th Cir. 2023).  As discussed, HEA 1420 violates the right protected by the Commerce Clause, i.e., the "right to engage in interstate trade free from restrictive state regulation."  *Dennis v. Higgins*, 498 U.S. 439, 448 (1991) (quotation marks omitted).  That is an independently sufficient basis for concluding that Plaintiffs have established irreparable injury.  *See, e.g.*, *Ind. Fine Wine & Spirits, LLC*, 459 F.Supp.4d at 1170 (dormant Commerce Clause violation constitutes *per se* irreparable injury); *NA Main St.*, 508 F.Supp.3d at 331, 333 (same); *Kendall-Jackson Winery, Ltd. v. Branson*, 82 F.Supp.2d 844, 878 (N.D. Ill. 2000) (same); *Am. Libr. Ass'n v. Pataki*, 969 F.Supp. 160, 168 (S.D.N.Y. 1997) (same); *Gov't Suppliers Consolidating Servs., Inc. v. Bayh*, 734 F.Supp. 853, 864 (S.D. Ind. 1990) (same); *Citicorp Servs., Inc. v. Gillespie*, 712 F.Supp. 749, 753-54 (N.D. Cal. 1989) (same).

**III.    The Remaining Factors Overwhelmingly Weigh In Favor Of Injunctive Relief.**

The balance-of-harms and public-interest factors "merge when, as in this case, the government is the defendant."  *Eli Lilly & Co. v. Cochran*, 526 F.Supp.3d 393, 409 (S.D. Ind. 2021) (citing *Nken v. Holder*, 556 U.S. 418, 435 (2009)).  Those factors weigh strongly in favor of preliminarily enjoining HEA 1420.

There are compelling equitable reasons to grant a preliminary injunction.  As discussed, Plaintiffs face a violation of constitutional rights for which there is not an adequate (or any) remedy at law, as well as the loss of several unique business opportunities in Indiana.  But it is not just Plaintiffs; consumers also face significant economic harm.  As FERC has explained, rights of first refusal tend to "undermine the identification and evaluation of a more efficient or cost-effective solution to regional transmission needs," resulting in rates "that are unjust and unreasonable."  Order No. 1000 ¶7; *see also id.* ¶¶231, 285.  Federal courts of appeals have likewise recognized that rights of first refusal are contrary to the public interest.  *See, e.g.*, *Lake*, 48 F.4th at 324 n.9

(recognizing that a state law that grants in-state incumbents an "exclusive right" to build new transmission lines "raises prices in the interstate market," thus harming consumers); *MISO Transmission Owners*, 819 F.3d at 333 (observing that incumbent transmission owners were not "able to articulate any benefit" that rights of first refusal would "confer on consumers of electricity or on society as a whole"); *Emera Me. v. FERC*, 854 F.3d 662, 671-72 (D.C. Cir. 2017) (upholding FERC's conclusion that "rights of first refusal harmed the public interest"); *cf. Okla. Gas & Elec. Co. v. FERC*, 827 F.3d 75, 77 (D.C. Cir. 2016) (holding that the presumption that contract rates for wholesale energy are just and reasonable does not apply to "anti-competitive rights of first refusal").

There are no meaningful equities supporting the state's position. The public obviously has no interest in paying artificially high rates for interstate transmission service. *See MISO Transmission Owners*, 819 F.3d at 333. And "the public interest is not harmed by preliminarily enjoining the enforcement of a statute that is probably unconstitutional." *ACLU of Ill. v. Alvarez*, 679 F.3d 583, 590 (7th Cir. 2012). All relevant considerations thus support allowing Plaintiffs to compete for new transmission projects in Indiana during the pendency of this litigation.

## CONCLUSION

The Court should preliminarily enjoin enforcement of HEA 1420.

24

Dated: October 2, 2024                    Respectfully submitted,


                                          /s/ Todd A. Richardson
PAUL D. CLEMENT*                          TODD A. RICHARDSON
ERIN E. MURPHY*                           JAMES E. ZOCCOLA
MATTHEW D. ROWEN*                         THOMAS JONES
JOSEPH J. DEMOTT*                         LEWIS KAPPES, P.C.
CLEMENT & MURPHY, PLLC                    One American Square
706 Duke Street                           Suite 2500
Alexandria, VA 22314                      Indianapolis, IN 46282
(202) 742-8900                            (317) 639-1210
                                          TRichardson@lewis-kappes.com
                                          JZoccola@lewis-kappes.com
                                          TJones@lewis-kappes.com

*Pro hac vice application forthcoming


                    Counsel for Plaintiffs