# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF INDIANA

| | | |
|---|---|---|
| LSP Transmission Holdings II, LLC, LS Power Midcontinent, LLC, Central Transmission, LLC, and LS Power Grid DRS Holdings, LLC, | ) ) ) ) ) | |
| *Plaintiffs*, | ) ) ) | |
| v. | ) ) | No. 1:24-cv-01722-TWP-MG |
| James F. Huston, Chairman, Indiana Utility Regulatory Commission, Wesley R. Bennett, Commissioner, Indiana Utility Regulatory Commission, Sarah E. Freeman, Commissioner, Indiana Utility Regulatory Commission, David E. Veleta, Commissioner, Indiana Utility Regulatory Commission, and David E. Ziegner, Commissioner, Indiana Utility Regulatory Commission, each in his or her official capacity, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) | |
| *Defendants*. | ) ) | |

## REPLY IN SUPPORT OF
## PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

# TABLE OF CONTENTS

TABLE OF AUTHORITIES.................................................................................................ii

INTRODUCTION ........................................................................................................... 1

ARGUMENT ................................................................................................................. 3

I.   The Commissioners' Threshold Arguments Are Meritless ................................. 3

    A.   Plaintiffs Have Article III Standing ........................................................... 3

    B.   Plaintiffs Have a Cause of Action and Are Not Collaterally Attacking Any FERC Order ..................................................................................... 6

    C.   Sovereign Immunity Does Not Bar Plaintiffs' Suit .................................... 8

II.   Plaintiffs Are Highly Likely To Succeed On Their Commerce Clause Claim ................. 11

    A.   HEA 1420 Discriminates Against Interstate Commerce in Multiple Ways, Triggering Strict Judicial Scrutiny ................................................ 11

        1.   HEA 1420 discriminates against interstate commerce on its face ......................................................................................... 12

        2.   HEA 1420 also discriminates against interstate commerce in its effects, as it uniformly benefits in-state interests at the expense of out-of-state interests .......................................................... 16

        3.   HEA 1420 was enacted for the avowedly discriminatory purpose of promoting in-state economic interests at the expense of out-of-state interests ..................................................................... 18

        4.   Intervenors' efforts to avoid Commerce Clause scrutiny fail ................... 19

    B.   HEA 1420 Cannot Survive Strict Judicial Scrutiny ................................... 23

III.   Plaintiffs Will Be Irreparably Injured If They Are Barred From Competing For New Projects in Indiana .................................................................................... 24

IV.   The Remaining Factors Overwhelmingly Weigh In Favor Of Injunctive Relief ............. 24

CONCLUSION ............................................................................................................. 25

# TABLE OF AUTHORITIES

**Cases**

*ACLU of Ill. v. Alvarez*,
  679 F.3d 583 (7th Cir. 2012) ............................................................................ 25

*All. for Clean Coal v. Bayh*,
  72 F.3d 556 (7th Cir. 1995) .............................................................................. 16

*All. for Clean Coal v. Miller*,
  44 F.3d 591 (7th Cir. 1995) ................................................................................ 3

*Am. Fed'n of Gov't Emps., Loc. 2119 v. Cohen*,
  171 F.3d 460 (7th Cir. 1999) .............................................................................. 6

*Berger v. N.C. State Conf. of NAACP*,
  597 U.S. 179 (2022) ...................................................................................... 2, 8

*C&A Carbone, Inc. v. Town of Clarkstown*,
  511 U.S. 383 (1994) .................................................................................... 13, 15

*Coal. of MISO Transmission Customers v. FERC*,
  45 F.4th 1004 (D.C. Cir. 2022) ........................................................................... 3

*Colon Health Centers of America, LLC v Hazel*,
  813 F.3d 145 (4th Cir. 2016) ............................................................................ 14

*Dean Milk Co. v. City of Madison*,
  340 U.S. 349 (1951) .................................................................................... 15, 18

*Dennis v. Higgins*,
  498 U.S. 439, 440 (1991) ............................................................................... 7, 24

*Doe v. Holcomb*,
  883 F.3d 971 (7th Cir. 2018) ........................................................................... 9, 11

*Driftless Area Land Conservancy v. Valcq*,
  16 F.4th 508 (7th Cir. 2021) ............................................................................... 8

*Ex parte Young*,
  209 U.S. 123 (1908) .......................................................................................... 8

*Florida Transportation Services, Inc. v. Miami-Dade County*,
  703 F.3d 1230 (11th Cir. 2012) ......................................................................... 13

*General Motors Corp. v. Tracy*,
  519 U.S. 278 (1997) .......................................................................... 2, 19, 20, 21

*Granholm v. Heald,*
    544 U.S. 460 (2005) ........................................................................ *passim*

*Hillside Dairy Inc. v. Lyons,*
    539 U.S. 59 (2003) ............................................................................... 22

*Hughes v. Oklahoma,*
    441 U.S. 322 (1979) ............................................................................. 23

*In re Dairy Mart Convenience Stores, Inc.,*
    411 F.3d 367 (2d Cir. 2005) ................................................................ 10

*Ind. Fine Wine & Spirits, LLC v. Cook,*
    459 F.Supp.3d 1157 (S.D. Ind. 2020) ................................................. 24

*L.A. Cnty. Bar Ass'n v. Eu,*
    979 F.2d 697 (9th Cir. 1992) ............................................................... 10

*Lapides v. Bd. of Regents of Univ. Sys. of Ga.,*
    535 U.S. 613 (2002) ............................................................................... 7

*Lewis v. BT Inv. Managers, Inc.,*
    447 U.S. 27 (1980) ............................................................................... 12

*LS Power Midcontinent, LLC v. State,*
    988 N.W.2d 316 (Iowa 2023) ................................................................ 5

*LSP Transmission Holdings, LLC v. Lange,*
    329 F.Supp.3d 695 (D. Minn. 2018) ..................................................... 8

*LSP Transmission Holdings, LLC v. Sieben,*
    954 F.3d 1018 (8th Cir. 2020) ......................................................... 8, 21

*Lujan v. Defs. of Wildlife,*
    504 U.S. 555 (1992) ............................................................................... 3

*McDaniel v. Precythe,*
    897 F.3d 946 (8th Cir. 2018) ............................................................... 10

*MISO Transmission Owners v. FERC,*
    819 F.3d 329 (7th Cir. 2016) ....................................................... 7, 22, 24

*Nat'l Pork Producers Council v. Ross,*
    598 U.S. 356 (2023) ............................................................................. 16

*NextEra Energy Cap. Holdings, Inc. v. Jackson,*
    2024 WL 46609201 (W.D. Tex. Oct. 28, 2024) .......................... 1, 6, 8, 23

*NextEra Energy Cap. Holdings, Inc. v. Lake*,
    48 F.4th 306 (5th Cir. 2022) ......................................................................... *passim*

*Norfolk Southern Corp. v. Oberly*,
    822 F.2d 388 (3d Cir. 1987) .................................................................................. 14

*Parsons v. DOJ*,
    801 F.3d 701 (6th Cir. 2015) ................................................................................... 4

*Peshek v. Johnson*,
    111 F.4th 799 (7th Cir. 2024) ........................................................................... 10, 11

*Pike v. Bruce Church, Inc.*,
    397 U.S. 137 (1970) ............................................................................................... 23

*Prairie Band Potawatomi Nation v. Wagnon*,
    476 F.3d 818 (10th Cir. 2007) ............................................................................... 10

*Preston v. Thompson*,
    589 F.2d 300 (7th Cir. 1978) ................................................................................. 24

*Reed v. Goertz*,
    598 U.S. 230 (2023) ............................................................................................... 10

*Reed v. Norfolk S. Ry. Co.*,
    740 F.3d 420 (7th Cir. 2014) ................................................................................... 7

*Regan v. City of Hammond*,
    934 F.3d 700 (7th Cir. 2019) ................................................................................. 16

*Taylor v. Salvation Army Nat'l Corp.*,
    110 F.4th 1017 (7th Cir. 2024) ................................................................................ 4

*Town of Barnstable v. O'Connor*,
    786 F.3d 130 (1st Cir. 2015) ................................................................................... 8

*United Haulers Ass'n, Inc. v. Oneida-Herkimer Solid Waste Mgmt. Auth.*,
    550 U.S. 330 (2007) ............................................................................................... 13

*United States v. Virginia*,
    518 U.S. 515 (1996) ............................................................................................... 23

*Walgreen Co. v. Rullan*,
    405 F.3d 50 (1st Cir. 2005) ................................................................................... 13

*Whole Woman's Health v. Jackson*,
    595 U.S. 30 (2021) ................................................................................................. 10

iv

*Will v. Michigan Department of State Police,*
    491 U.S. 58 (1989) ................................................................................... 7

*Wyoming v. Oklahoma,*
    502 U.S. 437 (1992) ................................................................................ 13

**Constitutional Provision**

U.S. Const. amend. XI ................................................................................. 8

**Statutes**

16 U.S.C. §824 ............................................................................................ 22

Ind. Code §8-1-2-115 ........................................................................... *passim*

Ind. Code §8-1-2-4 ....................................................................................... 9

Ind. Code §8-1-2-34.5 ................................................................................... 9

Ind. Code §8-1-2-42.5 ................................................................................... 9

Ind. Code §8-1-2-51 ..................................................................................... 9

Ind. Code §8-1-2-54 ..................................................................................... 9

Ind. Code §8-1-2-68 ..................................................................................... 9

Ind. Code §8-1-2-69 ..................................................................................... 9

Ind. Code §8-1-38-2 ................................................................. 12, 16, 21, 22

Ind. Code §8-1-38-7 ............................................................................. 22, 25

Ind. Code §8-1-38-9 ............................................................................. *passim*

Tex. Health & Safety Code §171.207 ........................................................ 10

Tex. Occ. Code §164.055 ........................................................................... 10

**Rule**

Fed. R. Evid. 901 ....................................................................................... 23

**Regulations**

*Midwest Indep. Transmission Sys. Operator, Inc.,*
    150 FERC ¶61,037 (2015) ................................................................... 7, 22

*Transmission Planning and Cost Allocation by Transmission Owning and Operating Public Utilities*, Order No. 1000, 136 FERC ¶61,051 (July 21, 2011)..................24

170 Ind. Admin. Code §4-1-2 ...................................................................................9

170 Ind. Admin. Code §4-1-23 .................................................................................9

170 Ind. Admin. Code §4-1-24 .................................................................................9

**Other Authorities**

Br. of Amicus Curiae MISO, *LS Power Midcontinent, LLC v. State*, No. 24-0641 (Iowa filed July 2, 2024)..................................................................4, 5

IURC, *Verified Direct Testimony of Amy L. Folz* (Dec. 5, 2024), https://tinyurl.com/bdd7bhbp ...........................................................................17

IURC, *Verified Direct Testimony of Michael L. Holtsclaw* (June 28, 2023), https://tinyurl.com/yzjjkp4u ..............................................................................17

IURC, *Verified Direct Testimony of Orville Cocking* (Sept. 12, 2024), https://tinyurl.com/2fk8emew .............................................................................17

IURC, *Verified Direct Testimony of Timothy Abbott* (Apr. 4, 2024), https://tinyurl.com/3csyj8s2 ...............................................................................17

MISO Tariff, Module A, §II.1.A ...............................................................................5

MISO Tariff, Module A, §II.1.M ...............................................................................5

MISO Tariff, Module A, §II.1.P................................................................................5

SPP, *2024 ITP Competitive Upgrade Transmission Report* (Nov. 5, 2024), https://tinyurl.com/5djssy3x.................................................................................6

## INTRODUCTION

Plaintiffs are entitled to a preliminary injunction to preserve their constitutional right to compete for billions of dollars' worth of interstate transmission projects. Like the nearly identical Texas right-of-first-refusal ("ROFR") law that a federal court enjoined last month, Indiana House Enrolled Act 1420 ("HEA 1420") discriminates against interstate commerce "on its face" by giving massive business opportunities to firms that have an established physical presence in the state—at the expense of out-of-state firms that would otherwise compete for those opportunities. *NextEra Energy Cap. Holdings, Inc. v. Lake*, 48 F.4th 306, 326 (5th Cir. 2022); *see NextEra Energy Cap. Holdings, Inc. v. Jackson*, 2024 WL 4660920, at *17 (W.D. Tex. Oct. 28, 2024). And Defendants' filings confirm that HEA 1420 will have severe discriminatory effects: They openly acknowledge that a small group of powerful "Indiana-based" companies lobbied for a "legislative solution" to growing out-of-state competition, and were rewarded with HEA 1420, which "guarantee[s]" them exclusive opportunities "to construct and operate new interstate transmission lines" worth "billions of dollars." Dkt.51 at 10; Dkt.52-3 ¶¶19, 35-36. HEA 1420 is a transparent effort to funnel these projects to "Hoosiers," including Duke Energy Indiana, LLC; Northern Indiana Public Service Company LLC ("NIPSCO"); Indianapolis Power & Light Company; and Southern Indiana Gas and Electric Company (collectively, "Intervenors"). The challenged law thus triggers "a virtually *per se* rule of invalidity." *Granholm v. Heald*, 544 U.S. 460, 476 (2005).

Lacking any viable argument that HEA 1420 can survive that exceedingly demanding scrutiny, the members of the Indiana Utility Regulatory Commission ("Commissioners" or "state") raise various threshold arguments. None of them succeeds. Plaintiffs clearly have Article III standing to challenge HEA 1420. Plaintiffs' injury is obvious: They intend to bid on several forthcoming Midcontinent Independent System Operator ("MISO") transmission projects in Indiana, but HEA 1420 blocks them from doing so. It is equally obvious that an injunction will

redress that injury: If this Court enjoins the Commissioners from implementing HEA 1420, MISO will award the new projects through competitive bidding; but if HEA 1420 remains in effect when MISO approves the forthcoming projects, then Plaintiffs will lose out on the opportunity to compete, as MISO will recognize that there is no point in holding a competitive bidding process, and the Commissioners will proceed to implement HEA 1420. The Commissioners also try to hide behind sovereign immunity, but a century of unbroken caselaw permits injured parties to challenge the constitutionality of a state law by "su[ing] the individual state officials most responsible for enforcing the law in question and seek[ing] injunctive or declaratory relief against them." *Berger v. N.C. State Conf. of NAACP*, 597 U.S. 179, 183-84 (2022). Here, those state officials are the Commissioners, who not only have express statutory authority "to enforce" HEA 1420, but give effect to its ROFR regime in various ways. *See* Ind. Code §§8-1-2-115, -38-9(d), (e).

Intervenors take a different tack, asserting that in-state incumbents are not "similarly situated" to non-incumbents under *General Motors Corp. v. Tracy*, 519 U.S. 278 (1997). The Fifth Circuit expressly rejected that argument in *Lake*, 48 F.4th at 318-20, and this Court should too. *Tracy* involved an Ohio tax exemption that applied predominantly in a local monopoly retail market and only incidentally in a different market with the potential for competition. *Id.* at 320. HEA 1420, by contrast, applies *only* in a competitive, interstate market that is regulated by FERC. So whatever *Tracy* may say about the ability of states to provide tax exemptions and other benefits in their local monopoly retail markets, it in no way countenances an effort to exclude out-of-state firms from the *inter*state electric transmission market that is regulated by FERC, not by the states.

Finally, all equitable considerations—including consumers' interest in enjoying lower rates and more efficient services, thanks to competition—tilt sharply in Plaintiffs' favor. This Court should preliminarily enjoin enforcement of HEA 1420 no later than December 9, 2024.

## ARGUMENT

I.  **The Commissioners' Threshold Arguments Are Meritless.**

A.  **Plaintiffs Have Article III Standing.**

To establish standing to challenge the constitutionality of HEA 1420, Plaintiffs must show (1) an actual or imminent "injury in fact"; (2) "a causal connection" between the injury and HEA 1420; and (3) that the injury is "likely" to be "redressed by a favorable decision." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992). Plaintiffs readily satisfy each of these requirements.

First, there is nothing "speculative" about Plaintiffs' fast-approaching injury. *Contra* Dkt.45 at 26. It is undisputed that the MISO Board of Directors is slated to approve more than *a billion dollars* of interstate transmission projects in Indiana when it meets on December 10-12, 2024. *See* Dkt.5-2 at 2; Dkt.45 at 6; Dkt.52-1 at 7. Plaintiffs "intend to bid, if allowed, on several" of the new projects, Dkt.45-3 at 6—just as Plaintiffs bid on (and won) the Duff to Coleman project and the Hiple to IN/MI State Border project before HEA 1420 took effect. *See* Dkt.5-1 ¶¶6, 9. Unless this Court intervenes before December 10, however, MISO will not open these projects for competitive bidding and will instead give in-state incumbents (namely, Intervenors) the exclusive "right to construct, own, operate, and maintain" the new electric transmission facilities. Ind. Code §8-1-38-9(a); *accord* Dkt.5-1 ¶8; Dkt.52-1 at 7. Under binding precedent, that imminent deprivation of Plaintiffs' "right[] to compete on an equal footing in interstate commerce" is an Article III injury. *All. for Clean Coal v. Miller*, 44 F.3d 591, 594 (7th Cir. 1995); *see also Coal. of MISO Transmission Customers v. FERC*, 45 F.4th 1004, 1015-16 (D.C. Cir. 2022).

Second, Plaintiffs' injury is "fairly traceable" to HEA 1420. Consistent with FERC Order No. 1000, MISO will invite competitive bidding on many LRTP Tranche 2.1 projects *unless* there is a state ROFR law in effect when those projects are approved. *See* Dkt.5-1 ¶9. HEA 1420 is thus a "but for" cause of Plaintiffs' impending injury, which easily satisfies traceability. *See, e.g.*,

*Taylor v. Salvation Army Nat'l Corp.*, 110 F.4th 1017, 1025 (7th Cir. 2024) ("Article III requires no more than a 'meaningful[] connect[ion]' between" the challenged law and the plaintiff's injury (alterations in original)); *Parsons v. DOJ*, 801 F.3d 701, 714 (6th Cir. 2015) ("fairly traceable" means "less than but-for"). The Commissioners' suggestion that Plaintiffs' injury "is the result of 'the independent action of some third party,'" Dkt.45 at 11, does not withstand the slightest scrutiny. MISO has no independent power to eschew competitive bidding; the only reason it is on the cusp of doing so is because its tariff requires it to "comply with any Applicable Laws and Regulations," which currently include HEA 1420. *See* Dkt.45-2.

Third, the requested injunction will prevent Plaintiffs' impending injury. MISO recognizes that there is no point in spending time and resources on a lengthy competitive-bidding process when a state ROFR law is in place. Dkt.5-1 ¶8. Consequently, if HEA 1420 remains in place on December 10, MISO will not open the projects to competitive bidding. Dkt.5-1 ¶8. The Commissioners will then proceed to exercise their statutory authority "to enforce" HEA 1420, which includes receiving notices about which incumbents intend to exercise a ROFR, resolving any disputes about who is entitled to a ROFR, analyzing incumbents' reports about the work they are conducting under a ROFR, and ensuring that incumbents abide by their statutory obligations when subcontracting out parts of these projects. Ind. Code §§8-1-2-115, -38-9(c)-(e); *see also infra* p.9 (further discussing the Commissioners' enforcement role).

If this Court enjoins the Commissioners from implementing HEA 1420, however, then— in MISO's own words—"no ROFR rights will be accorded to … projects to be included in new transmission portfolios under the MISO Tariff, such as LRTP Tranche 2." Br. of Amicus Curiae MISO 20, *LS Power Midcontinent, LLC v. State*, No. 24-0641 (Iowa filed July 2, 2024) ("MISO

Amicus Br.").[1]  This follows directly from the MISO tariff's definition of "Applicable Laws and Regulations," which includes not only "duly promulgated applicable" state laws, but also "orders" and "decrees" from any court having jurisdiction over "market participants" (such as Plaintiffs and Intervenors) and the transmission customers they serve.  MISO Tariff, Module A, §II.1.A (Definitions – A) (70.0.0) (defining "Applicable Laws and Regulations"); *see id.* §II.1.M (Definitions – M) (78.0.0); *id.* §II.1.P (Definitions – P) (67.0.0).[2]  So, if this Court enjoins the Commissioners from enforcing HEA 1420, MISO will no longer view it as a "duly promulgated" or "applicable" law, and Plaintiffs will be allowed to compete for the forthcoming projects.  *See* MISO Amicus Br.20-21.  Such relief would not flow from the "persuasive … effect of the opinion *explaining*" the Court's reasoning, but "*through the exercise of its power*" to block the Commissioners from implementing Indiana's ROFR regime.  *Contra* Dkt.45 at 12.

Recent decisions in analogous cases confirm that Plaintiffs have standing to challenge HEA 1420 through a suit against the Commissioners.  In *LS Power Midcontinent, LLC v. State*, 988 N.W.2d 316 (Iowa 2023), the Iowa Supreme Court rejected arguments that closely track those Indiana advances here, holding that "LSP's injury [wa]s traceable to the defendant State's actions" and that, although MISO was not a party to the suit, "a temporary injunction that stays enforcement of the ROFR statute" would likely redress LSP's claims.  *Id.* at 332-33, 338-40.  And in *Lake*, the Fifth Circuit considered a potential ripeness issue *sua sponte*, but concluded that the plaintiff had standing to sue the members of the Public Utility Commission of Texas ("PUCT"), rather than the regional transmission organization (there, Southwest Power Pool ("SPP")), over the constitutionality of Texas' ROFR law.  48 F.4th at 315-16.  What is more, subsequent events proved

---

[1] For the Court's convenience, MISO's amicus brief is attached.

[2] For the Court's convenience, these portions of the MISO tariff are attached.

that SPP's presence in the Texas suit was unnecessary:  On remand, the district court enjoined the PUCT Commissioners from enforcing the challenged Texas law—the day before the SPP Board was slated to approve new interstate transmission projects in Texas—and the SPP Board responded by ignoring the Texas ROFR law and opening the relevant project to competition.  *See Jackson*, 2024 WL 4660920, at \*17; SPP, *2024 ITP Competitive Upgrade Transmission Report* (Nov. 5, 2024), https://tinyurl.com/5djssy3x.  Given the analogous text of the MISO tariff, there is every reason to expect MISO to do the same if Plaintiffs obtain injunctive relief before December 10.

The Commissioners' counterarguments fall flat.  Plaintiffs have not suggested that MISO will "'deviate from' its FERC-approved tariff."  *Contra* Dkt.45 at 12.  As explained, if this Court enjoins enforcement of HEA 1420, then the tariff will *require* MISO to follow this Court's order instead of Indiana's unconstitutional law.  Nor is there any need to "speculate" about what MISO will do if this Court enjoins enforcement of HEA 1420.  *Contra* Dkt.45 at 12.  MISO itself has represented (to a court, no less) that once enforcement of a state ROFR law has been enjoined, "no ROFR rights will be accorded."  MISO Amicus Br.20.  Plaintiffs emphasized that representation in both their complaint and their preliminary-injunction papers; Defendants fail to muster any response.  *Compare* Dkt.3 ¶38, *and* Dkt.5-1 ¶9, *with* Dkt.45 at 12-13.  In view of MISO's stated position, there is much more than a "good chance" that Plaintiffs' injury would be "redressed by a favorable decision."  *Am. Fed'n of Gov't Emps., Loc. 2119 v. Cohen*, 171 F.3d 460, 466-67 (7th Cir. 1999).  That easily "satisf[ies] Article III."  *Id.* at 467.

## B.    Plaintiffs Have a Cause of Action and Are Not Collaterally Attacking Any FERC Order.

The Commissioners' contention that Plaintiffs "lack a cause of action" fares no better.  *See* Dkt.45 at 10.  Plaintiffs brought this suit under 42 U.S.C. §1983, which "provides a plaintiff with a cause of action for the deprivation of federal constitutional or statutory rights."  *Reed v. Norfolk*

*S. Ry. Co.*, 740 F.3d 420, 424 (7th Cir. 2014); *see* Dkt.3 ¶¶10, 14.  And the Supreme Court has held that "suits for violations of the Commerce Clause may be brought under … § 1983."  *Dennis v. Higgins*, 498 U.S. 439, 440, 446-51 (1991).  Indeed, *Dennis* made clear that "the Commerce Clause of its own force imposes limitations on state regulation of commerce *and is the source of a right of action in those injured by regulations that exceed such limitations*."  *Id.* at 450 (emphasis added).

Plaintiffs' contrary position rests on a misreading of *Will v. Michigan Department of State Police*, 491 U.S. 58 (1989).  *See* Dkt.45 at 10.  *Will* held that states and state officials are not "'person[s]' against whom a § 1983 claim *for money damages* [may] be asserted."  *Lapides v. Bd. of Regents of Univ. Sys. of Ga.*, 535 U.S. 613, 617 (2002) (emphasis added) (discussing *Will*, 491 U.S. at 66).  But this is not a suit for money damages.  And *Will* affirmed that "a state official in his or her official capacity, *when sued for injunctive relief*, would be a person under § 1983."  491 U.S. at 71 n.10 (emphasis added).  Section 1983 thus plainly supplies a cause of action here.

The Commissioners' attempt to frame this suit as an "impermissible collateral attack" on MISO's FERC-approved tariff, Dkt.45 at 13-14, is weaker still.  They cite *MISO Transmission Owners v. FERC*, 819 F.3d 329 (7th Cir. 2016), in which the Seventh Circuit upheld both FERC's refusal to authorize a ROFR for regionally allocated projects (such as those at issue here), *id.* at 332-35, and FERC's January 2015 decision to allow MISO "to include in its tariff a provision that allows it to honor rights of first refusal created by state and local law," *id.* at 336.  Plaintiffs are not trying to relitigate any of that; they take as a given for purposes of this litigation that MISO may follow Indiana's law if it is in force.  But FERC's January 2015 decision did not address (and the Seventh Circuit accordingly did not review) "the constitutionality of any particular state right-of-first-refusal law."  *Midwest Indep. Transmission Sys. Operator, Inc.*, 150 FERC ¶61,037, ¶61,195 (2015) (Bay, Commissioner, concurring).  And the constitutionality of *this* law cannot

possibly have "inher[ed]" in the prior case, Dkt.45 at 14, as HEA 1420 was not enacted until years after the *MISO* case was decided.  Plaintiffs are not "complaining that MISO intends to honor state rights of first refusal" when they are in force, Dkt.45 at 14; they are challenging an Indiana law—which is precisely why the Commissioners, not MISO, are the proper defendants in this case.

### C.    Sovereign Immunity Does Not Bar Plaintiffs' Suit.

The Commissioners' embrace of sovereign immunity falls flat.  To be sure, states generally enjoy sovereign immunity.  U.S. Const. amend. XI.  But it is well settled that plaintiffs may "sue the individual state officials most responsible for enforcing the law in question and seek injunctive or declaratory relief against them."  *Berger*, 597 U.S. at 184 (citing *Ex parte Young*, 209 U.S. 123 (1908)).  And this suit falls squarely within that longstanding exception to sovereign immunity, which applies "when a plaintiff [1] seeks prospective relief [2] against an ongoing violation of federal law."  *Driftless Area Land Conservancy v. Valcq*, 16 F.4th 508, 521 (7th Cir. 2021).

Plaintiffs readily satisfy this "straightforward inquiry."  *Id.*  First, the relief Plaintiffs seek—a declaratory judgment that HEA is unconstitutional and an injunction against its enforcement, Dkt.3 at 33—is unquestionably prospective.  *See, e.g.*, *Driftless Area*, 16 F.4th at 521 ("Injunctive relief is prospective relief.").  Second, Plaintiffs are not alleging that "federal law has been violated only at one time or over a period of time in the past," *id.* at 522; Plaintiffs have sued the Commissioners because they "possess an ongoing responsibility with respect to" HEA 1420.  *Town of Barnstable v. O'Connor*, 786 F.3d 130, 140 (1st Cir. 2015).  Notably, none of the courts that have heard similar suits seeking to enjoin state utilities commissioners from enforcing a ROFR law has identified any sovereign immunity concern, even though state sovereign immunity is an "unavoidable jurisdictional hurdle[]."  *Driftless Area*, 16 F.4th at 520; *see Lake*, 48 F.4th 306; *LSP Transmission Holdings, LLC v. Sieben*, 954 F.3d 1018 (8th Cir. 2020); *Jackson*, 2024 WL 4660920; *LSP Transmission Holdings, LLC v. Lange*, 329 F.Supp.3d 695 (D. Minn. 2018).

The Commissioners point out that *Ex parte Young* applies only when the defendants "ha[ve] 'some connection with the enforcement' of an allegedly unconstitutional state statute." *Doe v. Holcomb*, 883 F.3d 971, 975 (7th Cir. 2018); *see* Dkt.45 at 10.  But the Commissioners' assertion that they "do[] not enforce" HEA 1420, Dkt.45 at 13, blinks reality.  Indiana law expressly authorizes the Commission "to enforce" *all* "laws[] relating to public utilities," including HEA 1420.  Ind. Code §8-1-2-115.  That alone is enough to satisfy *Ex parte Young*, *see infra* p.10, but there is much more.  When an incumbent seeks to exercise a ROFR, HEA 1420 requires it to give notice to the Commission, Ind. Code §8-1-38-9(c), followed by a report to the Commission regarding the project, its estimated costs, and the rate formula, *id.* §8-1-38-9(d).  Armed with that information and its broad enforcement authority, *id.* §8-1-2-115, the Commission has the power to resolve issues and disputes relating to HEA 1420, including to what existing facilities a new project must "connect" for ROFR rights to be triggered, *id.* §8-1-38-9(a), which of multiple entities may exercise a given ROFR, *id.* §8-1-38-9(b), and whether an incumbent has satisfied the subcontracting requirements of §8-1-38-9(e).  Moreover, when incumbents like Intervenors exercise a ROFR, they are subject to Commission regulation, including extensive rate regulation, and must meet service quality standards enforced by the Commission.  *See id.* §§8-1-2-4, -34.5, -42.5, -51, -54, -68, -69; 170 Ind. Admin. Code §4-1-2, -23, -24.  Consequently, the Commission's role in enforcing HEA 1420 extends from the initial provision of notice all the way to establishing regulated rates that ensure the incumbent recovers associated costs from Indiana consumers.

The state next makes the remarkable claim that *Ex parte Young* applies only where there is a "threatened or imminent *enforcement action* by the [defendants] against [the] plaintiffs."  Dkt.45 at 10 (emphasis added).  No court has accepted that position.  On the contrary, courts consistently hold that *Ex parte Young* "does not mean that a suit may proceed only when it seeks to enjoin an

'enforcement action.'" *McDaniel v. Precythe*, 897 F.3d 946, 952 (8th Cir. 2018); *accord L.A. Cnty. Bar Ass'n v. Eu*, 979 F.2d 697, 704 (9th Cir. 1992); *see also, e.g.*, *Reed v. Goertz*, 598 U.S. 230, 234 (2023) (prisoner could challenge constitutionality of Texas statute regarding post-conviction DNA testing by suing district attorney); *In re Dairy Mart Convenience Stores, Inc.*, 411 F.3d 367, 373 (2d Cir. 2005) (plaintiffs seeking funds from environmental fund could sue state officials who had "significant responsibilities overseeing" that fund). The requirement that "[s]tate officers sued in *Ex parte Young* cases must have 'some connection' to the enforcement of the allegedly defective act" is satisfied if the officers "assist in giving effect to the law." *Prairie Band Potawatomi Nation v. Wagnon*, 476 F.3d 818, 828 & n.15 (10th Cir. 2007); *accord McDaniel*, 897 F.3d at 952. And, as explained, the Commissioners are the state officials tasked with giving effect to HEA 1420.

This suit thus bears no resemblance to the cases on which the Commissioners rely. *Whole Woman's Health v. Jackson*, 595 U.S. 30 (2021), held that *Ex parte Young* did not allow the plaintiffs to sue to enjoin the Texas Attorney General from enforcing a law that expressly *prohibited* enforcement by any "officer or employee of th[e] state." Tex. Health & Safety Code §171.207(a); *see Whole Woman's Health*, 595 U.S. at 43-45. HEA contains no similar provision. To the contrary, the Commissioners have express statutory authority "to enforce" HEA 1420. Ind. Code §8-1-2-115. They are thus like the members of the Texas Health and Human Services Commission whom *Whole Woman's Health* held *could* be sued because other statutes gave them general authority to enforce state health laws, and the challenged law's non-enforcement provision did not displace that authority. 595 U.S. at 36-37, 45-47 (citing Tex. Occ. Code §164.055(a)).

The Commissioners next invoke *Peshek v. Johnson*, 111 F.4th 799 (7th Cir. 2024), which held that the plaintiff "sued the wrong defendant" because the Wisconsin Attorney General—not the Secretary of the Department of Health Services, who was the only named defendant—is "the

state official charged with overall enforcement" of the state's civil-commitment regime. *Id.* at 805. Here, by contrast, the Commissioners do not and cannot claim that some other state actor enforces HEA 1420. They instead make the remarkable claim that *no state official* can be sued: "To the extent that anyone is enforcing the right of first refusal that exists under HEA 1420, it is MISO." Dkt.45 at 9. Again, the Indiana Code says otherwise; it expressly charges the Commission with overall enforcement of Indiana's utilities laws, including HEA 1420. Ind. Code §8-1-2-115. Nothing in the Code purports to task MISO (a nongovernmental entity) with *enforcing* Indiana law; instead, MISO's FERC-approved tariff requires it to "*comply* with" HEA 1420 unless and until it is enjoined. *Supra* pp.4-5 (emphasis added). Finally, *Doe v. Holcomb* is also inapposite; that case merely reaffirms that an attorney general "cannot be sued simply because of his duty to support the constitutionality of a challenged state statute," and a governor cannot be sued based solely on his "general duty to enforce [all] state laws." 883 F.3d at 976. Because the Commissioners are the Indiana officials with specific responsibility for enforcing HEA 1420, they are proper defendants under *Ex parte Young*.

## II.     Plaintiffs Are Highly Likely To Succeed On Their Commerce Clause Claim.

### A.     HEA 1420 Discriminates Against Interstate Commerce in Multiple Ways, Triggering Strict Judicial Scrutiny.

HEA 1420 directly (and undisputedly) regulates interstate commerce, as it applies only to electric transmission projects that have been approved through a federally mandated ISO/RTO planning process and will form part of the multi-state transmission grid. *See* Dkt.5 at 13-14 (citing Ind. Code §8-1-38-9). And, as explained in Plaintiffs' opening brief, HEA 1420 triggers the strictest form of judicial scrutiny three times over: It discriminates against interstate commerce on its face, in its effects, and in its purpose. *See* Dkt.5 at 14-21.

## 1.    HEA 1420 discriminates against interstate commerce on its face.

HEA 1420 facially discriminates against interstate commerce by explicitly granting an exclusive right to build new interstate transmission projects to entities with an existing physical presence in Indiana.  Ind. Code §§8-1-38-2, -9.  That discrimination among "business entities according to the extent of their contracts with the local economy" is a form of "local favoritism or protectionism" that implicates the Commerce Clause.  *Lewis v. BT Inv. Managers, Inc.*, 447 U.S. 27, 42 & n.9 (1980).  Indeed, the Supreme Court has repeatedly held that strict scrutiny applies to such facially discriminatory laws.  In *Granholm*, for example, the Supreme Court applied strict scrutiny to a New York law that conditioned business opportunities on an "in-state presence requirement," decreeing that only companies with "a branch office and warehouse" within the state could ship wine directly to consumers in the state.  544 U.S. at 474-76.  Applying those settled principles, the Fifth Circuit held that giving a ROFR to entities that "already own[] a transmission facility" in a state—i.e., "incumbents"—is facial discrimination against interstate commerce that triggers strict scrutiny.  *Lake*, 48 F.4th at 314, 325.  The same analysis applies to HEA 1420.

Try as they might, Defendants cannot avoid this conclusion.  Relying heavily on the Eighth Circuit's outlier decision in *Sieben*, Defendants assert that HEA 1420 is not facially discriminatory because it "does not mention the location of a company's headquarters or principal place of business."  Dkt.45 at 16-17; *accord* Dkt.52-1 at 13-16.  Nonsense.  Indiana has granted special privileges to firms that already "own[], operate[], and maintain[]" a "facility … in Indiana."  Ind. Code §8-1-38-2.  That is discrimination, full stop.  As the Fifth Circuit explained in *Lake*, *Sieben*'s focus on where a company "is incorporated or headquartered[] is irreconcilable with Supreme Court dormant Commerce Clause jurisprudence addressing physical-presence requirements."  48 F.4th at 323.  Numerous Supreme Court cases finding facial discrimination in favor of "in-state interests" do not even mention where the favored companies were incorporated or headquartered.

12

*Id.* at 322; *see, e.g.*, *Granholm*, 544 U.S. at 475; *C&A Carbone, Inc. v. Town of Clarkstown*, 511 U.S. 383, 387 (1994); *Wyoming v. Oklahoma*, 502 U.S. 437, 455-57 (1992).

The Fifth Circuit is not alone. "Most circuits have rejected the idea that a law survives Commerce Clause scrutiny if many of the favored interests are incorporated elsewhere." *Lake*, 48 F.4th at 323. In *Florida Transportation Services, Inc. v. Miami-Dade County*, 703 F.3d 1230 (11th Cir. 2012), for example, the Eleventh Circuit rejected a formalistic approach to determining whether a company should be considered "in-state" or "out-of-state," concluding that the Commerce Clause instead demands a "functional approach" that focuses on "where [a] company's business takes place or where its political influence lies." *Id.* at 1259. And in *Walgreen Co. v. Rullan*, 405 F.3d 50 (1st Cir. 2005), the First Circuit rejected the argument that a permitting requirement that excluded all out-of-state companies did not unduly burden interstate commerce because a few of the in-state entities that it favored were owned by out-of-state interests. *Id.* at 55-57. As the court explained, "[h]olding otherwise would be tantamount to saying that a favored group must be *entirely* in state for a law to have a discriminatory effect on commerce." *Id.* at 58.

These courts' focus on in-state presence makes eminent sense. After all, a statute limiting commercial opportunities to companies that already employ Indiana workers or already pay Indiana taxes would be an obvious Commerce Clause violation, even if some of the favored "incumbents" were headquartered elsewhere. The result is no different when incumbent status turns on whether someone already owns transmission facilities in Indiana. Indeed, one of the animating concerns of the Commerce Clause is that "when 'the burden of state regulation falls on interests outside the state, it is unlikely to be alleviated by the operation of those political restraints normally exerted when interests within the state are affected.'" *United Haulers Ass'n, Inc. v. Oneida-Herkimer Solid Waste Mgmt. Auth.*, 550 U.S. 330, 345 (2007). Favoring entities that

operate in state but are headquartered "out-of-state" raises all the same concerns.  This case illustrates as much:  While some Intervenors have out-of-state parent corporations, that does not diminish their political influence in Indiana—as evidenced by their ability to obtain a "legislative solution" to the competition ushered in by FERC Order No. 1000.  Dkt.52-1 ¶19.  In short, "local presence, rather than place of incorporation," is what matters.  *Lake*, 48 F.4th at 323.

Other than *Sieben*, none of Defendants' proffered cases holds otherwise.  *Colon Health Centers of America, LLC v Hazel*, 813 F.3d 145 (4th Cir. 2016), did not purport to declare any blanket rule that "incumbency" can never be a "proxy for in-state status."  *Contra* Dkt.52-1 at 15.  The case involved a facially *neutral* statute that required any healthcare operation—incumbent or not—to demonstrate a need for its services before it could build a new facility.  813 F.3d at 149, 152.  It is a highly "fact-intensive" decision involving expert testimony about the statute's *actual effects*, *id.* at 151; it does not remotely suggest that *facial* discrimination exists only when a law draws lines based on "state of incorporation or principal place of business," rather than in-state presence.  *Contra* Dkt.52-1 at 15.  As explained, the Supreme Court has repeatedly held otherwise.

*Norfolk Southern Corp. v. Oberly*, 822 F.2d 388 (3d Cir. 1987), is even farther afield.  That case also involved a concededly facially neutral law, which banned "offshore gas, liquid, or solid bulk product transfer facilities" in the Delaware coastal zone.  *Id.* at 391.  The plaintiffs alleged that the law's two exceptions—a "grandfather clause" for facilities "in operation on June 28, 1971," and a separate exception for the Port of Wilmington—were evidence that the law was motivated by protectionism.  *Id.* at 391, 403-04.  The Third Circuit rejected that argument, concluding that the grandfather clause was meant to protect reliance interests and the Port exception "concentrate[d] development in an already developed area."  *Id.* at 404.  That case thus provides no support for Defendants' position; after all, a facially neutral grandfather clause

14

allowing incumbents to continue their established activities is a far cry from a ROFR law reserving billions of dollars' worth of *new* economic opportunities for in-state entities.  Here, as in *Granholm* and *Lake*, the statute's in-state presence requirement is facially discriminatory.

Contrary to the Commissioners' contention, *see* Dkt.45 at 15-17, it makes no difference that when HEA 1420 confers a ROFR for a particular project on a single in-state incumbent, it disadvantages not only out-of-state entities, but other in-state entities as well.  The Supreme Court rejected precisely that argument in *C&A Carbone*, finding a flow control ordinance that favored a single processor "no less discriminatory because in-state or in-town processors are also covered by the prohibition." 511 U.S. at 391; *see also Dean Milk Co. v. City of Madison*, 340 U.S. 349, 354 n.4 (1951) (protectionist local ordinance violated Commerce Clause even though it harmed not only out-of-state interests but also other in-state interests).  These cases confirm that what matters is that the state has deprived out-of-state entities of equal access to its markets by diverting business to "favored operator[s]" with an in-state presence.  *C&A Carbone*, 511 U.S. at 391.  Whether Indiana has frozen out some in-state would-be-competitors in the process is immaterial.

Finally, the Commissioners' efforts to distinguish *Lake* fail.  The state emphasizes that if an incumbent were to choose not to exercise its ROFR, the Texas law at issue there would require the project to be awarded to another incumbent, whereas HEA 1420 would allow the project to be awarded through a competitive process.  Dkt.45 at 18.  But that does not make HEA 1420 non-discriminatory; in Indiana, as in Texas, in-state incumbents have an absolute right to exclude out-of-state competition.  Indeed, several of the facially discriminatory laws that the Supreme Court has struck down "allowed ways for those without a local footprint to establish one and compete." *Lake*, 48 F.4th at 325.  In *Granholm*, for example, "a winery with California vineyards could sell wine to New Yorkers by establishing a winery in the Empire State." *Id.*  HEA 1420's "incumbency

requirement is a more anticompetitive version of th[at] in-state presence requirement[],” *id.*, as it blocks companies that did not have interstate transmission lines in Indiana as of 2023 from *ever* building such lines, except in the highly unlikely scenario where the incumbent chooses not to take advantage of the ROFR. The incumbents lobbied for passage of HEA 1420 and intervened here to try to preserve it for good reason: They have every intention of taking advantage of the ROFR. While HEA 1420’s approach may be slightly less extreme than that of Texas’ (enjoined) ROFR law, it is still blatant facial discrimination against interstate commerce. *See All. for Clean Coal v. Bayh*, 72 F.3d 556, 560 (7th Cir. 1995) (“The fact that the ECPA does not explicitly forbid the use of out-of-state coal or require the use of Indiana coal, but ‘merely encourages’ utilities to use high-sulfur coal by providing economic incentives does not make the ECPA any less discriminatory.”).

> ### 2.    HEA 1420 also discriminates against interstate commerce in its effects, as it uniformly benefits in-state interests at the expense of out-of-state interests.

Even if HEA 1420 somehow could be considered facially neutral, it would still trigger strict scrutiny. The Supreme Court has repeatedly “condemn[ed] state laws that ‘although neutral on their face … were enacted at the instance of, and primarily benefit,’ in-state interests.” *Nat’l Pork Producers Council v. Ross*, 598 U.S. 356, 379 n.2 (2023); *see also, e.g., Granholm*, 544 U.S. at 487 (when a state law’s “effect is to favor in-state economic interests over out-of-state interests, we have generally struck down the statute without further inquiry”). HEA 1420 is just such a law: It will divert billions of dollars of investment to a select group of Indiana-based companies, to the detriment of potential out-of-state competitors and out-of-state consumers alike. *See* Ind. Code §8-1-38-2. If that does not “bear more heavily on interstate than local commerce,” *Regan v. City of Hammond*, 934 F.3d 700, 703 (7th Cir. 2019), it is hard to imagine what would.

Intervenors’ filings confirm that HEA 1420 will benefit a small cadre of companies that are the epitome of powerful in-state interests. By their own account, Intervenors include “the largest

electric utility in Indiana" (Duke Energy Indiana), Dkt.52-4 ¶3, as well as "Indiana's … second-largest electric distribution company" (NIPSCO), Dkt.52-3 ¶4.  These companies have a massive physical presence in the state; Duke Energy Indiana alone has "over 37,000 miles of transmission and distribution lines" in Indiana, as well as "39 operations facilities spread throughout the state." Dkt.52-4 ¶¶4, 9.  Intervenors collectively own approximately 600 transmission substations—the "termination points" where most new transmission projects begin or end, *see* Dkt.3 ¶54; *see also* Dkt.52-3 ¶23—in Indiana.[3]  It is therefore no surprise that each Intervenor owns electric transmission facilities to which proposed MISO projects will connect, and hence is "guarantee[d]" substantial business opportunities—without competition—thanks to HEA 1420.  *See* Dkt.52-3 ¶¶35-36; Dkt.52-4 ¶¶36-37; Dkt.52-5 ¶¶27-29; Dkt.52-6 ¶¶30-31.  And Intervenors affirm that the forthcoming projects in LRTP Tranche 2.1 "represent billions of dollars of potential capital investment."  Dkt.52-3 ¶35; Dkt.52-4 ¶36; Dkt.52-5 ¶28; Dkt.52-6 ¶30.

These facts fatally undermine the Commissioners' contention that "out-of-state entities are just as likely to be beneficiaries of [HEA 1420] as Indiana-based companies."  Dkt.45 at 17.  The Commissioners attempt to classify Intervenors Duke Energy Indiana, LLC, Indianapolis Power & Light Company, and Southern Indiana Gas & Electric Company as "out-of-state entities," on the theory that they are "subsidiaries of entities headquartered outside Indiana."  *Id.*  But those companies describe *themselves* as "Indiana-based" firms, Dkt.51 at 10, and they could hardly do otherwise, given their "vast Indiana presence," Dkt.52-4 ¶¶3, 9; *see* Dkt.52-5 ¶3; Dkt.52-6 ¶3.  The Commissioners also emphasize that out-of-state competitor (and LSP affiliate) Republic

---

[3] IURC, *Verified Direct Testimony of Orville Cocking* at 13 (Sept. 12, 2024), https://tinyurl.com/2fk8emew; IURC, *Verified Direct Testimony of Timothy Abbott* at 2 (Apr. 4, 2024), https://tinyurl.com/3csyj8s2; IURC, *Verified Direct Testimony of Amy L. Folz* at 21 (Dec. 5, 2024), https://tinyurl.com/bdd7bhbp; IURC, *Verified Direct Testimony of Michael L. Holtsclaw* at 5 (June 28, 2023), https://tinyurl.com/yzjjkp4u.

Transmission has gained a small toehold in Indiana, Dkt.45 at 17, but they ignore that Republic owns only a single 31-mile transmission line and no substations in Indiana—and was able to gain access to that paltry portion of Indiana's market only because HEA 1420 had not yet taken effect, Dkt.45-3 at 4; Dkt.5 at 17-18. HEA 1420 overwhelmingly benefits in-state interests.

Lacking any meaningful answer, Defendants reprise their argument that, for any particular project, the ROFR will benefit only the incumbent(s) whose facilities "connect[] to" the new project, "to the exclusion of all other in-state and out-of-state electric companies." Dkt.52-1 at 21; *see supra* p.15. Again, that contention is squarely foreclosed by Supreme Court precedent. The discrimination in *Dean Milk* had the exact same feature; that case involved a city ordinance that allowed sales of milk only by companies with a pasteurization facility within five miles of the town square in Madison, Wisconsin. 340 U.S. at 350. The Supreme Court held that the ordinance discriminated against interstate commerce "in practical effect" by "exclud[ing] from distribution in Madison wholesome milk produced and pasteurized in Illinois." *Id.* at 354. And the Court found it "immaterial that Wisconsin milk from outside the Madison area is subjected to the same proscription as that moving in interstate commerce." *Id.* at 354 n.4. Just so here.

> **3.    HEA 1420 was enacted for the avowedly discriminatory purpose of promoting in-state economic interests at the expense of out-of-state interests.**

On top of that, HEA 1420 was plainly *intended* to benefit Intervenors by insulating them from out-of-state competition. That is clear not only from legislators' statements about the bill— notably including its sponsor's express acknowledgment that the bill was meant to give projects to "Hoosiers we know," Dkt.5 at 17—but also from its text, its inevitable effects, and the context in which it was enacted. As explained, HEA 1420 was drafted and passed hot on the heels of Republic's successful bid for—and completion of—the Duff to Coleman project. Dkt.5 at 17-18. The bill resulted from extensive lobbying by incumbent utilities who recognized the threat posed

by out-of-state competition. *See id.* at 9, 20. Indeed, NIPSCO openly admits that, after Republic won the Duff-Coleman project and MISO solicited competitive bids for the Hiple to Indiana/Michigan State Border project, NIPSCO chose not to bid and instead "focused on seeking a legislative solution … for future projects." Dkt.52-3 ¶19. And the legislature predictably responded by giving NIPSCO and its fellow incumbents a "regulatory benefit[]," *id.* ¶30, that insulates them from virtually all out-of-state competition for billions of dollars' worth of future projects. That is exactly the type of protectionism that the Commerce Clause forbids.

Defendants offer little response. They do not and cannot dispute that the bill resulted from in-state utilities' lobbying efforts; they instead just meekly urge this Court to ignore the damning statements made during the legislative hearings on the ground that they do not constitute "legislative history" or an official "expression of legislative intent." Dkt.45 at 22. To be sure, legislators' statements are not controlling for purposes of construing ambiguous statutory provisions. But they are powerful evidence when it comes to assessing whether a law has a discriminatory purpose. In any event, even if one ignores the legislative hearings entirely, the statute's discriminatory purpose is abundantly clear from its text, context, and effects.

### 4.  Intervenors' efforts to avoid Commerce Clause scrutiny fail.

Invoking *Tracy*, Intervenors insist that in-state incumbents (such as themselves) and their would-be competitors (such as Plaintiffs) are not "'similarly situated' for purposes of a claim of facial discrimination under the Commerce Clause." Dkt.52-1 at 12-13, 16. The Commissioners notably do not make that argument—presumably because they recognize that it is meritless.

*Tracy* involved an Ohio law that exempted certain natural gas sales from a generally applicable sales and use tax. 519 U.S. at 281-82. That exemption applied only to sales of natural gas by local distribution companies ("LDCs"), i.e., local utilities that had an obligation to supply all members of the public with natural gas and provide them with a bundle of accompanying

19

benefits and protections.  *Id.*  The exemption did not apply to producers of gas (i.e., those who sold it at wholesale rather than retail), or to independent marketers who sold gas "unbundled" from all the benefits and protections that LDCs were obligated to provide.  *Id.* at 282-83, 297-98.  General Motors, which purchased its natural gas from an independent marketer whose sales were subject to the tax, argued that this differential treatment violated the Commerce Clause.  *Id.* at 285-86.

The Supreme Court disagreed.  It reasoned that the LDCs were not similarly situated to producers or independent marketers for purposes of natural gas sales because they sold a different product to different customers.  *Id.* at 297-98.  Independent marketers sold gas, in bulk, to large customers, like General Motors, who had the ability to bypass the ordinary natural gas market.  *Id.* at 302.  The LDCs, on the other hand, were heavily regulated public utilities that were under an obligation to sell a bundled gas product to ordinary consumers "who had neither the capacity to buy on the interstate market nor the resilience to forgo the reliability and protection that state regulation provided."  *Id.* at 294.  Granting LDCs the tax exemption in the ordinary gas market did not raise Commerce Clause concerns, as they had a legal monopoly there; but granting them the exemption in the bulk market for large customers raised at least the specter of impermissible discrimination.  *See id.* at 303-04.  "The case thus came down to whether the Court should 'accord controlling significance to the noncaptive market in which they compete, or to the noncompetitive captive market in which the local utilities alone operate.'"  *Lake*, 48 F.4th at 319 (quoting *Tracy*, 519 U.S. at 303-04).  "The Supreme Court determined that the local, captive market was the utilities' 'core market.'"  *Id.*  And because "the utilities and out-of-state sellers were not similarly situated for all, or even most applications, of the statute," "[t]he predominance of the monopoly market prevented classifying the statute as discriminatory on its face."  *Id.*

As the Fifth Circuit correctly recognized when rejecting the same argument in *Lake*, *Tracy*

does not shield HEA 1420 from Commerce Clause scrutiny.  *See id.* at 318-20.  Unlike the tax exemption in *Tracy*, which "operated in two different retail markets," HEA 1420 addresses only "a single market"—interstate transmission—"that is undoubtedly competitive."  *Id.* at 319-20. There is thus no conceivable argument that HEA 1420 "predominan[tly]" applies in a "noncompetitive, captive market," *id.* at 319; the law does not apply in any captive market at all. *See* Ind. Code §8-1-38-9(a).  In short, there is no "*Tracy* issue" here.  *Lake*, 48 F.4th at 319.

Intervenors claim that they are not similarly situated to Plaintiffs in *any* market by virtue of their status as vertically integrated public utilities.  Dkt.52-1 at 16; *see id.* at 5, 8.  The Fifth Circuit expressly rejected that sweeping reading of *Tracy*, which even *Sieben* did not adopt.  *Lake*, 48 F.4th at 320; *see Sieben*, 954 F.3d at 1027.  And rightly so, as by that logic "*Tracy* would not have had to grapple with the Ohio law's application in both captive and noncaptive retail markets and decide which was the utilities' 'core' market."  *Lake*, 48 F.4th at 320.  Intervenors' position "is also irreconcilable with the longstanding principle, reiterated in *Tracy*, that there is no 'public utilities exception' to the dormant Commerce Clause."  *Id.*  Moreover, it is not the case that *all* "incumbent electric transmission owner[s]" under HEA 1420 are vertically integrated public utilities that "generate and distribute electricity within state-designated service territory."  *Contra* Dkt.52-1.  HEA 1420 accords "incumbency" status to *any* entity that owns a transmission line in Indiana, even if it is an independent, transmission-only company like Republic Transmission, LLC. *See* Ind. Code §8-1-38-2; Dkt.45 at 17.  Indiana's ROFR regime is thus nothing like the tax exemption in *Tracy*, which was available *only* to LDCs.  *See* 519 U.S. at 282-83.

Properly understood, then, neither *Tracy* nor any other decision sanctions a law that precludes out-of-state companies from competing with in-state companies in an interstate market. Unlike in *Tracy*, Indiana is not treating two different kinds of sales or services differently.  Both

21

new entrants and incumbents must be certified as "public utilities" under Indiana law, *see* Ind. Code §§8-1-38-2, -7, so they are all subject to the same obligations, standards and requirements. HEA 1420 indisputably targets a single product: electric transmission facilities approved by a federally regulated "regional transmission organization" such as MISO. Ind. Code §8-1-38-9. And all entities that complete the rigorous process to become a MISO-qualified developer are "similarly situated" for purposes of bidding on MISO-approved transmission projects, regardless of whether they are "a vertically integrated utility" or "a transmission-only company." *Lake*, 48 F.4th at 320.

In a last-ditch effort to avoid strict scrutiny, Defendants assert that Congress "authorized States to enact ROFR laws like HEA 1420" in the Federal Power Act's "savings clause," 16 U.S.C. §824(b)(1). *See* Dkt.45 at 25; Dkt.52-1 at 22-23. That is another non-starter. Section 824(b)(1) provides that the federal government has jurisdiction over "the transmission of electric energy in *inter*state commerce," while the states retain jurisdiction over "the transmission of electric energy in *intra*state commerce" (emphasis added). Congress thus has not authorized states to regulate interstate transmission lines *at all*—much less "clearly expressed" any intention to let them to enact laws that discriminate in favor of in-state interests with respect to interstate transmission. *Cf. Hillside Dairy Inc. v. Lyons*, 539 U.S. 59, 66 (2003). To the contrary, the FPA expressly *precludes* states from enacting laws that, like HEA 1420, overtly attempt to regulate transmission lines "approved for construction through a regional transmission organization planning process"— i.e., lines approved by a *federally* regulated ISO/RTO managing the *inter*state grid. Ind. Code §8-1-38-9(c). Nor has FERC "determined that MISO *should* give effect to state-created rights of first refusal." Dkt.45 at 25 (emphasis added). FERC merely decided not to prohibit MISO from doing so, *see MISO*, 819 F.3d at 336, while offering no view on whether such laws are constitutional, *see MISO*, 150 FERC at ¶61,195 (2015) (Bay, Commissioner, concurring). That is a far cry from

affirmatively authorizing Indiana to discriminate against interstate commerce, which only Congress (not FERC) can do. To the best of Plaintiffs' knowledge, no court has ever accepted the remarkable claim that the FPA authorizes states to discriminate against interstate commerce. This Court should not be the first.

      B.    **HEA 1420 Cannot Survive Strict Judicial Scrutiny.**

Because HEA 1420 discriminates against interstate commerce, it is subject to "a virtually *per se* rule of invalidity." *Granholm*, 544 U.S. at 476. As Plaintiffs have explained, Defendants have no likelihood of showing that HEA 1420 "advances a legitimate local purpose that cannot be adequately served by reasonable nondiscriminatory alternatives." Dkt.5 at 19. Even assuming that the law furthers one of the potentially legitimate interests mentioned during the legislative hearings, that interest could readily be achieved through other, nondiscriminatory alternatives. *Id.* at 20-21; *see Jackson*, 2024 WL 4660920, at *17 (holding that Texas' ROFR law "does not survive strict scrutiny"). But if one ignores those hearings, as the state urges this Court to do, then the state is left with no asserted interest at all. HEA 1420 does not contain any legislative findings or statement of purpose, and post-hoc rationalizations cannot satisfy strict scrutiny. *See Hughes v. Oklahoma*, 441 U.S. 322, 338 n.20 (1979); *United States v. Virginia*, 518 U.S. 515, 533 (1996).

Defendants effectively concede that HEA 1420 cannot survive strict scrutiny. In fact, the Commissioners' brief is bereft of any reference to "strict scrutiny" or the "virtually *per se* rule of invalidity" that applies to discriminatory laws. *See generally* Dkt.45. Defendants instead argue only that HEA 1420 could survive the balancing test articulated in *Pike v. Bruce Church, Inc.*, 397 U.S. 137 (1970), or, in the alternative, "rational-basis review." Dkt.45 at 23-25; Dkt.52-1 at 17-21. Those arguments are irrelevant; neither standard applies, and Plaintiffs did not invoke either standard in their motion for preliminary injunction. Moreover, the so-called "studies" appended to the Commissioners' brief are not properly authenticated, *see* Fed. R. Evid. 901, and their

contention that allowing competition somehow *increases* costs to consumers defies FERC's express findings and basic principles of economics. *See, e.g.*, *Lake*, 48 F.4th at 324 n.9; *MISO*, 819 F.3d at 333; *Transmission Planning and Cost Allocation by Transmission Owning and Operating Public Utilities*, Order No. 1000, 136 FERC ¶61,051, ¶¶231, 285-86 (July 21, 2011). HEA 1420's blatant discrimination against interstate commerce is entirely unjustified.

## III.    Plaintiffs Will Be Irreparably Injured If They Are Barred From Competing For New Projects in Indiana.

Plaintiffs have also established an imminent threat of irreparable harm. The Commerce Clause gives Plaintiffs a constitutional right "to engage in interstate commerce free of discriminatory [state laws]." *Dennis*, 498 U.S. at 448. HEA 1420 is just such a discriminatory law, and (absent judicial intervention) it will cause Plaintiffs a concrete, irreparable injury in less than one month: It is undisputed that (1) the MISO Board is slated to approve well over *$1 billion* in new transmission projects in Indiana at its board meeting on December 10-12, 2024, and (2) if HEA 1420 remains in effect on that date, Plaintiffs will be barred from competing for any of those projects. *See* Dkt.5-1 ¶¶7-9; Dkt.45 at 5-6; Dkt.52-1 at 7. That impending Commerce Clause violation "constitutes proof of an irreparable harm." *Ind. Fine Wine & Spirits, LLC v. Cook*, 459 F.Supp.3d 1157, 1170 (S.D. Ind. 2020) (quoting *Preston v. Thompson*, 589 F.2d 300, 303 n.3 (7th Cir. 1978)). So does the loss of the unique business opportunities that MISO is poised to award, as Plaintiffs cannot recover money damages from Defendants. *Id.* Defendants' counterarguments are unpersuasive. Intervenors do not address irreparable harm at all, and the Commissioners just repeat their standing arguments, which fail for the reasons already explained. *See supra* pp.3-6.

## IV.    The Remaining Factors Overwhelmingly Weigh In Favor Of Injunctive Relief.

Little more needs to be said about the equitable factors. Defendants do not—and cannot—dispute that "the public interest is not harmed by preliminarily enjoining the enforcement of a

statute that is probably unconstitutional." *ACLU of Ill. v. Alvarez*, 679 F.3d 583, 590 (7th Cir. 2012). Defendants asserts that a state is irreparably harmed whenever it cannot enforce one of its statutes, Dkt.45 at 27-28, but that is not true when, as here, the statute is unconstitutional. *See Alvarez*, 679 F.3d at 590. Intervenors suggest that it is "unclear" how the requested injunction would operate. Dkt.52-1 at 24. But that is beside the point, as both MISO's tariff and MISO's public statements (which Defendants continue to ignore) make clear that MISO would not treat HEA 1420 as an "applicable, duly promulgated" law, and would thus open the LRTP Tranche 2.1 Projects to competition. *See supra* pp.4-5. To the extent Intervenors may be "harm[ed]" by the loss of their unconstitutional ROFR, Dkt.45 at 27, that injury is far outweighed by the harm Plaintiffs will suffer if they are barred from competing for the new projects. After all, Intervenors would still be able to compete for the projects on equal footing with Plaintiffs. Intervenors speculate that letting non-incumbents "operate critical pieces of the transmission grid" could "inject confusion and chaos," Dkt.52-1 at 28-29, but those concerns are completely unfounded, and indeed are thoroughly refuted by recent experience in Indiana. Any new market entrant must become an Indiana "public utility," Ind. Code §8-1-38-7, taking on an obligation to maintain its new facilities in accordance with same standards, responsibilities, and procedures as any other public utility, which is precisely what Republic did when it won the Duff to Coleman line. Plaintiffs are well-positioned to build and maintain the forthcoming LRTP Tranche 2.1 projects— as evidenced by their successful completion of the Duff to Coleman line. And the equities support not only honoring Plaintiffs' constitutional right to compete for the forthcoming LRTP Tranche 2.1 projects, but also allowing consumers across MISO's multi-state region to enjoy the lower prices and enhanced efficiency that would result from opening the projects to competition.

## CONCLUSION

The Court should preliminarily enjoin enforcement of HEA 1420.

Respectfully submitted,

s/Erin E. Murphy

| | |
|---|---|
| TODD A. RICHARDSON | PAUL D. CLEMENT* |
| JAMES E. ZOCCOLA | ERIN E. MURPHY* |
| THOMAS JONES | MATTHEW D. ROWEN* |
| LEWIS KAPPES | JOSEPH J. DEMOTT* |
| One American Square | CLEMENT & MURPHY, PLLC |
| Suite 2500 | 706 Duke Street |
| Indianapolis, IN 46282 | Alexandria, VA 22314 |
| (317) 639-1210 | (202) 742-8900 |
| | erin.murphy@clementmurphy.com |

*Admitted pro hac vice

*Counsel for Plaintiffs*

November 15, 2024