### UNITED STATES DISTRICT COURT
### SOUTHERN DISTRICT OF INDIANA
### INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| LSP TRANSMISSION HOLDINGS II, LLC,<br>LS POWER MIDCONTINENT, LLC,<br>CENTRAL TRANSMISSION, LLC,<br>LS POWER GRID DRS HOLDINGS, LLC,<br><br>Plaintiffs,<br><br>v.<br><br>CHAIRMAN JAMES F. HUSTON Indiana Utility<br>Regulatory Commission,<br>COMMISSIONER WESLEY R. BENNETT<br>Indiana Utility Regulatory Commission,<br>COMMISSIONER SARAH E. FREEMAN<br>Indiana Utility Regulatory Commission,<br>COMMISSIONER DAVID E. VELETA Indiana<br>Utility Regulatory Commission,<br>COMMISSIONER DAVID E. ZIEGNER Indiana<br>Utility Regulatory Commission,<br><br>Defendants.<br>_____<br>NORTHERN INDIANA PUBLIC SERVICE<br>COMPANY,<br>INDIANAPOLIS POWER & LIGHT COMPANY<br>d/b/a AES Indiana,<br>SOUTHERN INDIANA GAS AND ELECTRIC<br>COMPANY d/b/a CenterPoint Energy Indiana<br>South,<br>DUKE ENERGY INDIANA, LLC,<br><br>Intervenor Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Case No. 1:24-cv-01722-TWP-MG |

### <u>ENTRY ON PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION</u>

This matter is before the Court on plaintiffs LSP Transmission Holdings II, LLC, LS Power

Midcontinent, LLC, Central Transmission LLC, and LS Power Grid DRS Holdings, LLC's

(collectively, "LSP") Motion for Preliminary Injunction ("the Motion").  (Filing No. 4.)  LSP, a

developer and owner of transmission projects throughout the United States, seeks to bid on several

forthcoming transmission projects in Indiana, but claims that Indiana House Enrolled Act 1420 of 2023 ("HEA 1420") blocks them from doing so. LSP asserts its claim under 42 U.S.C. § 1983 and seeks to enjoin the Chairman and Commissioners of the Indiana Utility Regulatory Commission (collectively, "IURC" or "IURC Defendants") from enforcing HEA 1420 because it violates the dormant Commerce Clause of the U.S. Constitution. (Filing No. 4 at 1.)  For the reasons that follow, the Court **grants** LSP's request for preliminary injunctive relief.

## I.    LEGAL STANDARD

"A preliminary injunction is an extraordinary remedy never awarded as of right.  In each case, courts must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).  To obtain a preliminary injunction, the party seeking the injunctive relief must demonstrate that:

> (1) it has some likelihood of success on the merits of its claim; (2) it has no adequate remedy at law; (3) without relief it will suffer irreparable harm. If the plaintiff fails to meet any of these threshold requirements, the court must deny the injunction. However, if the plaintiff passes that threshold, the court must weigh the harm that the plaintiff will suffer absent an injunction against the harm to the defendant from an injunction, and consider whether an injunction is in the public interest.

*GEFT Outdoors, LLC v. City of Westfield*, 922 F.3d 357, 364 (7th Cir. 2019) ("*GEFT I*") (citations and quotation marks omitted).  "The court weighs the balance of potential harms on a 'sliding scale' against the movant's likelihood of success: the more likely he is to win, the less the balance of harms must weigh in his favor; the less likely he is to win, the more it must weigh in his favor." *Turnell v. CentiMark Corp.*, 796 F.3d 656, 662 (7th Cir. 2015).  "The sliding scale approach is not mathematical in nature, rather it is more properly characterized as subjective and intuitive, one which permits district courts to weigh the competing considerations and mold appropriate relief." *Stuller, Inc. v. Steak N Shake Enters.*, Inc., 695 F.3d 676, 678 (7th Cir. 2012) (citations and internal

quotation marks omitted). "Stated another way, the district court 'sit[s] as would a chancellor in equity' and weighs all the factors, 'seeking at all times to minimize the costs of being mistaken.'" *Id.* (quoting *Abbott Lab'ys v. Mead Johnson & Co.*, 971 F.2d 6, 12 (7th Cir. 1992)).

## II.    FINDINGS OF FACT

### A.    Regulatory Background

In 1920, Congress enacted the Federal Power Act ("the Act") to regulate the interstate transmission of electricity across the United States. *See generally,* 16 U.S.C. §§ 791, 824. The Act authorizes the Federal Energy Regulatory Commission ("FERC") (formerly, the Federal Power Commission) to regulate interstate electricity transmission by monitoring interstate energy markets to ensure they remain reliable, open and competitive.[1] In particular, FERC is charged with the "establishment, review, and enforcement of rates and charges for the transmission or sale of electric energy, including … the interconnection … of facilities for the generation, transmission, and sale of electric energy." 42 U.S.C. §§ 7134, 7172(a)(1)(B).

In the decades following the Act's enactment, FERC sought to transform the electric power market to make electric transmission more efficient, competitive, and affordable. In 1996, FERC issued a rule, known as Order No. 888, to "remove impediments to competition in the wholesale bulk power marketplace and to bring more efficient, lower cost power to the Nation's electricity consumers." *Promulgating Wholesale Competition Through Open Access Non-Discriminatory Transmission Services*, Order No. 888, 61 Fed. Reg. 21,540 (Apr. 24, 1996). Order No. 888 required all owners of high-voltage interstate transmission lines to allow access to their systems by any power generator or power consumer who wanted to use them. *Id*. It also encouraged the

---

[1] Federal Energy Regulatory Commission, *Open Access: Major FERC Orders: Part II, Order No. 888*, YOUTUBE (Apr. 27, 2017), https://www.youtube.com/watch?v=Qj_ElKbVKFE.

creation of independent system operators ("ISOs") and regional transmission organizations as a mechanism for streamlining regional electric transmission planning.  *Id.* at 279.  ISOs and regional transmission organizations are comprised of individual transmission owners that work together to develop procedures to manage electric transmission equitably.[2]  They are required to submit an "open-access tariff," subject to FERC's approval, describing the services they would provide, the cost of those services, and how their services would be regulated.  18 C.F.R. § 35.34(k); *see also* 18 C.F.R. § 35.2(c)(1).

Indiana's power grid is managed by two regional transmission organizations:  Midcontinent Independent System Operator ("MISO") and PJM Interconnection ("PJM").  Before 2011, MISO's tariff gave transmission owners already serving a particular area the right to be the first to decide whether to construct an electric transmission project.  *See MISO Transmission Owners v. F.E.R.C.*, 819 F.3d 329, 332 (7th Cir. 2016).  These grants were known as federal "rights of first refusal." *Id.* at 331. In July 2011, however, FERC eliminated federal rights of first refusal in Order No. 1000 to further its open-access goal.  *Transmission Planning and Cost Allocation by Transmission Owning and Operating Public Utilities*, Order No. 1000, 77 Fed. Reg. 64,890 (July 21, 2011) (18 C.F.R. § 35).  In FERC's view, rights of first refusal are "unjust and unreasonable" because they eliminate potential solutions to regional transmission needs.  Order No. 1000 at 225.  Indeed, federal rights of first refusal "create opportunities for undue discrimination and preferential treatment against nonincumbent transmission developers within existing regional transmission planning processes."  *Id.* at 226.  Instead of avoiding competition, individual providers would be required to meet certain qualification criteria and submit proposals to ISOs and regional

---

[2] Federal Energy Regulatory Commission, *Electric Power Markets: National Overview*, FERC (May 16, 2023), https://www.ferc.gov/electric-power-markets.

transmission organizations for the construction of new transmission lines in an open and competitive bidding process. *See id.* at 12.

Nevertheless, FERC stopped short of eliminating *state* rights of first refusal. *Id.* at 227. Order No. 1000 specifically states that it does not "limit, preempt, or otherwise affect state or local laws or regulations with respect to construction of transmission facilities." *Id.* As the Seventh Circuit explained, "FERC wanted 'to avoid intrusion on the traditional role of the States' in regulating the siting and construction of transmission facilities." *MISO Transmission Owners*, 819 F.3d at 336 (citing *S.C. Pub. Serv. Auth. v. FERC*, 762 F.3d 41, 72 (D.C. Cir. 2014)). As a result, many states, including Indiana, enacted statutes reintroducing state rights of first refusal for transmission providers with an existing presence in the state. And many regional transmission organizations, including MISO, reintroduced tariff provisions honoring state rights of first refusal consistent with Order No. 1000. (Filing No. 45-2, MISO Tariff, at 2.)

**B.    Electric Transmission in Indiana**

Following the enactment of Order No. 1000, the Indiana state legislature enacted House Enrolled Act 1420 of 2023, which provides:

> (a) An incumbent electric transmission owner has the right to construct, own, operate, and maintain the following: (1) An electric transmission facility that has been approved for construction through a regional transmission organization planning process and that connects to an electric transmission facility owned by the incumbent electric transmission owner. (2) Upgrades to an existing electric transmission facility owned by the incumbent electric transmission owner if the upgrades have been approved for construction through a regional transmission organization planning process.

Ind. Code § 8-1-38-9(a).  "Incumbent electric transmission owners" are public utilities[3] that own, operate, and maintain an electric transmission facility[4] in whole or in part in Indiana.  *Id.* § 8-1-38-2.  If the incumbent is approved for construction by an ISO or regional transmission organization, then it must notify IURC within ninety days of approval that it intends to construct such a facility.  *Id.* § 8-1-38-9(c).  If the incumbent does not intend to exercise its rights under HEA 1420, then another entity may seek approval to construct the facility.  *Id.*

In enacting HEA 1420, "the Indiana General Assembly concluded that this transmission-project designation framework would best address the critical and ongoing responsibility of owning and operating new transmission facilities as part of an integrated network." (Filing No. 60 at 6).  The IURC Defendants proffer that "this framework furthers the health and safety of all Hoosiers by promoting continuity of service, reliable service quality, and cost-effective infrastructure in Indiana, consistent with Indiana's traditional regulatory design and current energy policy." *Id.*

The Indiana Utility Regulatory Commission is the entity charged with regulating electric transmission in Indiana.  *See generally* Ind. Code. § 8-1-1-1.  It is IURC's "duty to enforce [Indiana utility regulations], as well as all other laws, relating to public utilities," *id.* § 8-1-2-115, including HEA 1420.

**C.    MISO's Response to Order No. 1000**

MISO is one of two regional transmission organizations that serve Indiana.  After FERC implemented Order No. 1000, MISO revised its tariff to include a provision requiring it to honor

---

[3] A "public utility" is a "public, municipally owned, or cooperatively owned utility" or a "joint agency created under Ind. Code § 8-1-2.2."  Ind. Code § 8-1-8.5-1(a).

[4] To be sure, an "electric transmission facility" is a "high voltage transmission line with a rating of at least one hundred (100) kilovolts and related transmission facilities and controls."  *Id.* § 8-1-38-1(a).

state rights of first refusal. (Filing No. 45-2 at 2) (providing that transmission providers "shall comply with any Applicable Laws and Regulations granting a right of first refusal to a Transmission Owner"). In 2022, MISO launched the second round ("Tranche 2.1") of its Long-Range Transmission Planning initiative, soliciting competitive bids for five transmission construction projects across the region, including in Indiana. MISO is set to approve a new round of construction bids when its Board of Directors meets on December 10, 2024. (Filing No. 5-1 at 3.)

**D.    LSP's Background**

LSP Transmission Holdings II, LLC, is a Delaware LLC with its principal place of business in Chesterfield, Missouri. (Filing No. 3 at 4.) It has several subsidiaries and affiliates, including Plaintiffs LS Power Midcontinent, LLC ("LSP Midcontinent"); Central Transmission, LLC ("Central Transmission"); and LS Power Grid DRS Holdings, LLC ("LS Power Grid"). *Id.* at 4-5. Each of the plaintiff-subsidiaries are qualified to bid in MISO except Central Transmission, which is qualified in PJM. *Id.* at 5. LS Power Grid is the majority owner of Republic Transmission, LLC ("Republic"), which has been certified as a public utility in Indiana and was awarded MISO's first post-Order No. 1000 project in December 2016. (Filing No. 5-1 at 3).

LSP has a long history of active development of new electric transmission, partnering with communities across the country to create lower-cost, cleaner energy solutions. Since their inception, Plaintiffs and their affiliates have developed, constructed, managed, and acquired more than 47,000 megawatts of competitive power generation and more than 780 miles of long-distance, high-voltage transmission infrastructure in the United States, for which they have collectively raised over $60 billion in debt and equity financing. (Filing No. 3 at 14). More than 350 miles of additional transmission projects are currently under construction. *Id.*

LSP and its affiliates filed their Complaint for declaratory and injunctive relief against the Chairman of IURC, James Huston, and IURC's four commissioners in their official capacities because, pursuant to 42 U.S.C. § 1983, HEA 1420 violates the Commerce Clause.  (Filing No. 3.) Plaintiffs also filed the Motion for Preliminary Injunction at issue here.  (Filing No. 4.)  Shortly thereafter, four entities moved under Federal Rule of Civil Procedure 24 to intervene as defendants: Northern Indiana Public Service Company, Indianapolis Power & Light Company, Southern Indiana Gas and Electric Company, and Duke Energy Indiana (collectively, "Intervenors" or "Intervenor Defendants").  (Filing No. 50.)  Intervenor Defendants are vertically integrated, incumbent Indiana service providers that supply electric transmission service to customers from electricity generation through distribution and sale.  (Filing No. 60 at 10, 13.)  They intervened in this action to "defend their express statutory [rights of first refusal] under HEA 1420." *Id.* at 13.

### III.    DISCUSSION

As previously stated, to obtain a preliminary injunction, LSP must establish the following factors as to the statute it seeks to enjoin: (1) that it is likely to succeed on the merits of its claims; (2) that it has no adequate remedy at law; (3) that it is likely to suffer irreparable harm in the absence of preliminary relief; (4) that the balance of equities tip in its favor; and (5) issuing the injunction is in the public interest.  *GEFT I,* 922 F.3d at 364.  The first two factors are threshold determinations.  "If the moving party meets these threshold requirements, the district court 'must consider the irreparable harm that the nonmoving party will suffer if preliminary relief is granted, balancing such harm against the irreparable harm the moving party will suffer if relief is denied.'" *Stuller, Inc.*, 695 F.3d at 678 (quoting *Ty, Inc. v. Jones Group, Inc.*, 237 F.3d 891, 895 (7th Cir. 2001)).  The Court will address the threshold factors before addressing the remaining factors.

A.     <u>**Likelihood of Success on the Merits**</u>

A party moving for preliminary injunctive relief need not demonstrate a likelihood of "absolute success on the merits." *Valencia v. City of Springfield*, 883 F.3rd 959, 966 (7th Cir. 2018). However, the plaintiff "must demonstrate that 'its claim has some likelihood of success on the merits,' not merely a 'better than negligible' chance." *Mays v. Dart*, 974 F.3d 810, 822 (7th Cir. 2020) (quoting *Ty, Inc.*, 237 F.3d at 895). "What amounts to 'some' depends on the facts of the case at hand because of [the] sliding scale approach." *Id.* (citing *Ty, Inc.*, 237 F.3d at 895).

The Commerce Clause gives Congress authority "to regulate Commerce … among the several States." U.S. Const. art. I, § 8, cl. 3. The United States Supreme Court has long held that the Commerce Clause also prohibits states from enacting laws that unduly restrict interstate commerce. *Tenn. Wine & Spirits Retailers Ass'n v. Thomas*, 588 U.S. 504, 514 (2019). State laws invalidly discriminate against interstate commerce in violation of the so-called "dormant Commerce Clause" if "they mandate differential treatment of in-state and out-of-state economic interests that benefits the former and burdens the latter." *Granholm v. Heald*, 544 U.S. 460, 472 (2005). LSP seeks to enjoin IURC from enforcing HEA 1420 because the statute mandates differential treatment of incumbent transmission owners and transmission owners without an existing physical presence in Indiana.

The Defendants argue that LSP is not likely to succeed on the merits of the Commerce Clause claim because the text of HEA 1420 does not create the in-state versus out-of-state distinction, and because the Court lacks authority to hear the claim. In Defendants' view, the claim is barred because (1) § 1983 does not provide a cause of action for Commerce Clause claims, (2) LSP lacks standing to bring the claim, and (3) the IURC Defendants are immune from suit. As to the first assertion, the Defendants are mistaken that LSP lacks a cause of action. It is well-settled

that "violations of the Commerce Clause may be brought under … § 1983." *Dennis v. Higgins*, 498 U.S. 439, 440 (1991).

Before moving to the substantive issues, the Court will first address the Defendants' standing and sovereign immunity arguments because they implicate the Court's jurisdiction. *See McHugh v. Ill. Dep't of Transp.*, 55 F.4th 529, 532 (7th Cir. 2022) ("When it applies, the Eleventh Amendment deprives federal courts of jurisdiction over claims against immune defendants.").

### 1.    <u>Standing</u>

Article III of the U.S. Constitution limits federal courts to resolving "cases" and "controversies." U.S. Const. art. III, § 2.  To establish the "irreducible constitutional minimum" of standing to challenge HEA 1420, the Plaintiffs must allege they suffered (1) an injury in fact, (2) that is fairly traceable to the defendants, and (3) that is likely to be redressed by a favorable judicial decision. *Bost v. Ill. State Bd. of Elections*, 114 F.4th 634, 639 (7th Cir. 2024) (citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992)).  LSP's burden at the preliminary injunction stage is "at least as great as the burden of resisting a summary judgment motion." *Speech First, Inc. v. Killeen*, 968 F.3d 628, 638 (7th Cir. 2020) (citation omitted).  Therefore, LSP must "'set forth' by affidavit or other evidence 'specific facts,' rather than 'general factual allegations of injury.'" *Id.* (citing *Six Star Holdings, LLC v. City of Milwaukee*, 821 F.3d 795, 801–02 (7th Cir. 2016)).

The IURC Defendants do not challenge LSP's assertion of an injury in fact.  But because it must assure itself of jurisdiction, the Court will briefly address this initial element of standing.  An injury in fact is one that is "concrete and particularized" and "actual or imminent, not conjectural or hypothetical." *Bost*, 114 F.4th at 634 (citing *Lujan*, 504 U.S. at 560).  The Plaintiffs submitted evidence that they "intend to bid, if allowed, on several—and possibly all—of the Tranche 2.1 projects in Indiana." (<u>Filing No. 45-3 at 7</u>.)  HEA 1420 allegedly impinges on LSP's

right to bid for those projects.  Thus, in this context, the "injury in fact" is "the inability to compete on an equal footing in the bidding process, not the loss of a contract."  *N. E. Fla. Contractors v. Jacksonville*, 508 U.S. 656, 666 (1993); *see also All. for Clean Coal v. Miller*, 44 F.3d 591, 594 (7th Cir. 1995).  LSP has satisfied the requirements to show it suffered an "injury in fact" at the preliminary injunction stage.

The IURC Defendants argue that even if LSP establishes an injury in fact, that injury is not traceable to IURC; instead, it is traceable to MISO's decision to honor state rights of first refusal in the first instance.  (Filing No. 45 at 14.)  "The traceability element of Article III standing examines the causal connection between the assertedly unlawful conduct and the alleged injury." *Taylor v. Salvation Army Nat'l Corp.*, 110 F.4th 1017, 1025 (7th Cir. 2024) (citation and quotations omitted).  The plaintiff "need not establish that the defendant's conduct was the most immediate cause, or even a proximate cause, of [its] injuries."  *Id*.  On the contrary, "Article III requires no more than a meaningful connection between the two."  *Id.* (cleaned up).  Here, a "meaningful connection" exists between LSP's inability to compete on an equal footing and the operation of HEA 1420.  If the right of first refusal conferred by HEA 1420 did not exist, MISO would award its new projects through a competitive process in which LSP could participate.  Because the IURC enforces the rights of first refusal, *see* Ind. Code § 8-1-2-115, LSP's alleged injury is traceable to the IURC Defendants.

Finally, the IURC Defendants argue that an injunction would not redress the alleged injury because it would not invalidate HEA 1420 or oblige MISO to act in any way.  (Filing No. 45 at 15.)  MISO would instead be required to follow its tariff, which orders MISO to honor state right of first refusal laws.  *Id*.  IURC is correct that "redressability requires that the court be able to afford relief *through the exercise of its power*."  *Haaland v. Brackeen*, 599 U.S. 255, 294 (2023)

11

(emphasis in original). But its contention fails on the theory that an injunction would only redress an injury resulting from a third party—MISO—not before this Court. As explained above, LSP's injury is traceable to IURC through its enforcement of HEA 1420. The Indiana legislature has imposed on IURC a "duty, to enforce [utility regulations] as well as all other laws, relating to public utilities." Ind. Code § 8-1-2-115. HEA 1420 is situated within Title 8, Article 1, Chapter 38 of the Indiana Code covering "Utilities and Transportation." *See* Ind. Code § 8-1-38-9. By definition, HEA 1420 is a law "relating to public utilities" that IURC must enforce. Accordingly, this Court can, through the exercise of its powers, enjoin IURC from implementing HEA 1420. *See GEFT Outdoor, LLC v. City of Evansville*, 110 F.4th 935, 938 (7th Cir. 2024) ("*GEFT II*"). IURC would no longer be permitted to recognize an incumbent's right of first refusal, and neither, in turn, would MISO.

If IURC remains concerned that an injunction would affect only MISO as an independent third party, LSP can still satisfy the redressability element by showing there is a "substantial risk that, in the near future," MISO will limit Tranche 2.1 awards to incumbents in violation of the Commerce Clause. *See Murthy v. Missouri*, 603 U.S. 43, 58 (2024) ("[T]he plaintiffs must show that the third-party platforms 'will likely react in predictable ways' to the defendants' conduct.") (citing *Dep't of Com. v. New York*, 588 U.S. 752, 768 (2019)). In a recent state case, an Iowa court enjoined enforcement of Iowa's right-of-first-refusal law. *See LS Power Midcontinent, LLC v. State*, 988 N.W.2d 316 (Iowa 2023). MISO appeared as *amicus curiae* in a subsequent appeal, acknowledging that "no ROFR rights will be accorded to Iowa projects" following the Iowa court's decision. (Filing No. 58-1 at 21.) IURC gives the Court no reason to believe MISO will deviate from this pattern should *this* Court enjoin enforcement of HEA 1420. Therefore, MISO's public statements suffice to show a "substantial risk" that, when its Board of Directors meets on December

10, 2024, it will decline to accord rights of first refusal to Indiana incumbents pursuant to HEA 1420.

Considering these requirements together, the Court is satisfied that LSP has standing to pursue its claims at this stage.

### 2. Sovereign Immunity

Next, the IURC Defendants argue that LSP is unlikely to succeed on the merits of its claim because the Chairman and Commissioners are state officials to whom the Eleventh Amendment of the U.S. Constitution grants sovereign immunity. Sovereign immunity is an affirmative defense that IURC must prove. *See On-Site Screening, Inc. v. United States*, 687 F.3d 896, 899 (7th Cir. 2012). Because "the burdens at the preliminary injunction stage track the burdens at trial," *Gonzalez v. O Centro Espirita Beneficiente Uniao do Vegetal*, 546 U.S. 418, 429 (2006), IURC must show it is likely to succeed on this defense. *See id.* at 428–30.

The Eleventh Amendment bars suit against state officials acting in their official capacities unless, under *Ex parte Young*, 209 U.S. 123 (1908), a plaintiff files suit seeking prospective equitable relief for ongoing violations of federal law. *Ind. Prot. & Advoc. Servs. v. Ind. Fam. & Soc. Servs. Admin.*, 603 F.3d 365, 370–71 (7th Cir. 2010). The plaintiff must show that the named state official "plays some role in enforcing the statute" for the exception to apply. *Doe v. Holcomb*, 883 F.3d 971 (7th Cir. 2018). The Court "need only conduct a 'straightforward inquiry' into whether [the] complaint alleges an ongoing violation of federal law and seeks relief properly characterized as prospective" for *Ex parte Young* to apply. *Indiana Protection*, 603 F.3d at 370–71 (citing *Verizon Maryland Inc. v. Pub. Serv. Comm'n*, 535 U.S. 635, 645 (2002)).

Here, LSP alleges that individual state officials tasked with enforcing utility laws commit an ongoing violation of the Commerce Clause by recognizing rights of first refusal under HEA 1420. LSP also seeks declaratory and injunctive relief, which are "paradigmatic examples of

prospective relief." *Driftless Area Land Conservancy v. Valq*, 16 F.4th 508, 521 (7th Cir. 2021). Still, the IURC Defendants insist *Ex parte Young* may not be invoked against state officials who merely regulate or supervise a particular area of state activity.  In their view, IURC's only role with respect to HEA 1420 is ministerial in nature – namely, to accept and docket notices from Indiana incumbents wishing to exercise their rights under the statute.  In support, IURC relies on *Doe v. Holcomb*, 883 F.3d 971 (7th Cir. 2018), and *Peshek v. Johnson*, 111 F.4th 799 (7th Cir. 2024), but both cases are inapposite.

In *Doe*, the Seventh Circuit held that none among the Governor of Indiana, the Indiana Attorney General, or a state court official could be sued for violations of the First and Fourteenth Amendments because they did not play any role in enforcing the name-change statute at issue. *See, e.g.*, 883 F.3d at 976 (finding the Governor could not be sued because he "was not specifically charged with a duty to enforce the name-change statute").  Unlike the Indiana officials in that case, the IURC was "specifically charged" with the duty to enforce laws relating to public utilities, including HEA 1420.  *See supra*, Section III(A)(1).  Similarly, in *Peshek*, the court found that Wisconsin law imbued the Attorney General with enforcement authority rather than the defendant in that case, the Secretary of the Wisconsin Department of Health Services.  111 F.4th at 804.  The plaintiffs had simply sued the wrong defendant.  *Id*.  The IURC Defendants identify no Indiana statute granting enforcement authority to any other state actor.  Nor do they explain why the enforcement authority imposed upon them under Ind. Code § 8-1-2-115 is not enough to pass constitutional muster.  The burden is on the defendants to show a likelihood of success on the sovereign immunity claim and they have failed to do so here.

To be sure, IURC's role in enforcing HEA 1420 is clear from the text of the statute.  HEA 1420 is given effect when IURC accepts notices from incumbents intending to construct, own,

operate and maintain an approved electric transmission facility.  Ind. Code § 8-1-38-9(c).  IURC continues in its enforcement role by monitoring the project, including its costs and rate formulas, and ensuring the incumbent complies with Indiana's utility regulations, *id.*, violations of which IURC may sanction with monetary penalties, *see id.* § 8-1-2-115.  In sum, IURC plays an enforcement rather than ministerial role, and its Chairman and Commissioners may be sued in their official capacities pursuant to *Ex parte Young*.

### 3.    The Commerce Clause claim

With preliminaries out of the way, the Court may now address the substance of the Commerce Clause claim.  Recall that the dormant Commerce Clause prohibits states from enacting laws that mandate differential treatment of in-state and out-of-state economic interests that benefits the former and burdens the latter.  *Granholm*, 544 U.S. at 472.  Almost all state laws and local regulations touch on interstate commerce in some way, but it is only those laws and regulations that *discriminate* against interstate commerce that run afoul of the dormant Commerce Clause. *Regan v. City of Hammond*, 934 F.3d 700, 702 (7th Cir. 2019).  The Seventh Circuit identifies discriminatory state laws by placing them in one of three categories, "depending on the degree to which to which they affect interstate commerce: (1) laws that expressly discriminate against interstate commerce; (2) laws that, although neutral on their face, bear more heavily on interstate commerce; and (3) laws that may have a mild effect on interstate commerce but in practice do not give local firms any competitive advantage over firms located elsewhere." *Id.* at 703.  A law that falls within the first category is *per se* unconstitutional and subject to strict scrutiny that allows the law to stand only if it serves a legitimate governmental interest for which there are no non-discriminatory alternatives to furthering that interest.  *Id.*

HEA 1420 grants a right of first refusal to incumbent transmission owners such that they may avoid competition in pursuit of electric transmission projects.  *See* Ind. Code § 8-1-38-9.  As

15

a reminder, "incumbent electric transmission owner" means a public utility that owns, operates, and maintains an electric transmission facility in whole or in part in Indiana.  *Id.* § 8-1-38-2.  The Plaintiffs are non-incumbent transmission owners who do not currently own, operate, or maintain transmission lines in Indiana.  As the statute concerns property ownership in the state, it expressly mandates differential treatment of in-state and out-of-state economic interests that benefits owners of transmission facilities in Indiana and burdens owners of transmission facilities outside of Indiana.  Entities, like Intervenor Defendants, that already own, operate, and maintain facilities in Indiana must do nothing more than inform IURC of their intent to construct or upgrade a transmission line that connects to one of their existing facilities to avoid competition for new transmission projects.  On the other hand, entities like LSP are required to establish a physical presence in the state before they may compete in the Indiana electric transmission market.  "Limiting competition based on the existence or extent of a business's local foothold is the protectionism that the Commerce Clause guards against."  *NextEra Energy Capital Holdings v. Lake*, 48 F.4th 306, 326 (5th Cir. 2022) (citing *Granholm*, 544 U.S. at 466).

The facts in *Granholm* are instructive.  A New York law permitted local wineries to make direct wine sales to New York customers on terms not available to out-of-state wineries. *Granholm*, 544 U.S. at 470.  Out-of-state wineries were permitted to ship to New York customers only if they established a branch factory, office, or storeroom within the State of New York.  *Id.* The Supreme Court struck down the law as violative of the dormant Commerce Clause because although it did not ban direct shipments from out-of-state wineries altogether, requiring them to establish an operation in New York was just an indirect way of subjecting those wineries to cost-prohibitive operating requirements to which local wineries were not similarly subject.  *Id.* at 474.

So too, here. HEA 1420, though not a complete ban on out-of-state transmission owners, erects a barrier to the interstate electric transmission market by limiting who can compete for new construction projects in Indiana. The right of first refusal in favor of Indiana incumbents runs contrary to the Supreme Court's admonition that "States cannot require an out-of-state firm to become a resident in order to compete on equal terms." *Id.* at 475 (citing *Halliburton Oil Well Cementing Co. v. Reilly*, 373 U.S. 64, 72 (1963)).

IURC and the Intervenors defend HEA 1420 on grounds similar to those rejected in *Granholm*. They argue that all transmission owners – both in-state and out-of-state – are limited by the right of first refusal because even new Indiana utilities may not connect to an incumbent's existing facility. But the Supreme Court has consistently held that it is immaterial that some in-state businesses are subject to the proscriptions of a discriminatory statute. *Dean Milk v. City of Madison*, 340 U.S. 349, 354 n.4 (1951); *C & A Carbone, Inc. v. Town of Clarkstown*, 511 U.S. 383, 391 (1994); *see Fort Gratiot Sanitary Landfill, Inc. v. Michigan Dep't of Nat. Res.*, 508 U.S. 353, 361 (1992). The Defendants also ask the Court to follow the Eighth Circuit's reasoning in *LSP Transmission Holdings, LLC v. Sieben*, 954 F.3d 1018 (8th Cir. 2020), but for the following reasons, the Court declines to do so.

In *Sieben*, the Eighth Circuit upheld a similar right-of-first-refusal statute enacted by the Minnesota legislature because Minnesota incumbents included entities headquartered in other states. 954 F.3d at 1028. The court reasoned that "[i]t would be a different matter … if the state were to treat a company in another state differently from Minnesota companies" based on where the company is incorporated or "principally located." *Id.* "Minnesota's preference is for electric transmission owners who have existing facilities, and its law applies evenhandedly to all entities, regardless of whether they are Minnesota-based entities or based elsewhere." *Id.*

17

Respectfully, the Court finds the Fifth Circuit's reasoning in *Lake* to be more persuasive. In striking down Texas' right-of-first-refusal statute, the Fifth Circuit explained, "if 'place of incorporation alone' were controlling, 'then a state's dormant Commerce Clause liability would turn on the empty formality of where a company's articles of incorporation were filed, rather than where the company's business takes place or where its political influence lies.'" *Lake*, 48 F.4th at 323 (citing *Fla. Transp. Servs., Inc. v. Miami-Dade Cnty.*, 703 F.3d 1230, 1259 (11th Cir. 2012)). Furthermore, "[i]n finding dormant Commerce Clause violations, the Supreme Court did not even mention place of incorporation for the wineries in New York, coal mines in Oklahoma, or dairies in Madison, Wisconsin that received an unlawful benefit because of their local presence." *Id.* at 322 (citing *Granholm*, 544 U.S. at 475; *Wyoming v. Oklahoma*, 502 U.S. 437, 457-59 (1992); *Dean Milk*, 340 U.S. at 352). The *Sieben* court does not grapple with *Granholm* or any of the Supreme Court's Commerce Clause jurisprudence affecting similar state statutes. Accordingly, "[f]or the concern about in-state interests being able to obtain favorable treatment over out-of-state interests, local presence, rather than place of incorporation, should matter." *Id.* at 323.

*Regan v. City of Hammond*, a Seventh Circuit decision on which the Defendants also rely, does not change the outcome. In that case, the Hammond municipal code required landlords to either obtain a license from the city or hire a Hammond-licensed contractor to make repairs to their property. *Regan*, 934 F.3d at 702. The ordinance excepted from the license requirement individuals who lived in the property they wished to repair. *Id*. The plaintiffs argued that the ordinance, coupled with the exception, "impermissibly burden[ed] interstate commerce by imposing costs on property owners who, like Regan, do not reside in Hammond which locally-domiciled homeowners do not have to pay." *Id*. The Seventh Circuit disagreed primarily because "occupant homeowners," to whom the exception applied, were not "similarly situated with

18

landlords," because they are "not in meaningful competition" with one another.  *Id.* at 704.  "Laws that draw distinctions between entities that are not competitors do not 'discriminate' for purposes of the dormant Commerce Clause."  *Id.* (citation omitted).

HEA 1420 is no such law.  It draws a straightforward distinction between entities that are direct competitors in the interstate market for electric transmission.  Both incumbent and non-incumbent transmission owners compete for business in Indiana and elsewhere throughout the Midwest via MISO's regional transmission planning process.  The Intervenor Defendants resist this conclusion on the theory that *some* incumbents operate in defined service areas as vertically integrated utilities and, therefore, do not compete with non-incumbents like LSP.  The Court is not persuaded.  HEA 1420 accords incumbency status to *any* public utility that owns a transmission line in Indiana, including those independent, transmission-only entities like Republic, who compete with vertically integrated companies such as Intervenor defendants.  (Filing No. 58 at 28.) Therefore, HEA 1420 expressly discriminates against interstate commerce and will stand only if it serves a legitimate governmental interest for which there is no non-discriminatory alternative.

HEA 1420 cannot withstand strict scrutiny.  Although it serves legitimate governmental interests—promoting transmission reliability, maintaining cost-effective infrastructure, and continuity of service—Indiana already requires "[e]very public utility … to furnish reasonably adequate service and facilities."  Ind. Code § 8-1-2-4.  Thus, the Defendants' proffered reasons for upholding the statute are insufficient because the state's interests are adequately served by existing, non-discriminatory utility regulations.  Therefore, Plaintiffs are likely to succeed on the merits of their dormant Commerce Clause claim.

**B.    Irreparable Harm and Inadequate Remedy at Law**

As explained above, LSP asserts it will suffer irreparable harm for which there is no adequate remedy at law because absent an injunction, it will be barred from competing for MISO's Tranche 2.1 projects at the soon-approaching MISO Board meeting.  Courts have repeatedly held that a company is irreparably harmed if it is disadvantaged in—let alone completely barred from—competing for business opportunities.  *See, e.g., Ind. Fine Wine & Spirits v. Cook*, 459 F.Supp.3d 1157, 1170 (S.D. Ind. 2020) (plaintiff established irreparable harm where protectionist law threatened to deprive it of "the opportunity to establish its store in Indiana").  Moreover, "the existence of a continuing constitutional violation constitutes proof of an irreparable harm … and this principle of law applies to violations of the Commerce Clause."  *Id.*  Based on the evidence before it, the Court is convinced that absent an injunction, MISO will grant its Tranche 2.1 projects to an incumbent and LSP will have missed out on its opportunity to compete for billions in potential profits.  And because LSP cannot recover monetary damages from the IURC Defendants as state officials, the Court is satisfied that LSP will suffer irreparable harm without an injunction.  *E. St. Louis Laborers' Local 100 v. Bellon Wrecking & Salvage Co.*, 414 F.3d 700, 703 (7th Cir. 2005).

**C.    Balance of Harms and Public Interest**

Having concluded that, absent an injunction, LSP will suffer irreparable harm for which there is no adequate remedy at law, the Court now considers whether the balance of harms and public interest weigh in favor of injunctive relief.  These remaining factors merge when, as here, the government is a defendant.  *Eli Lilly & Co. v. Cochran*, 526 F. Supp. 3d 393, 409 (S.D. Ind. 2021).

LSP asserts that the balance of harms and public interest favor LSP because while consumers will face economic harm in the form of "unjust" and "unreasonable" transmission rates

without an injunction, "no meaningful equities support[] the state's position." (Filing No. 5 at 31.) By contrast, the Defendants assert that an injunction will threaten confusion for MISO stakeholders, undermine the public's interest in lower energy costs, and create fragmentation that will undermine grid reliability. (Filing No. 45 at 31); (Filing No. 60 at 62).

"When a party establishes that a state law is depriving it of its constitutional rights, the balance of harms favors injunctive relief. There is no harm to a government agency when it is prevented from enforcing an unconstitutional statute." *Indiana Fine Wine*, 459 F. Supp. 3d at 1171. The IURC defendants have not presented (and the Court cannot identify) any harm that they will suffer with the issuance of a preliminary injunction in this case. On the other hand, if an injunction is not issued, LSP will lose the opportunity to compete for billions of dollars in new transmission projects and suffer from IURC's violation of the dormant Commerce Clause. Furthermore, the Intervenor Defendants' concern about chaos and fragmentation on the transmission grid is unfounded given that all utilities must provide reliable service, and because the Intervenors have presented no evidence that HEA 1420 was promulgated as a result of such chaos and fragmentation. The Court is further persuaded by LSP's argument that the equities strongly support allowing them to compete since the competitive process would likely take up to a year, and there's no harm to the Defendants as they can still attempt to carry their burden as the litigation goes forward. Therefore, the balance of harms and public interest favor LSP.

## IV.   <u>CONCLUSION</u>

LSP has demonstrated that it is likely to succeed on the merits of its dormant Commerce Clause claim. LSP has standing to pursue its claims in the first instance, and *Ex parte Young* permits its suit against the state officials in their official capacities. In addition, HEA 1420 facially

discriminates against out-of-state economic interests, and it cannot survive strict scrutiny.  Any harm to the Defendants is outweighed by the harm LSP will face absent an injunction.

Accordingly, LSP's Motion for Preliminary Injunction (Filing No. 4) is **GRANTED**. Pursuant to Federal Rule of Civil Procedure 65(d), the Court **ISSUES A PRELIMINARY INJUNCTION** prohibiting the Chair and Commissioners of the Indiana Utility Regulatory Commission, their agents, servants, and employees, and persons acting in concert or participation with them, from enforcing the rights of first refusal of Indiana Code § 8-1-38-9.  LSP need not post a bond because monetary damages are not at issue in this case.

**SO ORDERED**.

Date:   12/6/2024

Hon. Tanya Walton Pratt, Chief Judge
United States District Court
Southern District of Indiana

DISTRIBUTION:

Aaron A. Schmoll
LEWIS & KAPPES
aschmoll@lewis-kappes.com

Erin E. Murphy
CLEMENT & MURPHY, PLLC
erin.murphy@clementmurphy.com

James E. Zoccola
LEWIS & KAPPES PC
jzoccola@lewis-kappes.com

Joseph DeMott
CLEMENT & MURPHY, PLLC
joseph.demott@clementmurphy.com

Matthew D. Rowen
CLEMENT & MURPHY, PLLC
matthew.rowen@clementmurphy.com

Paul D. Clement
CLEMENT & MURPHY, PLLC
paul.clement@clementmurphy.com

Thomas R Jones
LEWIS & KAPPES
tjones@lewis-kappes.com

Todd Arthur Richardson
LEWIS & KAPPES PC
trichardson@lewis-kappes.com

Bradley Davis
OFFICE OF THE INDIANA ATTORNEY GENERAL
bradley.davis@atg.in.gov

Jade Poorman
OFFICE OF THE INDIANA ATTORNEY GENERAL
jade.poorman@atg.in.gov

James A. Barta
OFFICE OF THE INDIANA ATTORNEY GENERAL
james.barta@atg.in.gov

Jenna Lorence
OFFICE OF THE INDIANA ATTORNEY GENERAL
jenna.lorence@atg.in.gov

Rebekah Durham
OFFICE OF THE INDIANA ATTORNEY GENERAL
rebekah.durham@atg.in.gov

Kaitlin O'Donnell
TROUTMAN PEPPER
kaitlin.odonnell@troutman.com

Kevin Michael LeRoy
TROUTMAN PEPPER HAMILTON SANDERS LLP
kevin.leroy@troutman.com

Misha Tseytlin
TROUTMAN PEPPER HAMILTON SANDERS, LLP
misha.tseytlin@troutman.com

Sierra Stockley
TROUTMAN PEPPER
sierra.stockley@troutman.com

William R. Derasmo
TROUTMAN PEPPER
william.derasmo@troutman.com