## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF INDIANA

LSP Transmission Holdings II, LLC, et al., )
)
)
    *Plaintiffs*, )
)
    v. )
)
James F. Huston, Chairman, Indiana Utility Regulatory Commission, et al., )
)
)
    *Defendants,* )
)
)
Northern Indiana Public Service Company, et al., )
)
)
    *Intervenor-Defendants.* )

Case No. 1:24-cv-01722-TWP-MKK

## BRIEF IN SUPPORT OF
## <u>PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT</u>

# TABLE OF CONTENTS

TABLE OF AUTHORITIES................................................................................................iii

INTRODUCTION .......................................................................................................... 1

LEGAL BACKGROUND .............................................................................................. 3

    A.    Federal and State Authorities Regulate Power Transmission .................................. 3

    B.    FERC Promulgates Reforms to Promote Competition ........................................... 3

    C.    ISOs Respond to Order No. 1000 ........................................................................... 5

STATEMENT OF MATERIAL FACTS NOT IN DISPUTE ......................................... 6

    A.    Developers and Owners of Electric Transmission Facilities Are Subject to Pervasive Regulation Under Federal and Indiana Law ...................................... 6

    B.    Plaintiffs Are Non-Indiana Companies That Have Successfully Competed for New Interstate Transmission Projects Across the United States ......................................................................................................................... 7

    C.    Incumbents—Four Vertically Integrated Utilities That Have Operated in Indiana for Over a Century—Collectively Own Most of the Transmission Lines and Substations in Indiana ....................................................... 8

    D.    Four Other Entities With a Longstanding Presence in Indiana Own Nearly All the Rest of the Transmission Lines and Substations in Indiana ....................................................................................................................... 9

    E.    In 2016 and 2023, an LSP Affiliate Successfully Competed for Two MISO-Approved Regional Transmission Projects in Indiana ............................. 11

    F.    Rather Than Compete, Incumbents Sought and Obtained a "Legislative Solution" ................................................................................................................ 11

    G.    HEA 1420 Protects Local Companies from Out-of-State Competition for New Regional Transmission Projects in Indiana............................................. 13

PROCEDURAL HISTORY .......................................................................................... 15

    A.    LSP Challenges HEA 1420, and This Court Issues a Preliminary Injunction .............................................................................................................. 15

    B.    The Seventh Circuit Vacates and Remands Because MISO Took the View that *Preliminary* Injunctions Have No Effect on Its Tariff Obligations ............................................................................................................. 15

C.    The Magistrate Judge Grants, and This Court Affirms, a Stay of Discovery ............................................................................................... 17

LEGAL STANDARD ........................................................................................................ 17

ARGUMENT ...................................................................................................................... 18

I.    HEA 1420 Violates The Commerce Clause ............................................................ 18

A.    HEA 1420 Triggers Strict Scrutiny Several Times Over ..................................... 19

1.    HEA 1420 directly regulates interstate commerce and its instrumentalities ........................................................................................ 19

2.    HEA 1420 discriminates against interstate commerce on its face ............................................................................................................... 19

3.    HEA 1420 discriminates against interstate commerce in its effects ............................................................................................................. 23

4.    HEA 1420 discriminates against interstate commerce in its purpose .......................................................................................................... 24

B.    HEA 1420 Cannot Survive Strict Scrutiny ............................................................ 25

C.    Congress Did Not Authorize HEA 1420's Blatant Discrimination ..................... 27

II.    This Court Should Issue A Declaratory Judgment And A Permanent Injunction ............ 28

A.    A Declaratory Judgment Is Amply Warranted .................................................... 28

B.    Plaintiffs Satisfy All Remaining Factors for Permanent Injunctive Relief ............................................................................................................................. 28

1.    HEA 1420 irreparably harms Plaintiffs, and legal remedies are inadequate .................................................................................................... 29

2.    The balance of hardships and public interest favor a permanent injunction ..................................................................................................... 29

CONCLUSION .................................................................................................................... 30

# TABLE OF AUTHORITIES

**Cases**

*A.C. ex rel. M.C. v. Metro. Sch. Dist. of Martinsville*,
   761 F.Supp.3d 1159 (S.D. Ind. 2025) .................................................. 28

*Anatol Zukerman & Charles Krause Reporting, LLC v. U.S. Postal Serv.*,
   64 F.4th 1354 (D.C. Cir. 2023) ......................................................... 29

*Anderson v. Liberty Lobby, Inc.*,
   477 U.S. 242 (1986) ......................................................................... 18

*Bacchus Imports, Ltd. v. Dias*,
   468 U.S. 263 (1984) ......................................................................... 24

*Basic v. Fitzroy Eng'g, Ltd.*,
   132 F.3d 36 (7th Cir. 1997) .............................................................. 28

*Byrd v. Tenn. Wine & Spirits Retailers Ass'n*,
   2017 WL 1021296 (M.D. Tenn. Mar. 16, 2017) ............................... 18

*C&A Carbone, Inc. v. Town of Clarkstown*,
   511 U.S. 383 (1994) ......................................................................... 21

*Camps Newfound/Owatonna, Inc. v. Town of Harrison*,
   520 U.S. 564 (1997) ............................................................. 1, 2, 25

*City of Chicago v. Sessions*,
   321 F.Supp.3d 855 (N.D. Ill. 2018) .................................................. 30

*Dean Milk Co. v. City of Madison*,
   340 U.S. 349 (1951) ........................................................................... 1

*FERC v. Elec. Power Supply Ass'n*,
   577 U.S. 260 (2016) ........................................................................... 3

*Fort Gratiot Sanitary Landfill, Inc. v. Mich. Dep't of Nat. Res.*,
   504 U.S. 353 (1992) ......................................................................... 21

*Fulton Corp. v. Faulkner*,
   516 U.S. 325 (1996) ......................................................................... 19

*General Motors Corp. v. Tracy*,
   519 U.S. 278 (1997) ......................................................................... 22

*Granholm v. Heald*,
   544 U.S. 460 (2005) ................................................................ *passim*

*Hughes v. Oklahoma*,
    441 U.S. 322 (1979) ................................................................................ 19, 25

*La. Pub. Serv. Comm'n v. FCC*,
    476 U.S. 355 (1986) ....................................................................................... 27

*Lewis v. BT Inv. Managers, Inc.*,
    447 U.S. 27 (1980) .......................................................................................... 20

*LSP Transmission Holdings II, LLC v. Huston*,
    131 F.4th 566 (7th Cir. 2025) ................................................................. *passim*

*Maine v. Taylor*,
    477 U.S. 131 (1986) ............................................................................ 19, 26, 27

*Midwest Title Loans, Inc. v. Ripley*,
    616 F.Supp.2d 897 (S.D. Ind. 2009) ............................................................... 29

*MISO Transmission Owners v. FERC*,
    819 F.3d 329 (7th Cir. 2016) ...................................................................... 5, 30

*Nat'l Pork Producers Council v. Ross*,
    598 U.S. 356 (2023) ....................................................................................... 23

*New England Power Co. v. New Hampshire*,
    455 U.S. 331 (1982) ....................................................................................... 27

*New York v. FERC*,
    535 U.S. 1 (2002) ................................................................................... 3, 4, 19

*NextEra Energy Cap. Holdings, Inc. v. Jackson*,
    756 F.Supp.3d 428 (W.D. Tex. 2024) ......................................................... 2, 18

*NextEra Energy Cap. Holdings, Inc. v. Lake*,
    48 F.4th 306 (5th Cir. 2022) ..................................................................... *passim*

*NUCOR Corp. v. Aceros y Maquilas de Occidente, S.A. de C.V.*,
    28 F.3d 572 (7th Cir. 1994) ....................................................................... 2, 28

*Or. Waste Sys., Inc. v. Dep't of Envt'l Qual. of Or.*,
    511 U.S. 93 (1994) ................................................................................... 19, 25

*Philadelphia v. New Jersey*,
    437 U.S. 617 (1978) ................................................................................. 19, 20

*Poor Richard's Inc. v. Ramsey Cnty.*,
    922 F.Supp. 1387 (D. Minn. 1996) ................................................................. 18

*Preston v. Thompson*,
    589 F.2d 300 (7th Cir. 1978) ................................................................ 29

*Pub. Utils. Comm'n of R.I. v. Attleboro Steam & Elec. Co.*,
    273 U.S. 83 (1927) ............................................................................ 3

*Regan v. City of Hammond*,
    934 F.3d 700 (7th Cir. 2019) ........................................................ 22, 24

*S.C. Pub. Serv. Auth. v. FERC*,
    762 F.3d 41 (D.C. Cir. 2014) ........................................................ 4, 5

*Siegel v. Shell Oil Co.*,
    612 F.3d 932 (7th Cir. 2010) ............................................................ 18

*Tenn. Wine & Spirits Retailers Ass'n v. Thomas*,
    588 U.S. 504 (2019) .................................................................... 18, 20

*United States v. Virginia*,
    518 U.S. 515 (1996) ........................................................................ 25

*Wilton v. Seven Falls Co.*,
    515 U.S. 277 (1995) ........................................................................ 28

*Wyoming v. Oklahoma*,
    502 U.S. 437 (1992) ........................................................................ 27

**Statutes**

16 U.S.C. §824(b)(1) ............................................................................ 3, 27

Ind. Code §8-1-2-4 ................................................................................ 7

Ind. Code §8-1-2-115 ............................................................................ 7

Ind. Code §8-1-38-2 .................................................................... 1, 20, 22, 23

Ind. Code §8-1-38-4 .............................................................................. 7

Ind. Code §8-1-38-7 .......................................................................... 7, 22

Ind. Code §8-1-38-9 .................................................................... 1, 19, 22

Ind. Code §8-1-38-9(a) ........................................................................ 13

Ind. Code §8-1-38-9(c) ........................................................................ 13

Ind. Code ch. 8-1-2 .............................................................................. 7

**Rule and Regulations**

Fed. R. Civ. P. 56(a) ............................................................................................ 18

18 C.F.R. Part 39.2(a) (2011) ................................................................................ 6

170 Ind. Admin. Code 4-1-23 ............................................................................... 7

**Other Authorities**

2013 Ind. Legis. Serv. P.L. 174 ..................................................................... 11, 13

*Hearing on HB 1420 Before S. Utils. Comm.*, 2023 Leg. (Ind. Apr. 13, 2023),
https://tinyurl.com/yc56r2az ............................................................ 12, 24, 26

*House Proceedings on HB 1420*, 2023 Leg. (Apr. 20, 2023),
https://tinyurl.com/4bszemkc ................................................................. 13, 26

*Midwest Indep. Transmission Sys. Operator, Inc.*, 142 FERC ¶61,215 (2013) ............................ 5

*Midwest Indep. Transmission Sys. Operator, Inc.*, 147 FERC ¶61,127 (2014) ...................... 6, 27

*Midwest Indep. Transmission Sys. Operator, Inc.*, 150 FERC ¶61,037 (2015) ...................... 6, 28

Order No. 888, 75 FERC ¶61,080, 61 Fed. Reg. 21,540 (1996) .................................... 4

Order No. 1000, 136 FERC ¶61,051 (July 21, 2011) .................................... 5, 6, 26, 29

*PJM Interconnection, LLC*, 147 FERC ¶61,128 (2014) ................................................ 6

*Senate Chamber Proceedings on HB 1420*, 2023 Leg. (Apr. 18, 2023),
https://tinyurl.com/yrk3vb8y ............................................................ 12, 13, 26

# INTRODUCTION

Plaintiffs would like to compete with Incumbents—a handful of powerful Indiana companies—to build new electric transmission lines in Indiana that will be part of a multistate power grid.[1]  If allowed to compete, Plaintiffs would be strong contenders; they have already won numerous competitively solicited interstate transmission projects in Indiana and beyond.  But Plaintiffs are barred from competing by House Enrolled Act 1420 ("HEA 1420"), which gives "incumbent electric transmission owners" a right of first refusal ("ROFR") for all new regional transmission lines that connect to their existing facilities in Indiana.  Ind. Code §§8-1-38-2, -9.

HEA 1420 is unconstitutional on its face.  The Supreme Court has repeatedly held that state laws that discriminate against interstate commerce and in favor of in-state interests are "all but *per se* invalid."  *Camps Newfound/Owatonna, Inc. v. Town of Harrison*, 520 U.S. 564, 581 (1997).  This includes laws that burden interstate commerce by granting special benefits to those with a physical presence in the state.  *E.g.*, *Granholm v. Heald*, 544 U.S. 460 (2005); *Dean Milk Co. v. City of Madison*, 340 U.S. 349 (1951).  And HEA 1420 is even worse than typical local-presence requirements, which at least allow out-of-staters to compete by establishing in-state operations, because it effectively bars out-of-staters from *ever* competing in the interstate transmission market in Indiana.  *See NextEra Energy Cap. Holdings, Inc. v. Lake*, 48 F.4th 306, 324-25 (5th Cir. 2022) (describing a substantially similar Texas ROFR law as "a more anticompetitive version of the in-state presence requirements held unconstitutional in cases like *Granholm* or *Dean Milk*").

---

[1] "Defendants" refers to all parties on the other side, i.e., the five members of the Indiana Utility Regulatory Commission ("IURC"), and the five intervenor defendants.  "Incumbents" refers to the four original intervenors:  Duke Energy Indiana, LLC ("Duke"), Northern Indiana Public Service Company, LLC ("NIPSCO"), Indianapolis Power & Light Company d/b/a AES Indiana ("AES Indiana"), and Southern Indiana Gas and Electric Company d/b/a CenterPoint Energy Indiana South ("SIGECO").  *See* Dkt.56.  "ComEd Indiana" refers to Commonwealth Edison Company of Indiana, Inc., the fifth intervenor, *see* Dkt.108, which is represented by separate counsel and has filed its own briefs.

Under the standard applicable to such facially discriminatory laws—the "strictest scrutiny," *Camps Newfound*, 520 U.S. at 581—HEA 1420 is plainly invalid. Defendants have offered shifting accounts of the state's supposed interest in blocking competition, eventually settling on purported risks to "the integrity of Indiana's franchise utility model and the safety and stability of its electric grid." CA7.Dkt.45 at 7. Such post-hoc rationalizations cannot carry the day under strict scrutiny, and they are an obvious pretext for protectionism in all events. Allowing competition for *regional* projects supporting the interstate transmission grid does not undermine a state's control of *local* utilities or threaten grid integrity. And, at both the state and federal level, there are already comprehensive regulations to ensure grid safety and stability. HEA 1420 was enacted not for any legitimate purpose, but to do what its sponsor promised: give business to "Hoosiers" rather than companies from "somewhere else."

As another court recognized in holding Texas' substantially similar ROFR law unconstitutional on a motion for judgment on the pleadings, *see NextEra Energy Cap. Holdings, Inc. v. Jackson*, 756 F.Supp.3d 428, 452-53 (W.D. Tex. 2024), no further factual development is needed to conclude that HEA 1420 violates the Commerce Clause on its face. As this Court already held, HEA 1420's text "expressly discriminates against interstate commerce," triggering "strict scrutiny," which the statute plainly "cannot withstand." Dkt.70 at 19. There is every reason to issue a declaratory judgment holding HEA 1420 unconstitutional, which would "settle the particular controversy and clarify the legal relations in issue." *NUCOR Corp. v. Aceros y Maquilas de Occidente, S.A. de C.V.*, 28 F.3d 572, 579 (7th Cir. 1994). And this Court already held that all factors for granting injunctive relief are met. Dkt.70 at 20-21. This Court should accordingly grant Plaintiffs' motion for partial summary judgment, enter a final judgment declaring HEA 1420 unconstitutional, and permanently enjoin Defendants from relying on or giving effect to it.

## LEGAL BACKGROUND

### A.    Federal and State Authorities Regulate Power Transmission.

In the early twentieth century, electricity markets largely "operat[ed] as vertically integrated monopolies in confined geographic areas." *FERC v. Elec. Power Supply Ass'n*, 577 U.S. 260, 267 (2016). But it made little sense for every community to generate, transmit, and sell its own power. So, an interstate market emerged, with energy-rich states generating electricity and selling it at wholesale for transmission to local retail distributors in other states.

As the energy market evolved, so did the law. In the nascent days of electric power, states exercised broad authority to regulate energy markets. But in 1927, the Supreme Court held that a state's attempt to regulate the rates of electricity sold across state lines violated the Commerce Clause. *Pub. Utils. Comm'n of R.I. v. Attleboro Steam & Elec. Co.*, 273 U.S. 83, 89 (1927). An interstate market had emerged, so piecemeal, state-by-state rate regulation would impose a "direct burden upon interstate commerce." *Id.* The ball was thus in Congress' court.

Congress responded by enacting the Federal Power Act ("FPA") of 1935. The FPA gave the Federal Power Commission—the predecessor to the Federal Energy Regulatory Commission ("FERC")—sole authority to regulate transmission and sales of electricity at wholesale in interstate commerce. 16 U.S.C. §824(b)(1). But the FPA preserves state authority over certain other matters, including retail sale of electricity, facilities used to generate and transmit electricity within a state, and transmission of electricity consumed wholly by the transmitter. *New York v. FERC*, 535 U.S. 1, 20 (2002). The result is a system in which the federal government takes the dominant role but states and their agencies retain authority over traditionally local energy issues. *Id.* at 16-23.

### B.    FERC Promulgates Reforms to Promote Competition.

Over the past 30 years, FERC has enacted a series of reforms to promote the development of competitive energy markets. It kicked off this free-market initiative in 1996 with Order No. 888.

Having "found that electric utilities were discriminating in the 'bulk power markets,' … by providing either inferior access to their transmission networks or no access at all to third-party wholesalers of power," FERC required transmission providers to "unbundle[]" their wholesale generation and transmission services and allow non-discriminatory access to transmission lines. *New York*, 535 U.S. at 11.  Order No. 888 also debuted the "ISO" model, in which federally regulated non-governmental organizations plan and operate the power grid for a multistate region. Order No. 888, 75 FERC ¶61,080, 61 Fed. Reg. 21,540.[2]

Order No. 888 suffered, however, from a predictable problem:  the tendency of incumbent-dominated ISOs to hoard opportunities for their constituents.  For more than a decade after Order No. 888, many ISOs used ROFR provisions in their FERC-approved tariffs to give vertically integrated public utilities an exclusive right to construct new transmission lines in their existing service areas (where they have a monopoly on retail service).  *S.C. Pub. Serv. Auth. v. FERC*, 762 F.3d 41, 71-72 (D.C. Cir. 2014) (per curiam).  This sop to local economic interests destroyed any incentive for non-incumbents to even identify the need for new projects, let alone propose lower cost ways to build and maintain them.  *Id.* at 72.  The lack of competition led to higher costs, which were passed on to consumers.  *Id.*  And these "concerns were particularly acute in light of [FERC's] expectation that a massive amount of transmission facility development would take place during the next two decades as renewable energy sources were integrated into the grid."  *Id.*

In 2011, FERC issued its landmark Order No. 1000, which (among other things) ordered ISOs to delete these "federal" ROFRs from their tariffs.  *Id.* at 72-73.  Order No. 1000 drew a line

---

[2] Next came Order No. 2000, which built on Order No. 888 by encouraging owners of transmission facilities to voluntarily form "RTOs."  Like ISOs, RTOs are nongovernmental entities with authority, under FERC-approved tariffs and agreements, to operate interstate transmission grids on a regional basis.  Ex.A ¶5.  Because RTOs and ISOs are materially equivalent for purposes of this litigation, this brief uses the term "ISO" as a shorthand for both types of entities.

between *local* projects, for which "the costs … to consumers are limited to the service area of the company that builds the project," *MISO Transmission Owners v. FERC*, 819 F.3d 329, 335 (7th Cir. 2016), and *regional* projects, for which costs are allocated to customers across an ISO's multistate footprint, *see S.C. Pub. Serv. Auth.*, 762 F.3d at 73. ISOs could continue to award local projects to local public utilities without competitive bidding, but Order No. 1000 eliminated ROFRs as to regional projects so that customers would no longer be deprived of "the benefits of competition in transmission development, and associated potential savings." Order No. 1000, 136 FERC ¶61051 at ¶285 (July 21, 2011). And to ensure that competition would not undermine grid safety or reliability, Order No. 1000 mandated a rigorous qualification process for entities to become eligible to compete for new transmission projects. *Id.* at ¶¶293-301, 323-24.

**C.    ISOs Respond to Order No. 1000.**

In compliance with Order No. 1000, ISOs revised their tariffs to remove federal ROFRs for regional projects. *See, e.g.*, *Midwest Indep. Transmission Sys. Operator, Inc*., 142 FERC ¶61,215, ¶¶1, 7 (2013). They also built competitive solicitation processes and crafted rules to govern the allocation of project costs across all or a substantial part of their regions. Under the FERC-approved tariff for Midcontinent Independent System Operator ("MISO"), for example, the costs of "Multi-Value Projects" are allocated across multiple states in the MISO region because they provide widespread reliability, public-policy, and economic benefits. *See* Ex.1 §III.A.2.g.[3]

While these regional projects are generally subject to competitive bidding pursuant to Order No. 1000, incumbents may obtain a ROFR for regional projects in certain circumstances. For one, Order No. 1000 permits ISOs to grant incumbents a federal ROFR "for upgrades to [their] own transmission facilities," even if the costs are allocated across multiple states. Order No. 1000

---

[3] All numbered exhibits are attached to the Declaration of Todd A. Richardson, filed herewith as Exhibit B.

at ¶319.  ISOs also urged FERC to let them recognize *state* laws granting a ROFR to incumbent transmission owners, and, after initially rejecting the proposal, FERC ultimately acquiesced.  *See Midwest Indep. Transmission Sys. Operator, Inc.*, 147 FERC ¶61,127, ¶¶149-50 (2014); *PJM Interconnection, LLC*, 147 FERC ¶61,128, ¶¶132-33 (2014).  MISO's tariff thus requires compliance with "any [a]pplicable" state laws "granting a right of first refusal to a Transmission Owner," Ex.1 §VIII.A.1, and PJM's Operating Agreement includes a similar provision, Ex.2 §1.5.8(*l*).  As one Commissioner emphasized, however, FERC did not weigh in on whether such laws are constitutional, instead recognizing that "the constitutionality of any particular state right-of-first-refusal law" would be decided by the courts.  *Midwest Indep. Transmission Sys. Operator, Inc.*, 150 FERC ¶61,037, ¶61,195 (2015) (Bay, Commissioner, concurring); *accord* CA7.Dkt.76 at 11 (FERC has never "taken a position on the constitutionality of state [ROFR] laws").

## STATEMENT OF MATERIAL FACTS NOT IN DISPUTE

### A.    Developers and Owners of Electric Transmission Facilities Are Subject to Pervasive Regulation Under Federal and Indiana Law.

1.    "All providers of bulk-power system transmission facilities, including nonincumbent transmission developers, that successfully develop a transmission project, are required to be registered as functional entities and must comply with all applicable reliability standards."  Order No. 1000 at ¶266 (citing 18 C.F.R. Part 39.2(a) (2011)).

2.    MISO operates most of the electric transmission grid in Indiana, and PJM Interconnection, LLC ("PJM") operates the rest.  *See* Ex.A ¶8.  Before an entity may bid on a new electric transmission project overseen by MISO or PJM, it must complete a rigorous qualification process.  *See* Ex.1 at §VIII.B; Ex.2 at §1.5.8(a); Ex.3 at §§2.1-2.4.  This ensures that bidders have the technical, managerial, and financial capabilities to build and maintain transmission facilities.  *See* Ex.1 at §VIII.B; Ex.3 at §§2.1-2.4.

3.      MISO and PJM also verify that a transmission developer has the necessary technical, managerial, and financial capabilities when evaluating bids for each new regional transmission facility.  *See* Ex.1 at §VIII.E; Ex.2 at §1.5.8(f).

4.      The IURC regulates public utilities and the provision of retail services to consumers in Indiana.  It has broad authority over the rates, services, and operations of public utilities—set forth, among other places, in its statutory power and duty "to enforce [its enabling act], as well as all other laws, relating to public utilities."  Ind. Code §8-1-2-115; *see generally id.* ch. 8-1-2.

5.      Indiana law requires that every new electric transmission owner be certified as a "public utility" by the IURC.  *See id.* §§8-1-38-4, -7.  Before certifying a transmission owner as a public utility, the IURC must find that it "has the financial, managerial, and technical capability to construct, own, operate, and maintain an electric transmission facility" and "the ability and intent to comply with all statutes, rules, and regulations enforced by the [IURC]."  *Id.* §8-1-38-7.

6.      Accordingly, once an Indiana public utility builds an electric transmission facility, it must furnish "reasonably adequate service and facilities," *id.* §8-1-2-4, and comply with IURC regulations addressing service interruptions, 170 Ind. Admin. Code 4-1-23.

## B.    Plaintiffs Are Non-Indiana Companies That Have Successfully Competed for New Interstate Transmission Projects Across the United States.

7.      Plaintiff LSP Transmission Holdings II, LLC ("LSP") is a Delaware company that is headquartered in Missouri.  Ex.A ¶3.  LSP its affiliates and subsidiaries (collectively, "LSP entities") develop, own, and maintain electric transmission projects across the country.  *Id.* ¶3.

8.      Plaintiffs LS Power Midcontinent, LLC ("LSP Midcontinent"), Central Transmission, LLC ("Central Transmission"), and LS Power Grid DRS Holdings, LLC ("LS Power Grid") are LSP entities incorporated and headquartered outside of Indiana.  *Id.* ¶4.

9.      Over the past decade and a half, LSP entities have successfully competed for

numerous interstate transmission projects across the United States. *Id.* ¶9. They have repeatedly completed these projects on (or ahead of) schedule and within (or below) budget. *Id.*

10.     LSP Midcontinent is qualified to bid on regional transmission projects in the parts of Indiana served by MISO. *Id.* ¶8(a). Central Transmission is qualified to bid on regional transmission projects in the parts of Indiana served by PJM. *Id.* ¶8(b). LS Power Grid controls Republic Transmission, LLC ("Republic"), which has qualified and successfully competed through MISO for regional electric transmission projects located in Indiana and has been certified as an Indiana public utility by the IURC. *Id.* ¶¶4, 8(a), 11.

11.     With over $6 billion of investment in the transmission sector across eight states, LSP entities are responsible for more than 780 miles of long-distance, high-voltage transmission infrastructure—with another 350 miles in development. Ex.A ¶10. LSP's transmission utilities averaged 99.99% availability in 2024 and had a higher rate of availability than the North American Electric Reliability Corporation's industry average over the prior five years. *Id.*

**C.     Incumbents—Four Vertically Integrated Utilities That Have Operated in Indiana for Over a Century—Collectively Own Most of the Transmission Lines and Substations in Indiana.**

12.     Incumbents are four of Indiana's five investor-owned public utilities. Each enjoys a monopoly on retail electric service in a particular geographic area within the MISO portion of Indiana, and each is a MISO member. Dkt.52-3 ¶3; Dkt.52-4 ¶5; Dkt.52-5 ¶3; Dkt.52-6 ¶3.

13.     Duke Energy Indiana is the largest electric utility in Indiana. Dkt.52-4 ¶3. It is based in Plainfield, Indiana. *Id.* It has done business in Indiana for over 110 years, employs about 2,500 people in Indiana, and has about 900,000 customers across 69 of Indiana's 92 counties. *Id.* ¶¶3-4. Its transmission system is jointly owned with Indiana Municipal Power Agency ("IMPA") and Wabash Valley Power Association, Inc. ("WVPA"). *Id.* ¶6. This system consists of over 5,200 miles of transmission lines and about 500 substations, including over 100 transmission substations.

Ex.4 at 200; Ex.5 at 3, tbl.1.

14.    NIPSCO is Indiana's second-largest electric utility.    Dkt.52-3 ¶4.    It is headquartered in Merrillville, Indiana.  Ex.6 at 30.  It has done business in Indiana for over 100 years, employs about 3,100 people in Indiana, and has about 480,000 electric customers across more than 30 of Indiana's 92 counties.  Dkt.52-3 ¶¶4-5; Ex.7.  NIPSCO owns approximately 2,919 miles of electric transmission lines and 63 transmission substations in Indiana.  Ex.8 at 13:14-17.

15.    AES Indiana is a large investor-owned utility based in Indianapolis.  Dkt.52-5 ¶3; Ex.6 at 30.  It has done business in Indiana for a century, employs about 1,300 people in Indiana, and has about 520,000 customers in Indianapolis and 10 Indiana counties.  Dkt.52-5 ¶¶3-4.  AES Indiana owns approximately 866 miles of electric transmission lines and 23 transmission substations in Indiana.  *Id.*; Ex.9 at 4:4-5, 5:1-2.

16.    SIGECO is a large investor-owned utility based in Evansville, Indiana.  Ex.6 at 30. It has done business in Indiana for over 110 years, employs about 330 people in its electric operations in Indiana (plus many more in its natural gas operations), and has about 155,000 customers across 7 Indiana counties.  Dkt.52-6 ¶¶4-5; Ex.6 at 30.  SIGECO owns about 1,046 miles of electric transmission lines and 34 transmission substations in Indiana.  Ex.10 at 21:8-10.

### D.    Four Other Entities With a Longstanding Presence in Indiana Own Nearly All the Rest of the Transmission Lines and Substations in Indiana.

17.    There are nine other entities that own electric transmission facilities in Indiana.  *See* Ex.11 at 6-10.  Four of them—Indiana-Michigan Power ("I&M"), Hoosier Energy Rural Electric Cooperative, Inc. ("Hoosier Energy"), IMPA, and WVPA—have a large presence in the state.

18.    I&M, a subsidiary of American Electric Power ("AEP"), is Indiana's fifth investor-owned utility.  Ex.6 at 30.  It has a monopoly on retail electric service in the PJM portion of Indiana and is a PJM member.  Ex.12 at 3:4-5.

19.     I&M is headquartered in Fort Wayne, Indiana.  Ex.6 at 30.  It has done business in Indiana for 100 years, employs about 850 people in Indiana, and has about 484,000 customers across 24 Indiana counties.  Ex.13.  I&M and its affiliates own about 4,430 miles of electric transmission lines in Indiana and 130 transmission substations in Indiana.  Ex.12 at 4:20-25.

20.     Hoosier Energy is a wholesale supplier for rural cooperatives, headquartered in Bloomington, Indiana.  Ex.11 at 7; *see* Ex.6 at 32.  It owns approximately 1,720 miles of electric transmission lines and 25 transmission substations in Indiana.  Ex.14 at 14.

21.     IMPA is a not-for-profit utility based in Carmel, Indiana, that provides wholesale power to 61 cities and towns—60 in Indiana and one in Ohio.  Ex.6 at 31; Ex.15.  It is a joint owner of Duke Energy Indiana's transmission system, Ex.4 at 200, and a MISO member.

22.     WVPA, based in Indianapolis, is a non-profit generation and transmission entity that serves 21 distribution co-ops—18 in Indiana and 3 in Illinois.  Ex.6 at 32; Ex.16 at 1-2.  It is a joint owner of Duke Energy Indiana's transmission system, Ex.4 at 200, and a MISO member.

23.     Pioneer Transmission, LLC ("Pioneer") is an affiliate of two of Indiana's investor-owned utilities.  It is a joint venture formed by Duke Energy and American Electric Power—the parent companies of Duke Energy Indiana and I&M, Ex.6 at 30—to build and operate approximately 290 miles of transmission lines and related facilities in Indiana.  Ex.17.

24.     The four remaining entities—Louisville Gas & Electric Co. ("LG&E"); ComEd Indiana; NextEra Energy Transmission Midatlantic Indiana, Inc. ("NextEra Indiana"); and Republic—collectively own a very small percentage of electric transmission facilities in Indiana.  ComEd Indiana owns one substation near the Indiana-Illinois border.  Ex.11 at 6-7; Dkt.98 at 3-4.  NextEra Indiana, which is a transmission-only company rather than a vertically integrated utility, owns one 20-mile transmission line that it purchased from ComEd Indiana in 2020.  Ex.18.

Republic, another transmission-only company, owns a 31-mile transmission line and is building another 23-mile line.  *Infra* ¶¶26-31.

> **E.    In 2016 and 2023, an LSP Affiliate Successfully Competed for Two MISO-Approved Regional Transmission Projects in Indiana.**

25.    In 2013, the Indiana legislature created a ROFR for "local reliability electric transmission facilit[ies]."  2013 Ind. Legis. Serv. P.L. 174, §§2, 3, 9.  This law did not restrict competition for new *regional* transmission projects (with costs allocated among multiple states).

26.    In December 2016, an LSP entity—Republic—was selected for the first competitive transmission project in MISO: a 31-mile, 345 kV transmission line between southern Indiana and western Kentucky, known as the Duff-Coleman project.  Ex.A ¶11(a) & n.7.  Republic beat out ten other proposals, including five from an Incumbent or its affiliate.  *Id.* ¶11(a).

27.    Upon winning the bid, Republic became certified as an Indiana public utility, thus becoming subject to all applicable IURC regulations.  *Id.*

28.    Republic completed the Duff-Coleman project in June 2020—more than six months ahead of schedule—and currently owns and operates the 31-mile Duff-Coleman line.  *Id.*

29.    In May 2023, Republic won another competitive MISO transmission project in Indiana—the Hiple to Indiana/Michigan State Border project.  *Id.* ¶11(b) & n.8.

30.    This time, MISO chose Republic's proposal over six others, concluding that Republic "had a well-supported project implementation cost estimate, a superior revenue requirement commitment, and a well-reasoned routing strategy."  *Id.*

31.    The Hiple project is on schedule and slated for completion in 2030.  *Id.* ¶11(b).

> **F.    Rather Than Compete, Incumbents Sought and Obtained a "Legislative Solution."**

32.    NIPSCO owns the Hiple substation, Ex.19, but it chose not to bid on the Hiple to Indiana/Michigan State Border project, Dkt.52-3 ¶¶18-19.  Instead, NIPSCO "focused on seeking

a legislative solution at the Indiana legislature for future projects." *Id.* ¶19.

33.    On January 17, 2023, Rep. Edmond Soliday introduced House Bill 1420 ("HB 1420"), which ultimately became HEA 1420.  Ex.20.

34.    The Indiana Energy Association ("IEA"), a trade association representing Indiana's investor-owned electric utilities, lobbied for the bill's enactment.  *Hearing on HB 1420 Before S. Utils. Comm.*, 2023 Leg. 2:02:12-06:16 (Ind. Apr. 13, 2023), https://tinyurl.com/yc56r2az.

35.    During the legislative debate, Sen. Shelly Yoder suggested that "[HB] 1420 is just giving a priority to players that we know," i.e., Indiana's "investor-owned utilities."  *Id.* at 25:32-56, 26:41-50.  Rep. Soliday responded, "Yes."  *Id.* at 26:50-56.

36.    Rep. Soliday also framed "the issue" as:  "Do we want local control, with Hoosiers we know, with an IURC that we appoint, or do we want to have it somewhere else?"  *Id.* at 2:35:50.

37.    Representatives of a local labor union told legislators:  "[O]ur operators work side-by-side with [Indiana's investor-owned] utility companies.  We are supporting this bill for the fact that it will support skilled labor, local workers, and a local economy."  *Id.* at 2:01:37-50.

38.    Sen. Gary Byrne subsequently explained that he was voting to advance HB 1420 out of committee because "I'd rather have folks from Indiana own [new electric transmission lines] than [people from] who knows where," *id.* at 2:52:38-42, and "we're more likely to have the individuals from Indiana there working there, too, on these lines," *id.* at 2:52:50-56.

39.    During the discussion of HB 1420 on the Senate floor, one of the bill's co-sponsors, Sen. Eric Koch, stated:  "Fortunately, if one of our incumbents exercises a right of first refusal, then those jobs will go to Indiana workers, as evidenced by the strong labor support that you saw during our committee hearing and afterwards."  *Senate Chamber Proceedings on HB 1420*, 2023 Leg. 1:55:09-25 (Apr. 18, 2023), https://tinyurl.com/yrk3vb8y; *see supra* ¶37.

40.     Sen. David Niezgodski urged support for HB 1420 on the ground that it would further "local Indiana control." *Id.* at 2:28:43-55.  Sen. Jean Leising similarly invoked "Indiana control" and the prospect of funneling "big union jobs" to "people in Indiana from our good construction companies." *Id.* at 2:31:25-51.

41.     During the discussion of HEA 1420 on the House floor, Rep. Soliday "urge[d] [legislators] to vote for" HEA 1420 because "our locals do a good job." *House Proceedings on HB 1420*, 2023 Leg. 1:07:15-20 (Apr. 20, 2023), https://tinyurl.com/4bszemkc.

42.     HEA 1420 does not contain any legislatively enacted findings of fact or statement of purpose. *See* 2013 Ind. Legis. Serv. P.L. 174.  It was designated "emergency" legislation, *id.* §2, and signed into law on May 1, 2023, Ex.20.

43.     Indiana allows out-of-state entities to buy in-state transmission facilities, *see* Ex.18, and to bid on new projects if the incumbent does not exercise its ROFR, Ind. Code §8-1-38-9(c).

44.     Only seven other states (besides Indiana) currently have a law in effect that gives local utilities a ROFR for new regional transmission projects.  Ex.A ¶13 & n.11.

**G.     HEA 1420 Protects Local Companies from Out-of-State Competition for New Regional Transmission Projects in Indiana.**

45.     HEA 1420 grants a right of first refusal to any "incumbent"—regardless of whether it is a vertically integrated utility or an independent transmission-only company—whenever a new regional transmission project "connects to" one of its existing facilities.  Ind. Code §8-1-38-9(a).

46.     New regional transmission projects typically begin or end at an existing transmission substation, where voltage can be decreased before local distribution, or require the construction of new substation that connects to an existing transmission line.  Ex.A ¶16.

47.     Indiana's five investor-owned utilities own the vast majority of transmission lines and substations in Indiana.  *Supra* ¶¶12-19, 23.  Three other Indiana entities—Hoosier Energy,

IMPA, and WVPA—own most of the remaining transmission facilities in the state. *Supra* ¶¶20-22. Consequently, HEA 1420 ensures that almost all new regional transmission projects in Indiana will go to an in-state entity, without out-of-state competition. Ex.A ¶¶17-19; *supra* ¶¶11-24.

48.    The March 2025 assignment of the 68 Indiana facilities in Tranche 2.1 of MISO's Long Range Transmission Planning ("LRTP") initiative confirms as much. Fifty-five of the facilities—collectively valued at about $1 billion—are located entirely in MISO's footprint; seven are entirely in PJM's footprint; and six are in both MISO and PJM. Ex.A ¶21; *see* Ex.21.

49.    MISO has determined that all the Indiana facilities in Tranche 2.1 that are located entirely within its footprint are subject to HEA 1420.[4] Ex.A ¶22. All 55 of these facilities have been assigned to Indiana's local utilities. *Id.* Forty-eight of them went to Incumbents—23 to Duke Energy Indiana, 11 to SIGECO, five to NIPSCO, four to AES Indiana, three to both Duke Energy Indiana and AES Indiana, one to Duke Energy Indiana and Hoosier Energy, and one to Duke Energy Indiana and IMPA. *Id.* The other seven were assigned as follows: four to Hoosier Energy, one to I&M, one to IMPA, and one to both Hoosier Energy and IMPA. *Id.*

50.    Incumbents intend to exercise ROFRs for all Tranche 2.1 facilities in Indiana. *See* Ex.22.

51.    MISO and PJM are each planning billions of dollars of investment in regional power transmission systems over the next several years. Ex.A ¶25 & n.20; *see* Ex.23; Ex.24.

52.    This will include new regional projects in Indiana that would be open to competitive bidding if not for HEA 1420. Ex.A ¶25 & n.21; *see* Ex.23; Ex.25; Ex.26. Indeed, LSP entities are currently participating in PJM's open window for proposing new competitive projects. Ex.A ¶25.

---

[4] MISO has listed "PJM," rather than "State ROFR," as its reason for excluding facilities in the PJM parts of Indiana from competitive bidding. *See* Ex.21 ("Exclusion" column).

## PROCEDURAL HISTORY

**A.    LSP Challenges HEA 1420, and This Court Issues a Preliminary Injunction.**

Plaintiffs filed this suit on October 2, 2024, seeking a declaratory judgment that HEA 1420 is unconstitutional and a permanent injunction against its enforcement. Dkt.3. Plaintiffs also moved for a preliminary injunction so they could compete for LRTP Tranche 2.1 projects (among others) while the litigation was pending. Dkts.4, 5. After hearing argument on that motion, Dkt.61, this Court granted Plaintiffs a preliminary injunction on December 6, 2024, Dkts.70, 71. The Court rejected Defendants' threshold arguments and proceeded to hold that HEA 1420 likely violates the Commerce Clause because it "expressly discriminates against interstate commerce" and "cannot withstand strict scrutiny." Dkt.70 at 19.

**B.    The Seventh Circuit Vacates and Remands Because MISO Took the View that *Preliminary* Injunctions Have No Effect on Its Tariff Obligations.**

Incumbents appealed, filing an "emergency" motion for an administrative stay. The Seventh Circuit initially granted that motion, CA7.Dkt.9, and later entered a stay pending appeal, CA7.Dkt.27. Upon learning that MISO was poised to assign all the disputed Tranche 2.1 projects to Incumbents no later than January 13, 2025, however, the Seventh Circuit lifted the stay. CA7.Dkt.53. The appeal was set for expedited oral argument on January 27, 2025. CA7.Dkt.28.

In the interim, MISO released a list of Tranche 2.1 projects that would be open to competition but did not include any Indiana projects on that list—even though HEA 1420 was preliminarily enjoined at the time. *See* CA7.Dkt.68, Att.1. MISO indicated that it intended to exclude the Indiana projects from competition based on HEA 1420 but deferred making those assignments to "the coming weeks." *Id.*, Att.2. MISO also stated that its list of competitive projects "may be revised in the event of changes to Applicable Laws and Regulations, including state and local laws granting a Right of First Refusal." *Id.*, Att.1.

MISO later filed an amicus brief in the Seventh Circuit, explaining that it "has no interest in" and "takes no position on … whether [HEA 1420] is constitutional." CA7.Dkt.81 at 1, 3. And while it asserted that HEA 1420 remained an "Applicable Law[]" for purposes of its tariff while *preliminarily* enjoined, MISO recognized that "an actual determination as to the constitutionality of the statute"—i.e., a final judgment—would be a different story. *Id.* at 17-18 & n.11. MISO also made clear that it "is bound to adhere to the terms of its" tariff, which *require* competitive bidding unless HEA 1420 is an "Applicable Law[]." *Id.* at 6.[5]

After hearing (a second) oral argument, the Seventh Circuit issued a divided opinion concluding that Plaintiffs lacked standing to seek a preliminary injunction and remanding for further proceedings. *LSP Transmission Holdings II, LLC v. Huston*, 131 F.4th 566, 583-84 (7th Cir. 2025). The panel majority did not address injury-in-fact or causation, let alone the merits of Plaintiffs' Commerce Clause claim; it concluded only that the *preliminary* injunction against the IURC was not redressing LSP's injury because MISO "d[id] not view itself as bound by the preliminary injunction" to "refrain from assigning projects based on HEA 1420." *Id.*

Judge Scudder dissented. After explaining why he thought Plaintiffs had standing to seek a preliminary injunction, Judge Scudder turned to the merits. Like this Court, Judge Scudder concluded that HEA 1420 is likely unconstitutional. First, "HEA 1420 facially discriminates against interstate commerce by imposing differential treatment on companies' ability to compete for new construction projects in Indiana based on their preexisting ownership of transmission facilities in the State." *Id.* at 591 (Scudder, J., dissenting). Second, HEA 1420 "fails to satisfy strict scrutiny." *Id.* at 591; *see id.* at 592-93. Third, "the Supreme Court's decision in *General*

---

[5] In a FERC filing after the Seventh Circuit decision, MISO reiterated that it "*does* interpret its Tariff to preclude it from giving any effect to HEA 1420 if a federal court were to issue a *final* judgment on the merits declaring that law unconstitutional." Ex.A ¶26 (emphasis added).

*Motors Corp. v. Tracy*, 519 U.S. 278 (1997), … does not save it." *Id.* at 593-95. Finally, "nothing in the Federal Power Act reflects that Congress authorized this dormant Commerce Clause violation with a clear statement." *Id.* at 591; *see id.* at 595-96.

### C.    The Magistrate Judge Grants, and This Court Affirms, a Stay of Discovery.

While the preliminary-injunction appeal was still pending, Incumbents moved to stay all litigation in this Court "pending the Seventh Circuit's forthcoming decision" and the "conclusion of any proceedings at the U.S. Supreme Court." Dkt.118. Magistrate Judge Klump granted that motion several days after the Seventh Circuit issued its decision. Dkt.131.

Despite having procured a stay of "[a]ll proceedings," Defendants filed three separate motions to dismiss in late April, *see* Dkts.139, 140; Dkts.143, 144; Dkts.145, 146. Plaintiffs objected, observing that the case had been stayed. *See* Dkts.148, 152. This Court clarified that the stay is limited to "discovery and related deadlines" and concluded that Plaintiffs would not be prejudiced by the stay because they remain free to "file dispositive motions without further discovery." Dkt.153 at 6-7. The motions to dismiss are now fully briefed and remain pending.

Consistent with the Court's most recent order, *id.*, Plaintiffs move for summary judgment on their Commerce Clause claim. This motion has the potential to resolve the entire case. If granted, it would fully redress Plaintiffs' injuries and obviate the need to adjudicate Plaintiffs' remaining claims. Accordingly, Plaintiffs respectfully ask the Court to consider it concurrently with the pending motions to dismiss. *See* Dkt.137 ¶¶9-10.[6]

### LEGAL STANDARD

Summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ.

---

[6] Consistent with the case-management order, Dkt.122 at 11, Plaintiffs reserve the right to seek leave to move for summary judgment on all remaining issues if the present motion is not granted.

P. 56(a). "Once a party has made a properly-supported motion for summary judgment," the nonmoving party must "submit evidentiary materials that 'set forth specific facts showing that there is a genuine issue for trial.'" *Siegel v. Shell Oil Co.*, 612 F.3d 932, 937 (7th Cir. 2010). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Neither a "metaphysical doubt as to the material facts" nor "a scintilla of evidence" favoring the nonmoving party suffices; "there must be evidence on which the jury could reasonably find in favor of the nonmoving party." *Siegel*, 612 F.3d at 937.

Commerce Clause challenges to facially discriminatory state laws are ideal candidates for resolution at summary judgment (or even on the pleadings). After all, "[w]hen a state statute directly regulates or discriminates against interstate commerce, or when its effect is to favor in-state economic interests over out-of-state interests," it is "generally struck down … without further inquiry." *Granholm*, 544 U.S. at 487. And any evidence of a non-discriminatory state interest is limited to the legislature's stated objectives, tightly cabining any factual inquiry. *Jackson*, 756 F.Supp.3d at 448 (awarding LSP judgment on the pleadings). Courts have therefore proceeded to summary judgment with little or no discovery on facial discrimination claims much like this one. *See, e.g.*, *Byrd v. Tenn. Wine & Spirits Retailers Ass'n*, 2017 WL 1021296, at *3 (M.D. Tenn. Mar. 16, 2017); *Poor Richard's Inc. v. Ramsey Cnty.*, 922 F.Supp. 1387, 1394 n.1 (D. Minn. 1996).

## ARGUMENT

### I.    HEA 1420 Violates The Commerce Clause.

Under binding precedent, "the Commerce Clause by its own force" "prevents the States from adopting protectionist measures and thus preserves a national market for goods and services." *Tenn. Wine & Spirits Retailers Ass'n v. Thomas*, 588 U.S. 504, 514, 518 (2019). State laws that discriminate against out-of-state interests are subject to a "virtually *per se* rule of invalidity."

*Philadelphia v. New Jersey,* 437 U.S. 617, 624 (1978); *see, e.g.*, *Fulton Corp. v. Faulkner*, 516 U.S. 325, 331 (1996); *Or. Waste Sys., Inc. v. Dep't of Envt'l Qual. of Or.*, 511 U.S. 93, 99 (1994). Such laws can be saved only by a showing that the State has no other means to advance a legitimate local purpose or by an "unmistakably clear" blessing from Congress.  *Maine v. Taylor*, 477 U.S. 131, 138-39 (1986); *see, e.g.*, *Hughes v. Oklahoma*, 441 U.S. 322, 337 (1979).  These principles doom HEA 1420, which blatantly discriminates against interstate commerce on its face, in its effects, and in its purpose; abjectly fails strict scrutiny; and enjoys no congressional sanction.

### A.    HEA 1420 Triggers Strict Scrutiny Several Times Over.

#### 1.    HEA 1420 directly regulates interstate commerce and its instrumentalities.

"When a state statute directly regulates … interstate commerce," it triggers strict scrutiny under the Commerce Clause.  *Granholm*, 544 U.S. at 487.  HEA 1420 plainly fits the bill.  In fact, it regulates *only* interstate commerce, as it applies exclusively to facilities that "ha[ve] been approved for construction through a regional transmission organization planning process."  Ind. Code §8-1-38-9; *see LSP*, 131 F.4th at 585 (Scudder, J., dissenting) ("HEA 1420 only regulates transmission lines that connect to the *interstate* electric grid").  "Transmission lines that are part of an interstate grid are much closer to the heartland of interstate commerce than the wine stores, dairies, or waste processing facilities that have faced dormant Commerce Clause scrutiny." *NextEra*, 48 F.4th at 321.  After all, not only are they physical instrumentalities of interstate commerce, but electricity transmitted on the interstate grid "immediately becomes a part of a vast pool of energy that is constantly moving in interstate commerce."  *New York*, 535 U.S. at 7.

#### 2.    HEA 1420 discriminates against interstate commerce on its face.

HEA 1420 not only regulates interstate commerce but discriminates in favor of in-state economic interests and against out-of-state interests, triggering a "virtually *per se* rule of

invalidity." *Philadelphia*, 437 U.S. at 624. "[D]iscrimination based on the extent of local operations is itself enough to establish the kind of local protectionism" that implicates the Commerce Clause. *Lewis v. BT Inv. Managers, Inc.*, 447 U.S. 27, 42 n.9 (1980). And that form of discrimination is evident on the face of HEA 1420: The statute explicitly grants preference to build and maintain new transmission development to "public utilit[ies]" that already "own[], operate[], and maintain[]" "electric transmission facilit[ies] in whole or in part *in Indiana*," to the detriment of all those who do not. Ind. Code §8-1-38-2 (emphasis added).

As this Court and Judge Scudder correctly recognized at the preliminary-injunction phase, that discrimination mirrors local presence requirements that the Supreme Court has time and again invalidated. Dkt.70 at 16-17; *LSP*, 131 F.4th at 591 (Scudder, J., dissenting).[7] "States cannot require an out-of-state firm 'to become a resident in order to compete on equal terms.'" *Granholm*, 544 U.S. at 475; *see Tenn. Wine*, 588 U.S. at 518 (two-year durational residency requirement "plainly" favored in-state residents). Just like the facially discriminatory state laws held unconstitutional in *Granholm* and *Tennessee Wine*, HEA 1420 on its face favors entities with ties to the state over out-of-state entities by giving those who already own facilities in Indiana the right to build all new regional transmission facilities in the state.

The Fifth Circuit's analysis in *NextEra* is compelling and on all fours with this case. *See* Dkt.70 at 18; *LSP*, 131 F.4th at 591 (Scudder, J., dissenting). Like HEA 1420, the Texas ROFR law gave incumbents first dibs on new transmission projects. As the Fifth Circuit explained, local presence requirements are unconstitutional in themselves—but ROFR laws like HEA 1420 are "a *more* anticompetitive version of the in-state presence requirements held unconstitutional in cases

---

[7] Because the disposition of the appeal turned on standing, the majority did not address the merits or express any disagreement with Judge Scudder's analysis.

like *Granholm* or *Dean Milk*." *NextEra*, 48 F.4th at 324-25. While the (unconstitutional) laws in those two cases at least allowed out-of-state competitors to establish in-state operations, HEA 1420 excludes out-of-staters indefinitely, except in the rare (if not illusory) circumstance in which an incumbent declines to exercise its right. *See* Dkt.70 at 16-19. And, even worse than setting up a protectionist wall against out-of-state milk or wine, HEA 1420 regulates the very instrumentalities of the interstate electric grid. *NextEra*, 48 F.4th at 321; *see supra* p.19. "Because the electricity grid is on its own an interstate market, state protectionist measures regulating its instrumentalities run a much greater risk of harming out-of-state interests—the ability of companies to compete, the prices consumers pay—than regulations on retail wine stores." *NextEra*, 48 F.4th at 322.

HEA 1420 also runs headlong into the Supreme Court's numerous Commerce Clause cases invalidating state or municipal "flow control" laws. *See C&A Carbone, Inc. v. Town of Clarkstown*, 511 U.S. 383 (1994). Like those laws, which grant an absolute preference to a particular local interest at the expense of all others, HEA 1420 "depriv[es] competitors, including out-of-state firms, of access to a local market." *Id.*; *see also Fort Gratiot Sanitary Landfill, Inc. v. Mich. Dep't of Nat. Res.*, 504 U.S. 353, 361 (1992). Indeed, HEA 1420, again, is worse; rather than protecting a given industry, it attempts to reserve the very instrumentalities of interstate commerce for in-state interests. *See NextEra*, 48 F.4th at 321-22.

It is no answer that HEA 1420 also disfavors in-state entities that do not own transmission facilities. Because "the statute concerns property ownership in the state, it expressly mandates differential treatment of in-state and out-of-state economic interests"—whether or not "some in-state businesses are subject to the proscriptions." Dkt.70 at 16-17. As this Court, the Fifth Circuit, and Judge Scudder have correctly recognized, that is facial discrimination under settled Supreme Court precedent. *See id.*; *NextEra*, 48 F.4th at 325; *LSP*, 131 F.4th at 592 (Scudder, J., dissenting).

It is no answer, either, that Incumbents are vertically integrated utilities with exclusive retail territories.  Unlike the law at issue in *General Motors v. Tracy*, 519 U.S. 278 (1997), HEA 1420 does not involve a special preference available *only* to vertically integrated utilities that serve a local captive market.  It gives a preference to *any* entity with an existing presence "in Indiana," Ind. Code §8-1-38-2—not only vertically integrated utilities (like Incumbents) but also transmission-only companies (like NextEra Indiana).  HEA 1420 grants that preference, moreover, only as to a single product:  facilities approved and operated by a federally regulated "regional transmission organization," such as MISO.  Ind. Code §8-1-38-9.  So, unlike the tax exemption in *Tracy*, which "operated in two different retail markets," HEA 1420 addresses only "a single market"—interstate transmission—"that is undoubtedly competitive," not captive.  *NextEra*, 48 F.4th at 319-20; *accord* Dkt.70 at 19.  The Commerce Clause's antidiscrimination principle applies to "laws regulating a single market where vertically integrated utilities undoubtedly compete alongside other transmission-only operators."  *LSP*, 131 F.4th at 594 (Scudder, J., dissenting).

As this Court correctly recognized at the preliminary-injunction stage, *see* Dkt.70 at 18-19, that likewise distinguishes *Regan v. City of Hammond*, 934 F.3d 700 (7th Cir. 2019), which held that a local law permissibly differentiated between landlords and owner-occupiers.  Landlords and owner-occupiers are not competitors; "during the term of their ownership, they are using the property for different purposes."  *Id.* at 704.  But new entrants and incumbents who want to construct and maintain transmission lines very much are competitors.  When competition was open, they competed directly.  And both must be certified as "public utilit[ies]" under Indiana law, *see* Ind. Code §§8-1-38-2, -7, so they are all subject to the same obligations and requirements.  All entities that complete the rigorous process to become a MISO-qualified developer are thus "similarly situated" for purposes of bidding on the same MISO-approved transmission projects,

regardless of whether they are "vertically integrated utilities" or "transmission-only entities." Again, that is plain from HEA 1420 itself, which grants a preference to incumbents regardless of whether they are the former or the latter; all that matters is that they operate "in Indiana."  Ind. Code §8-1-38-2.  In short, by "draw[ing] a straightforward distinction between direct competitors in the interstate market for electric transmission," based on the extent of their existing presence in Indiana, HEA 1420 "expressly discriminates against interstate commerce."  Dkt.70 at 19.

### 3.    HEA 1420 discriminates against interstate commerce in its effects.

Even if it were facially neutral (it is not), HEA 1420 would still be invalid.  The Supreme Court has repeatedly "condemn[ed] state laws that 'although neutral on their face … were enacted at the instance of, and primarily benefit,' in-state interests."  *Nat'l Pork Producers Council v. Ross*, 598 U.S. 356, 379 n.2 (2023); *see Granholm*, 544 U.S. at 487 (if a statute's "effect is to favor in-state economic interests over out-of-state interests," it is "generally struck down … without further inquiry").  HEA 1420 was enacted at the behest of, and will divert new business to, a small cadre of Indiana firms—namely, Duke Energy Indiana, NIPSCO, AES Indiana, SIGECO, and I&M.

These firms epitomize powerful in-state interests.  Each of them has been "serving Hoosiers" for at least a century.  *Supra* Statement of Undisputed Material Facts ("SOF") ¶¶13-16, 19.  They have a huge physical presence in Indiana, including scores of local facilities, thousands of employees, and distinct access to state and local legislators.  *Id.* ¶¶12-19.  They collectively own the vast majority of Indiana's transmission lines and substations—the "termination points" where most new projects begin or end—and Hoosier Energy, IMPA, and WVPA, own almost all the rest. *Id.* ¶¶12-22.  HEA 1420 thus guarantees that virtually every new regional transmission project in Indiana will be handed to an in-state entity without any out-of-state competition.  *Id.* ¶¶45-47. Underscoring the point, once MISO determined that HEA 1420 applies to the Tranche 2.1 facilities in its Indiana footprint, MISO assigned *all 55 of them*—about *$1 billion* in new business—to

23

Indiana firms without competition.  *Id.* ¶¶48-49.  If that does not "give local firms [a] competitive advantage over firms located elsewhere," *Regan*, 934 F.3d at 703, it is hard to imagine what would.

Simply put, HEA 1420 has the effect of barring *virtually all* out-of-state competition for billions of dollars' worth of interstate transmission lines—an unquestionably "strong" burden on interstate commerce that independently triggers strict scrutiny.  *See id.*

### 4.    HEA 1420 discriminates against interstate commerce in its purpose.

"A finding that state legislation constitutes 'economic protectionism' may [also] be made on the basis of … discriminatory purpose." *Bacchus Imports, Ltd. v. Dias*, 468 U.S. 263, 270-71 (1984).  HEA 1420 was enacted for the express purpose of favoring "Hoosiers."  That is clear not only from its text and inevitable effects, but also from legislators' statements about HEA 1420 and the context in which it was enacted.  The law's sponsor, Rep. Edmond Soliday, explained that it gives new transmission projects to "Hoosiers we know," as opposed to companies from "somewhere else," like "Florida."  *Hearing on HB 1420*, *supra*, at 2:35:50-36:15; *see supra* SOF ¶¶35-36, 41.  Other legislators similarly stated that they supported HEA 1420 because they would rather have "folks from Indiana" build and own transmission lines than people "from who knows where," *supra* SOF ¶38 (Sen. Byrne), and they believed it would create "big union jobs" for "people in Indiana," *id.* ¶40 (Sen. Leising); *see id.* ¶37 (union representatives), ¶39 (Sen. Koch).

It is also telling that HEA 1420 was passed shortly after MISO began awarding competitive transmission projects in Indiana to transmission developers with no previous in-state presence.  In December 2016, Republic was selected to build the first new project in Indiana that MISO competitively awarded under Order No. 1000 (Duff-Coleman).  *Id.* ¶26.  And in May 2023, Republic was selected to build the first new LRTP Tranche 1 project in Indiana (Hiple).  *Id.* ¶29. That very same month, HEA 1420 was enacted, ensuring that Indiana incumbents would no longer have to face competitors they had twice failed to best.  *Id.* ¶42, 45-47.

Indeed, NIPSCO openly admits that, after Republic won the Duff-Coleman project, NIPSCO chose not to bid on the Hiple project and instead "focused on seeking a legislative solution … for future projects." *Id.* ¶32. And the legislature responded by giving NIPSCO and its fellow incumbent Hoosiers a "regulatory benefit[]" that insulates them from out-of-state competition for billions of dollars' worth of projects. Dkt.52-3, ¶30; *see supra* SOF ¶¶33-52. Both the legislative debate on HEA 1420 and the circumstances surrounding its enactment thus underscore what is plain from the law's text: HEA 1420, like Texas' ROFR law, embodies exactly the kind of "protectionism that the Commerce Clause guards against." *NextEra*, 48 F.4th at 326.

### B.    HEA 1420 Cannot Survive Strict Scrutiny.

When a state law discriminates against interstate commerce, it is subject to the "strictest scrutiny." *Hughes*, 441 U.S. at 337. Under that "extremely difficult burden," the state must demonstrate that its discriminatory law "advances a legitimate local purpose that cannot be adequately served by reasonable nondiscriminatory alternatives." *Camps Newfound*, 520 U.S. at 581-82. Indeed, "[t]he State's burden of justification is so heavy that 'facial discrimination by itself may be a fatal defect.'" *Or. Waste Sys.*, 511 U.S. at 101.

Defendants have never argued that HEA 1420 passes strict scrutiny, and for good reason. As discussed, HEA 1420 was motivated by rank economic protectionism—the constitutionally *illegitimate* objective of giving business and jobs to "Hoosiers" by suppressing out-of-state competition. *See supra* p.24. While Defendants have asserted that the statute furthers "the integrity of Indiana's franchise utility model and the safety and stability of its electric grid," CA7.Dkt.45 at 7, 40-41, the legislature enacted HEA 1420 without any findings of fact or statement of purpose, *supra* SOF ¶42, and post-hoc rationalizations cannot satisfy strict scrutiny. *See Hughes*, 441 U.S. at 338 n.20; *United States v. Virginia*, 518 U.S. 515, 533 (1996). And to the extent that some advocates of HEA 1420 tried to gin up non-protectionist rationales, they are quite

different from the ones Defendants have offered.  *See, e.g.*, *Hearing on HB 1420*, *supra*, at 2:02:12-06:16 (IEA President), https://tinyurl.com/yc56r2az; *House Proceedings*, *supra*, at 1:03:57-07:24 (Rep. Soliday); *Senate Proceedings*, *supra*, at 2:22:17-25:04, 2:33:40-34:21 (Sen. Koch).

In all events, Defendants' made-for-litigation rationales are blatantly pretextual.  FERC has expressly rejected the argument that giving incumbents exclusive business opportunities is necessary to protect grid safety and reliability.  Order No. 1000 at ¶¶260-66.  And rightly so, as every entity that builds a regional project in Indiana—incumbent or not—is already subject to extensive federal and state regulations to ensure safety and reliability.  *See supra* SOF ¶¶1-6.  Moreover, to the extent incumbents bring anything uniquely valuable to the table, they are "free to highlight [those] strengths" in the competitive bidding process.  Order No. 1000 at ¶260.  As for "the integrity of Indiana's franchise utility model," CA7.Dkt.45 at 7, allowing competition for *regional* transmission projects—which are cost-allocated across multiple states—does not undermine a state's control of *local* utilities providing retail services to consumers.  Moreover, Indiana lets out-of-staters purchase existing transmission facilities and compete for new projects if an incumbent does not exercise its ROFR.  *Supra* SOF ¶43.  That is irreconcilable with the notion that letting non-incumbents enter the market would threaten grid safety or stability.

Finally, HEA 1420 cannot be justified as the only reasonable means to pursue Defendants' asserted aims.  *See Maine*, 477 U.S. at 138.  After all, most states safely and reliably deliver energy to their residents without discriminating against interstate commerce.  *Supra* SOF ¶44; *NextEra*, 48 F.4th at 326.  As this Court explained in granting the preliminary injunction, "the state's interests are adequately served by [the] existing, non-discriminatory utility regulations" referenced above.  Dkt.70 at 19; *see supra* SOF ¶¶1-6.  This Court's conclusion that "HEA 1420 cannot withstand strict scrutiny" was therefore correct at the preliminary-injunction stage, and it remains correct

now.  Dkt.70 at 19; *accord LSP*, 131 F.4th at 592-93 (Scudder, J., dissenting).

### C.    Congress Did Not Authorize HEA 1420's Blatant Discrimination.

Defendants have argued that "Congress has authorized States to enact [right-of-first-refusal laws] like HEA 1420 through the Federal Power Act."  CA7.Dkt.45 at 46; Dkt.52-1 at 22-24.  No court has ever accepted this argument, and it is squarely foreclosed by Supreme Court precedent.

Although "Congress may authorize the States to engage in regulation that the Commerce Clause would otherwise forbid," a court may find such authorization "only when the congressional direction to do so has been 'unmistakably clear.'"  *Maine*, 477 U.S. at 138-39.  Defendants contend that such an "unmistakably clear" statement can be found in 16 U.S.C. §824(b)(1), the FPA's "savings clause," which preserves state jurisdiction over local distribution and *intra*state transmission.  But that provision contains no statement—let alone any "unmistakably clear" one— authorizing discrimination against interstate commerce when it comes to *inter*state transmission.  In fact, even as to *intra*state areas that the FPA leaves to the states, like retail sales, the Supreme Court has squarely held—twice—that the savings clause does not "alter the limits of state power otherwise imposed by the Commerce Clause."  *Wyoming v. Oklahoma*, 502 U.S. 437, 458 (1992) (quoting *New England Power Co. v. New Hampshire*, 455 U.S. 331, 341 (1982)).  Plainly, then, it does not expand state power to regulate *interstate* transmission.

Defendants' argument that *FERC* has somehow authorized HEA 1420's discrimination is weaker still.  FERC's actions cannot change the Supreme Court's authoritative interpretation of the FPA's savings clause.  *See id.*  Moreover, FERC's function under the FPA is to regulate interstate power transmission—not to tell states how they may legislate.  *See La. Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 357 (1986) ("[A]n agency literally has no power to act … unless and until Congress confers power upon it.").  And while FERC has decided not to "prohibit [ISOs] from recognizing state and local laws and regulations as a threshold issue," 147 FERC ¶61,127 at

¶¶149-50, that is a far cry from authorizing *states to enact legislation* that would otherwise violate the Commerce Clause. In all events, FERC has not even taken a position on whether such laws are constitutional, let alone purported to try to make them so. *See* 150 FERC ¶61,037, at ¶61,195 (Bay, Commissioner, concurring); *supra* p.6. Indeed, at the Seventh Circuit, FERC made a point of emphasizing that it has *never* "taken a position on the constitutionality of state [ROFR] laws." CA7.Dkt.76. So even if FERC had the power to authorize states to enact discriminatory regulations of interstate transmission (which it does not), it has not even purported to exercise any such power here.

## II.   This Court Should Issue A Declaratory Judgment And A Permanent Injunction.

### A.   A Declaratory Judgment Is Amply Warranted.

While declaratory relief is not "automatic" or "obligatory," *Wilton v. Seven Falls Co.*, 515 U.S. 277, 288 (1995), a declaratory judgment is "usually" granted when it will "settle the dispute[]" and "afford relief" to the plaintiff, *NUCOR*, 28 F.3d at 578-79. That standard is unquestionably met here, and this case presents none of the "equitable considerations" that might cut against issuing a declaratory judgment—e.g., concerns about "forum shopping," "procedural fencing," or "friction between … federal and state courts," *Basic v. Fitzroy Eng'g, Ltd.*, 132 F.3d 36 (7th Cir. 1997). To the contrary, the equities tilt sharply in favor of issuing a final judgment that will protect Plaintiffs and consumers from further irreparable harm. *See infra* pp.29-30.

### B.   Plaintiffs Satisfy All Remaining Factors for Permanent Injunctive Relief.

To obtain permanent injunctive relief, a plaintiff must show not only success on the merits but also that (1) it faces irreparable injury; (2) "remedies available at law, such as monetary damages, are inadequate"; (3) the balance of hardships tilts in its favor; and (4) a permanent injunction would not disserve the public interest. *A.C. ex rel. M.C. v. Metro. Sch. Dist. of Martinsville*, 761 F.Supp.3d 1159, 1174 (S.D. Ind. 2025) (Pratt, J.). Each factor is established here.

1.    **HEA 1420 irreparably harms Plaintiffs, and legal remedies are inadequate.**

Plaintiffs continue to suffer two irreparable injuries.  First, "[c]ourts have repeatedly held that a company is irreparably harmed if it is disadvantaged in—let alone completely barred from— competing for business opportunities." Dkt.70 at 20.  That rule is implicated here:  Whether or not the projects awarded to Incumbents in Tranche 2.1 (worth nearly $2 billion) are still in play, HEA 1420 irreparably harms Plaintiffs by preventing them from competing for future interstate transmission projects in Indiana.  *See supra* SOF ¶¶51-52.  Second, Plaintiffs face ongoing irreparable harm in the form of "a continuing constitutional violation."  Dkt.70 at 20; *see, e.g.*, *Preston v. Thompson*, 589 F.2d 300, 303 n.3 (7th Cir. 1978); Dkt.5 at 22-23 (collecting cases).  An injunction prohibiting the IURC Commissioners from giving effect to HEA 1420 and prohibiting Intervenors from exercising rights under HEA 1420 would prevent further irreparable injury.

2.    **The balance of hardships and public interest favor a permanent injunction.**

The "balance of harms and public interest … merge when, as here, the government is a defendant." Dkt.70 at 20; *see Anatol Zukerman & Charles Krause Reporting, LLC v. United States Postal Serv.*, 64 F.4th 1354, 1364 (D.C. Cir. 2023); *Midwest Title Loans, Inc. v. Ripley*, 616 F.Supp.2d 897, 908 (S.D. Ind. 2009).  These factors tilt sharply in favor of a permanent injunction.

Plaintiffs face significant hardship absent a permanent injunction:  Without an injunction, Plaintiffs will be unable to bid on billions of dollars' worth of future interstate transmission projects in Indiana.  And it is not just Plaintiffs who stand to lose out; consumers also face significant economic harm.  FERC has recognized that ROFRs tend to "undermine the identification and evaluation of a more efficient or cost-effective solution to regional transmission needs," resulting in rates "that are unjust and unreasonable."  Order No. 1000 at ¶7; *see also id.* at ¶¶231, 285. Federal courts of appeals have likewise recognized that ROFRs are contrary to the public interest.

*See, e.g.*, *NextEra*, 48 F.4th at 324 n.9 (recognizing that a state law that grants in-state incumbents an "exclusive right" to build new transmission lines "raises prices in the interstate market," thus harming consumers); *MISO Transmission Owners*, 819 F.3d at 333 (noting that incumbents were not "able to articulate any benefit" that ROFRs would confer on "consumers" or "society as a whole"). So does the United States. *See, e.g.*, CA7.Dkt.63; Ex.28; Ex.29.

On the flip side, "[t]here is no harm to a government agency when it is prevented from enforcing an unconstitutional statute," Dkt.70 at 21, and "enforcement of an unconstitutional law is always contrary to the public interest," *City of Chicago v. Sessions*, 321 F.Supp.3d 855, 879 (N.D. Ill. 2018). That remains equally true whether HEA 1420 takes force via actions of the IURC or via actions of Incumbents. Moreover, any supposed "concern[s] about chaos and fragmentation on the transmission grid [are] unfounded given that all utilities must provide reliable service, and because the Intervenors have presented no evidence that HEA 1420 was promulgated as a result of such chaos and fragmentation." Dkt.70 at 21.

*    *    *

Time is on Incumbents' side. The longer HEA 1420 remains in effect, the harder it becomes to reverse unconstitutional assignments of projects, and the more likely it is that new projects will be announced and gifted to Incumbents. That is no doubt why Incumbents have taken every opportunity to extend this litigation. *See, e.g.*, Dkts.118, 119; Dkt.141; Dkt.163. This Court should not indulge any further efforts to delay the inevitable: There are no genuine issues of material fact as to Plaintiffs' claim that HEA 1420 triggers—and fails—strict scrutiny under the Commerce Clause, which is sufficient to resolve this litigation.

**CONCLUSION**

The Court should grant summary judgment on Plaintiffs' claim that HEA 1420 violates the Commerce Clause and enter an order granting declaratory and permanent injunctive relief.

Respectfully submitted,

s/Erin E. Murphy

TODD A. RICHARDSON
JAMES E. ZOCCOLA
THOMAS JONES
LEWIS KAPPES
One American Square
Suite 2500
Indianapolis, IN 46282
(317) 639-1210

PAUL D. CLEMENT*
ERIN E. MURPHY*
MATTHEW D. ROWEN*
JEFFREY C. THALHOFER*
JOSEPH J. DEMOTT*
CLEMENT & MURPHY, PLLC
706 Duke Street
Alexandria, VA 22314
(202) 742-8900
erin.murphy@clementmurphy.com

*Admitted pro hac vice

*Counsel for Plaintiffs*

August 6, 2025