UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF INDIANA

| | |
|---|---|
| LSP TRANSMISSION HOLDINGS II, LLC, et al., | |
| Plaintiffs, | |
| **v.** | |
| JAMES F. HUSTON, Chairman, Indiana Utility Regulatory Commission, et al., | Case No. 1:24-cv-01722-TWP-MKK |
| Defendants, | |
| NORTHERN INDIANA PUBLIC SERVICE COMPANY, et al., | |
| Intervenor-Defendants. | |

**Amicus Curiae Brief of Consumer Organizations**

Amicus Curiae, Citizens Action Coalition of Indiana, Inc., Wisconsin Citizens Utility Board, and Illinois Citizens Utility Board are the leading consumer organizations dedicated to advocating for utility customers in their respective states. Amici provide this brief in support of Plaintiffs' Motion for Partial Summary Judgment (Doc. 165) because Indiana House Enrolled Act 1420 ("HEA 1420") favors in-state incumbent utilities over competition and consumers. By precluding competition in the design and construction of interstate transmission infrastructure, HEA 1420 produces a higher-cost transmission system that consumers ultimately pay for. Ultimately, it is Amici's members—retail electricity consumers—who bear the brunt of HEA 1420's economic favoritism.

1

## Identity and Interest of the Amici Curiae

Citizens Action Coalition of Indiana, Inc. ("CAC"), is Indiana's oldest and largest consumer and environmental advocacy organization. Since 1974, CAC has helped Hoosiers save more than $10 billion in excess utility charges by advocating on energy policy and utility reform, including by creating public awareness, lobbying legislators, intervening in utility cases before the Indiana Utility Regulatory Commission, and litigating when necessary.

The Wisconsin Citizens Utility Board ("Wisconsin CUB") was created by the Wisconsin legislature under Chapter 72, Laws of 1979, to advocate on behalf of residential and other customers on utility issues and represent the rights of residential ratepayers in rate proceedings. *See* Wis. Stat. § 199.02. Wisconsin CUB subsequently reorganized and is currently a nonstock, nonprofit corporation with approximately 2,000 members who are customers of the largest investor-owned utilities in Wisconsin. Wisconsin CUB – pursuant to its statutory mandate under Wis. Stat. § 196.315 – provides public interest ratepayer advocacy on behalf of residential, farm, and small business utility customers before regulatory agencies and the courts. Wisconsin CUB seeks to promote reliable, affordable, and sound utility service.

The Illinois Citizens Utility Board ("Illinois CUB") is a statewide organization of residential ratepayers and the legally-recognized representative of utility consumers in Illinois. 220 ILCS 10/5. Illinois CUB has saved Illinois consumers more than $20 billion by fighting proposed electricity, natural gas and telephone rate hikes. For every dollar Illinois CUB has raised during that time, it has yielded roughly $300 in

savings—a dramatic return on investment that represents one more reason why the St. Louis Post-Dispatch praised Illinois CUB as the "gold standard" of consumer advocates.

Amicis' members pay for the cost of transmission projects through their retail utility rates. State regulators are required to pass through all federally-tariffed transmission costs to retail ratepayers. *Miss. Power & Light Co. v. Miss.*, 487 U.S. 354, 369-73 (1988) (federally-set rates are binding on states and states must allow them to be recovered through retail rates). Thus, Amicis' members will pay higher utility bills because of Indiana's decision to prefer uncompetitive in-state interests over lower cost out-of-state competitors through HEA 1420,

## Introduction

By its express terms, HEA 1420—codified as Indiana Code § 8-1-38-9— discriminates in favor of entities with an existing in-state presence and against interstate commerce. It provides the "incumbent electric transmission owner… the right to construct, own, operate and maintain" any transmission facility or upgrade to any transmission facility approved by an interstate regional transmission organization ("RTO") that connects to an existing transmission facility that the incumbent owns. Ind. Code4 § 8-1-38-9(a). All the incumbent must do is notify the Indiana Utility Regulatory Commission of its choice to own and operate the new facility within 90 days. Ind. Code § 8-1-38-9(c). It need not have the best design, lowest cost, or be most capable of building and owning the facility. It just gets the unearned benefit of monopoly over new interstate transmission projects by legislated

3

preference for in-state incumbents—at the expense of the ratepaying public across the whole region.

HEA 1420 is classic protectionism that is per se invalid under the Commerce Clause in nearly all cases. This Court correctly found the statute likely unconstitutional and enjoined enforcement in its preliminary injunction. It should now find the statute unconstitutional and enter a permanent injunction to serve the public interest by providing consumers with the benefit of more cost-effective transmission project construction through competition.

## Background

Monopoly utility companies have no incentive to constrain cost. In fact, the opposite is true. Under cost-of-service ratemaking—in which utility rates are set to cover all expenses plus a return on investment—utilities are incentivized to avoid cost-saving methods or designs and maximize costs to increase their authorized return on investment. Monopoly utilities also lack any incentives to innovate and improve technology, design, or engineering that bring better products at lower costs to the ultimate consumers. At the same time, the electricity sector as a whole is undergoing significant change and demands for additional infrastructure. Low-cost renewable generation is displacing old fossil fuel generation and massive new electricity demand from electric vehicles and data centers is projected to eclipse current capacity of delivering electricity. That transition necessitates significant transmission investments that will raise rates for consumers. Competition by

innovative and better-managed transmission companies is the only counter-pressure that can keep costs down.

### I.    Transmission is no longer a natural nor a legal monopoly under federal law.

Once upon a time each electric utility owned all power plants, transmission lines, and local distribution wires needed to supply power to each customer—known as "vertically integrated" utilities. *FERC v. Elec. Power Supply Ass'n*, 577 U.S. 260, 267 (2016); *Midwest ISO Transmission Owners v. FERC*, 373 F.3d 1361, 1363 (D.C. Cir. 2004). But times have changed. Power production and transmission are interstate, competitive, enterprises today.

Interstate transmission systems and wholesale power prices are regulated exclusively by the Federal Energy Regulatory Commission ("FERC"), not by state legislators or regulatory agencies. 16 U.S.C. §§ 824(a)(a), 824(b)(1); *see also Pub. Utils. Comm'n of R.I. v. Attleboro Steam & Elec Co.*, 273 U.S. 83, 89 (1927) (states may not regulate the rate of electricity sold across state lines). Federal policy eschews monopoly utilities and bureaucratically-set prices in favor of competitive markets and economic efficiency as the preferable way to ensure the lowest cost power to consumers. *Midwest ISO*, 373 F.3d at 1364; FERC Order 2000, 65 Fed. Reg. 809 (2000). FERC does so by dividing the country into regional markets operated by RTOs or independent system operators ("ISOs"). *See generally*, 18 C.F.R. § 35.34; *Regional Transmission Organizations*, 89 FERC ¶61,285 (Dec. 20, 1999); *Promoting Wholesale Competition Through Open Access Non-discriminatory Transmission Services by Public Utilities; Recovery of Stranded Costs by Public Utilities and Transmitting*

*Utilities*, 75 FERC ¶61,080, 61 Fed. Reg. 21,540, 21,551-52, 21,560, 21,593-97 (Apr. 24, 1996). In Indiana, two market operators control the interstate transmission and wholesale power markets: MISO and PJM.[1]



As to transmission, FERC's and RTOs' rules generally divide new transmission projects into two categories: (1) local projects and (2) regional projects. *MISO Transmission Owners*, 819 F.3d at 335. Local projects are mostly left to incumbent transmission providers, and their costs are allocated only to that local transmission provider's customers. But FERC spreads the costs of regional projects that address the needs of multiple transmission providers, generators, and consumers across multiple states. *Id.*; *see also Midcontinent Independent System Operator, Inc.*, 179 FERC P 61,124 ¶¶ 2, 68-78 (2022) (explaining initial cost allocation and modification

---

[1] https://www.ferc.gov/power-sales-and-markets/rtos-and-isos. MISO is the Midcontinent Independent System Operator. PJM is the Pennsylvania-New Jersey-Maryland Interconnection RTO.

to spread costs between states in the North or South region); *Midcontinent Independent System Operator, Inc.*, 162 FERC P 61,063, ¶ 2 (2018) (eighty percent of costs of transmission project allocated to the local zones that benefit from the project and twenty percent allocated system-wide).

Prior to 2011, the MISO and PJM tariffs still contained a vestige of the old, monopoly model by permitting incumbent monopoly utilities "the first crack at building" all new transmission facilities. *Midwest ISO Transmission Owners v. FERC*, 819 F.3d 329, 332 (7th Cir. 2016). But in 2011, FERC directed MISO and PJM to remove those preferential, anti-competitive "ROFR" provisions because competition produces lower costs for consumers. *LS Power Midcontinent, LLC v. State*, 988 N.W.2d 316, 323 (Iowa 2023), *reh'g denied* (Apr. 26, 2023); *Transmission Planning & Cost Allocation by Transmission Owning & Operating Public Utilities*, FERC Order No. 1000, 76 Fed. Reg. 49,842, 49,885 (2011). FERC reasoned that preferential treatment of incumbents over competitive new entrants crowds out more efficient and cost-effective solutions and leads to higher costs for customers. *LS Power*, 988 N.W.2d at 323 (citing 76 Fed. Reg. at 49,855 and *NextEra Energy Cap. Holdings, Inc. v. Lake*, 48 F.4th 306, 312 (5th Cir. 2022)). Courts upheld FERC's decision to eliminate federal ROFR provisions because "basic economic principles make clear that rights of first refusal are likely to have a direct effect on the cost of transmission facilities because they erect a barrier to entry." *S.C. Pub. Serv. Auth.*, 762 F.3d at 75.

Even so, FERC stopped short of exercising its authority under the Federal Power Act to preempt *state*-level ROFR laws. *Id.* That left the question of whether states can thwart competition with state protectionist laws to political fights in state houses and challenges under the Constitution's Commerce Clause. *Cf. Southwest Power Pool, Inc.*, 151 FERC 61,045 (Apr. 16, 2015) ("The Commission's order today does not determine the constitutionality of any particular state right-of-first-refusal law… [that determination] lies with a different forum, whether state or federal court.") (Bay, concurring).

## II.    Consumers face significant rate hikes to pay for new transmission infrastructure.

Electricity consumers are already experiencing large rate hikes and face a daunting projection of more rate hikes over the next decade. While power supply will eventually transition to power generation without fuel costs—like wind and solar— that transition will require additional transmission construction to move power to the cities and towns that need it. *See Ill. Com. Comm'n v. FERC*, 721 F.3d 764, 771 (7th Cir. 2013) (achieving more renewable energy generation requires new transmission to move power from remote locations of generation to population centers); MTEP21 Report Addendum: Long Range Transmission Planning Tranche 1 Executive Summary at 18 (MTEP21 Report) (projecting increase in wind and solar generation)[2].

---

[2] https://cdn.misoenergy.org/MTEP21%20Addendum-LRTP%20Tranche%201%20Report%20with%20Executive%20Summary625790.pdf.

Since 2003, MISO invested more than $34 billion in new transmission. MISO, MTEP23 at 1.[3] MISO recently proposed another four tranches of additional regional build-out. Project selection for "Tranche 1" began in the summer of 2022 and includes 18 projects at an estimated initial capital cost of $10.3 billion. MTEP21 Report at 2.[4] MISO recently announced Tranche 2.1, which includes another twenty-four projects involving 323 facilities at an estimated $21.8 billion. MISO Long Range Transmission Planning (LRTP) Tranche 2.1 Fact Sheet.[5]



Source: https://www.misoenergy.org/planning/long-range-transmission-planning/.

---

[3] https://cdn.misoenergy.org/MTEP23%20Executive%20Summary630586.pdf.

[4] https://cdn.misoenergy.org/MTEP21%20Addendum-LRTP%20Tranche%201%20Report%20with%20Executive%20Summary625790.pdf.

[5] https://cdn.misoenergy.org/LRTP%20Tranche%202.1%20Fact%20Sheet%20Website666573.pdf.

Paying for those billions of dollars in new transmission project costs, plus a return on capital invested, will ultimately fall on consumers. MISO projects that the cost of just the new Tranche 1 regional "multi-value projects" will increase MISO Schedule 26A transmission rates by 815% over ten years from 2028 to 2038. MISO LRTP Tranche 1 Appendix A-4 Schedule 26A Indicative.[6] Those costs will multiply further as MISO implements the additional three tranches of planned new projects.

But that's not all. Customers will also have to pay more for increased costs to maintain and upgrade the existing grid, most of which was built more than fifty years ago and requires $10 billion in annual maintenance, replacement, and upgrades as well. *See* Pfeifenberger, et al., *Transmission Investment Needs and Challenges* at 3 (June 1, 2021).[7]

Together, that represents hundreds of billions of additional costs that consumers will have to shoulder. The only relief available to ratepayers is to hold down the cost of the new transmission infrastructure and maintenance. And the only way to do that is by forcing transmission providers to compete on price and design.

Right of First Refusal ("ROFR") laws like HEA 1420, which grant preference to incumbents, undermines the price constraint of competition and, instead, "create[s] a potential for higher rates to consumers of electricity than if competition to create

---

[6] https://cdn.misoenergy.org/LRTP%20Tranche%201%20Appendix%20A-4%20Schedule%2026A%20Indicative625788.xlsx.

[7] https://www.brattle.com/wp-content/uploads/2021/10/Transmission-Investment-Needs-and-Challenges.pdf.

transmission facilities in transmission companies' service areas was allowed…."

*MISO Transmission Owners*, 819 F.3d at 333. As the Seventh Circuit explained:

> [Under competition, t]here would be a low bidder, and the lower his bid and therefore (in all likelihood) the cost of the facility he built, the lower would be the rates charged consumers of the electricity transmitted by the facility. In contrast, when the local firm has the right of first refusal an outsider will have little incentive to explore the need for a new transmission facility because the local firm would be likely to say to the outsider (sotto voce) "thank you very much for identifying, at no cost to me, a lucrative opportunity for me to exploit," and thus the outsider would be unable to recoup the cost of his research into the need for the new facility.

*Id.*

Experience since FERC eliminated the federal ROFR confirms that forcing transmission companies to compete lowers costs and improves design. In May 2023, MISO conducted a competitive solicitation to construct the "Hiple to Indiana/Michigan border 345 kilovolt ("kV")" transmission line (which is designated as "Project 17" within MISO's Tranche 1 set of Long-Range Transmission Planning projects). *See* MISO Selection Report, Hiple IN/MI State Border 345 kV Competitive Transmission Project (May, 2023).[8] MISO rated the design and cost of a non-incumbent, competitive developer's proposal the best overall. *Id.* at 7. The competitive offer was lower than that of the incumbent utilities and included other benefits for ratepayers: annual revenue caps for each of the first forty years of the project and a favorable capital structure and return on equity. *Id.* at 14. Tellingly, every

---

[8] https://cdn.misoenergy.org/HIMB%20345%20kV%20Selection%20Report628866.pdf

competitive bid submitted for the project—ranging from \$66 million to \$107 million—was significantly below MISO's cost estimate of \$254 million. *Id.* at ii. Consumers saved tens of millions because of competition. Notably, the competitive selection process for the Hiple IN/MI State Border project—which is MISO's default tariff process[9] in the absence of any state ROFR law—occurred before the effective date of the new Public Law 145 in Indiana—July 1, 2023.

In 2016, MISO selected the same non-incumbent, competitive developer to build a 345 kV project from the Duff substation in southern Indiana to the Coleman substation in western Kentucky. MISO Selection Report, Duff-Coleman EHV 345 kV Competitive Transmission Project at 2 (Dec. 20, 2016).[10] The lowest bid submitted in the competitive bidding process for that project was \$34 million, compared to MISO's initial estimate of \$58.9 million. *Id.* at 5. In fact, all 11 competitors submitted bids below MISO's initial estimate. *Id.* The winning bid was the second-lowest (it prevailed on other factors) at \$49.8 million—a savings of more than 15% from MISO's estimated cost. *Id.* In addition, the competitive transmission builder proposed additional cost saving measures for consumers: to cap its return on equity and limit the equity in the capital structure for the life of the project. *Id.* at 6. Again, consumers will save millions because of competition. The competitive procurement process also provided experience that improved later bids for other projects. MISO Selection Report,

---

[9] MISO Tariff, Attachment FF, Section VIII.

[10] https://www.republictransmission.com/wp-content/uploads/2021/01/1_Republic_MISO_Duff-Coleman_EHV_345kv_Selection_Report__Republic_Transmission-PDF_.pdf

Harburg-Sabine Junction 500 kV Competitive Transmission Project at 3 (Nov. 27, 2018) ("It was clear RFP Respondents that participated in the Duff-Coleman solicitation brought forward meaningful insights and experience they gained in that process.").[11]

In 2018, MISO selected a different, non-incumbent competitive developer to construct a new 500 kV project consisting of five new transmission lines and one substation in western Louisiana and eastern Texas. *Id.* at 2, 12. The winning company's bid of $95.4 million was $11 million, or 9%, below MISO's cost estimate. *Id.* at 5-6. It also offered greater cost certainty through cost caps, limited return on equity, and limited equity in the capital structure—again, limiting the impact to ratepayers. *Id.* at 6. Once again, consumers will benefit because the project was competitively sourced rather than awarded to the incumbent utility.

Just last month, MISO selected a competitive, non-incumbent transmission developer for the "Reid EHV to IN/KY State Border 345 kV" project.[12] The developer's cost and design was better than the competing bids "due to its lower estimated capital cost, its lower cost of debt and equity, and its increased leverage in its capital structure." *Id.* at ii. The developer also agreed to cap its revenue at 5% above the revenue requirement and to limit annual increases if final routing increased the

---

[11] https://cdn.misoenergy.org/Hartburg-Sabine%20Junction%20500%20kV%20Selection%20Report296754.pdf

[12] https://cdn.misoenergy.org/RIKY%20Selection%20Report710990.pdf.

length of transmission line. *Id.* MISO deemed that proposal to be "significantly better" than the competing developer. *Id.* at 15.

While incumbent utilities were able to bid on each of these projects—and should have been able to undercut competitors because of the many benefits inherent to monopoly incumbents—they could not compete on price, design, and implementation. Ratepayers will benefit from the cost-containment provided by competition. But they won't in Indiana if HEA 1420 is allowed to prefer in-state incumbents over competition. Those higher costs will then be spread across the region and paid by ratepayers across the Midwest, including Amici's members in Wisconsin, Illinois and Indiana.

## Argument

Indiana's ROFR law is classic rent-seeking by incumbent monopoly companies who exert their superior in-state political influence rather than competing with out-of-state transmission developers on price. Under applicable Supreme Court precedent, the Indiana ROFR statute violates the Commerce Clause. Declaratory and injunctive relief for Plaintiffs is appropriate.

### I.    Right of First Refusal statutes are quintessential cronyism at the expense of consumers

Rent-seeking is defined as "the act or process of exploiting the political process or manipulating the economic environment to increase one's revenues or profits."[13] HEA 1420 is prototypical rent-seeking: incumbent utilities used their outsized political

---

[13] www.dictionary.com/browse/rent%20seeking.

influence to legislate away competition, rather than using their inherent advantages to beat competitive transmission project developers on price and design. The ultimate losers will be the electricity consumers who will pay higher utility bills to cover the largesse bestowed by the Indiana Legislature on in-state monopolists.

As the Seventh Circuit previously explained, ROFR laws like HEA 1420 only benefit the incumbent monopoly by protecting them from "hav[ing] to bid down the prices at which they will build new facilities in order to remain competitive," which leads to "higher rates to consumers of electricity than if competition to create transmission facilities in transmission companies' service areas was allowed." *MISO Transmission Owners*, 819 F.3d at 333. And as the Federal Trade Commission explained, conveying special privileges to incumbent monopolies "reduces capital investment opportunities for potential developers by increasing their risk, encourages free ridership among incumbent developers, and creates a barrier to entry." 136 FERC P 61,051, ¶ 231.

If there were legitimate policy reasons to favor the incumbent utility to build new interstate transmission, the Indiana Legislature would have acted earlier and required incumbents to build all projects in their existing service territory. Tellingly, Indiana did not respond immediately to FERC Order 1000, which eliminated the federal ROFR provision and opened the door for competition in 2011. It waited 12 years—until after competitive transmission providers beat the politically-connected incumbent utilities and won the right to build transmission projects on the merits.

Only then did the Indiana Legislature narrowly pass HEA 1420 to shield incumbent Indiana companies from having to compete to build new interstate transmission lines.

The statute's one-sided benefits without obligations is also conspicuous. If there were valid policy reasons for incumbent utilities to build all new transmission infrastructure, the Legislature would have presumably required them to do so. But HEA 1420 is all carrot and no stick: It shields in-state companies from competition but does not require them to build any transmission facilities. Incumbents can simply decline to construct new projects by notifying the state and simply walk away. Ind. Code § 8-1-38-9(c). The timing and one-sided nature of HEA 1420 scotches any post hoc arguments the Defendants may offer that HEA 1420 serves the public interest.

The Iowa Supreme Court correctly called out state ROFR statutes like 1420 for what they are: "quintessentially crony capitalism… rent-seeking, protectionist legislation [that are] anticompetitive." *LS Power*, 988 N.W.2d at 338. As that court explained:

> Common sense tells us that competitive bidding will lower the cost of upgrading Iowa's electric grid and that eliminating competition will enable the incumbent to command higher prices for both construction and maintenance. Ultimately, the ROFR will impose higher costs on Iowans. The data back this up: amicus Coalition of MISO Transmission Customers offers data collected from two recent bid-based projects that indicate competition reduces costs by fifteen percent compared to MISO's estimates. As the Coalition summarizes, "Without competition, there are fewer checks and balances on cost estimates, and no pressures or incentives to curb project costs and prevent cost overruns."

*LS Power*, 988 N.W.2d at 338. The court also agreed with an amicus developer that "It is axiomatic that competition breeds innovation, variety, higher quality goods and

services, and lower prices for consumers" and that an ROFR statute "deprives the… market of the benefits of competition" which "will undoubtedly injure Iowa residents by removing [the incumbent's] incentives to innovate, improve, and reduce costs." *Id.* at 339. So too here. The Indiana ROFR statute is crony rent-seeking that will increase costs to not only Hoosiers, but electricity consumers across all of MISO and PJM.

## II.    The Indiana ROFR statute's preferential treatment of existing in-state companies without imposing corresponding duties to construct transmission lines violates the Constitution's Commerce Clause.

Picking economic winners and losers—favoring political friends as the winners— is dubious but sometimes within a state legislature's authority. But not when it violates the United States Constitution by favoring its in-state friends over interstate competition. The Constitution gives Congress the exclusive power to regulate commerce among the states. U.S. Const. art. I, § 8, cl. 3. That authority acts to also prohibit states from "adopting protectionist measures and thus preserves a national market for goods and services." *Tenn. Wine & Spirits Retailers Ass'n v. Thomas*, 588 U.S. 504, 514-15 (2019). Any state law that discriminates against out-of-state economic actors "can be sustained only on a showing that it is narrowly tailored to advance a legitimate local purpose." *Id.*; *see also Fort Gratiot Sanitary Landfill, Inc. v. Mich. Dep't of Nat. Res.*, 504 U.S. 353, 361 (1992).

HEA 1420 erects an explicitly protectionist regime that favors businesses with existing in-state presence and precludes interstate competition. Only companies with preexisting presence in Indiana can build interstate transmission projects in an otherwise competitive market. That violates the Commerce Clause because it

discriminates on its face and in its effect, is not narrowly tailored, and does not advance any legitimate local purpose.

### A. Indiana's ROFR discriminates on its face.

There is no question that HEA 1420, Ind. Code § 8-1-38-9, overtly discriminates. Only incumbent companies that already own transmission lines in Indiana get the unconditional "right" to skip competitive bidding and construct interstate transmission projects that would otherwise be subject to competitive selection by any qualified company. In fact, it is as facially discriminatory as the unconstitutional preferences for in-state wineries in *Granholm v. Heald*, 544 U.S. 460, 474 (2005), liquor store owners in *Tennessee Wine & Spirits*, 588 U.S. at 518, and waste disposal companies in *C&A Carbone, Inc. v. Town of Clarkston*, 511 U.S. 383, 386 (1994). If anything, the Indiana ROFR is at the most discriminatory end of the spectrum of state protectionism, since it precludes out-of-state companies from owning the very channels of interstate commerce—transmission lines connecting generation in one state to consumers in another—that are paid for by consumers across many states. *E.g.*, *Buck v. Kuykendall*, 267 U.S. 307, 315-16 (1925) (states may not prohibit competition on interstate highways within their borders). If left to stand, the Indiana ROFR statute directs money from ratepayers spanning from New Jersey to Iowa exclusively into the pockets of favored companies with an existing in-state presence.

### B. The Fifth Circuit correctly applied the Commerce Clause caselaw that the Eighth Circuit misread.

This is not the first time a state's protectionist ROFR statute has been challenged as violating the Commerce Clause. Analogous statutes to HEA 1420 were enacted in Minnesota and Texas and then challenged under the Commerce Clause. The Eighth Circuit upheld Minnesota's ROFR statute[14] in 2020. *LSP Transmission Holdings v. Sieben*, 954 F.3d 1018, (8th Cir. 2020). Like HEA 1420, the Minnesota statute gives in-state companies—utilities that already own transmission lines in the state—"the right" to construct all federally planned new transmission facilities, while also letting

---

[14] Minn. Stat. § 216B.246 provides:

Subdivision 1. Definitions

…

(c) "Incumbent electric transmission owner" means any public utility that owns, operates, and maintains an electric transmission line in this state; any generation and transmission cooperative electric association; any municipal power agency; any power district; any municipal utility; or any transmission company as defined under section 216B.02, subdivision 10.

Subd. 2. Incumbent electric transmission owner rights. An incumbent electric transmission owner has the right to construct, own, and maintain an electric transmission line that has been approved for construction in a federally registered planning authority transmission plan and connects to facilities owned by that incumbent electric transmission owner. The right to construct, own, and maintain an electric transmission line that connects to facilities owned by two or more incumbent electric transmission owners belongs individually and proportionally to each incumbent electric transmission owner, unless otherwise agreed upon in writing. This section does not limit the right of any incumbent electric transmission owner to construct, own, and maintain any transmission equipment or facilities that have a capacity of less than 100 kVs.

Subd. 3. Commission procedure. (a) If an electric transmission line has been approved for construction in a federally registered planning authority transmission plan, the incumbent electric transmission owner, or owners if there is more than one owner, shall give notice to the commission, in writing, within 60 days of approval, regarding its intent to construct, own, and maintain the electric transmission line. If an incumbent electric transmission owner gives notice of intent to build the electric transmission line then, unless exempt from the requirements of section 216B.243, within 12 months from the date of the notice described in this paragraph, the incumbent electric transmission owner shall file an application for a certificate of need under section 216B.243 or certification under section 216B.2425.

them off the hook if they elect not to do so. *Compare* Minn. Stat. § 216B.246(2), (3) *with* Ind. Code. § 8-1-38-9. The Eighth Circuit upheld the Minnesota's ROFR on the spurious theory that it is neutral to in-state and out-of-state entities because while it favors companies with in-state presence, some of those companies are headquartered in other states. *LSP Transmission*, 954 F.3d at 1027-28. Thus, according to the Eighth Circuit, the Dormant Commerce Clause's prohibition on discrimination turns on where corporations are headquartered or incorporated, not their existing in-state presence. *Id.* at 1028. That is not the law and would effectively negate the Dormant Commerce Clause given the ease of finding at least one in-state economic interest that is headquartered or incorporated in another state (not to mention the relative ease for a company to re-incorporate somewhere else): Delaware, for example. *Cf. Lewis v. BT Inv. Managers, Inc.*, 447 U.S. 27, 42 n.9 (1980) (finding discrimination based on local operations implicates the Commerce Clause and not mentioning state of headquarters or incorporation).

Two years later the Fifth Circuit correctly applied the law, rejected the Eighth Circuit's interpretation of the Commerce Clause, and found Texas's ROFR statute unconstitutional. *NextEra Energy Cap. Holdings, Inc. v. Lake*, 48 F.4th 306 (5th Cir. 2022). Like HEA 1420, Texas's ROFR statute prohibits any company from constructing transmission facilities unless it is already located in Texas and owns an existing transmission facility with which the new line will connect. Tex. Util. Code §

37.056(e).[15] "So the only way a company without a Texas presence can build, operate, or own transmission lines is to buy a utility that already owns a power facility in the state." *NextEra*, 48 F.4th at 314.

The Texas ROFR has other similarities to HEA 1420. Like the Indiana Legislature, the Texas Legislature adopted its preferential statute only after in-state companies started losing competitive solicitations to competitors without "a foothold in Texas" who MISO found would provide "an outstanding combination of low cost and high value, with best-in-class cost and design, best-in-class implementation plans, and top-tier plans for operation and maintenance" and that would provide "substantial benefits to ratepayers over time." *Id.* at 310, 315.

This Court should follow the Fifth Circuit's, and reject the Eighth Circuit's, interpretation of the Commerce Clause.

> 1. **The Fifth Circuit correctly interpreted unconstitutional preference of in-state companies to turn on in-state presence not location of corporate headquarters.**

The Fifth Circuit correctly rejected the Eighth Circuit's theory that favoring companies with in-state presence does not discriminate as long as at least one such company is headquartered or incorporated elsewhere. The Fifth Circuit noted that

---

[15] Tex. Util. Code § 37.056(e) provides:

> A certificate to build, own, or operate a new transmission facility that directly interconnects with an existing electric utility facility or municipally owned utility facility may be granted only to the owner of that existing facility. If a new transmission facility will directly interconnect with facilities owned by different electric utilities or municipally owned utilities, each entity shall be certificated to build, own, or operate the new facility in separate and discrete equal parts unless they agree otherwise.

none of the Supreme Court's cases mentioned, much less turned on place of incorporation. *Id.* at 322-23. It also noted that "transmission lines that are part of an interstate grid are much closer to the heartland of interstate commerce than wine stores, dairies, or waste processing facilities that have faced dormant Commerce Clause scrutiny" and "state protectionist measures regulating its instrumentalities run a much greater risk of harming out-of-state interests" and "the prices customers pay…." *Id.* at 322. And it noted that "[m]ost circuits have rejected the idea that a law survives Commerce Clause scrutiny if many of the favored interests are incorporated elsewhere" because "local presence, rather than place of incorporation, should matter." *Id.* at 323. Thus, the Fifth Circuit concluded that the Eighth Circuit's reliance on where a company is headquartered is "irreconcilable with Supreme Court dormant Commerce Clause jurisprudence addressing physical-presence requirements." *Id.* at 323.

The Fifth Circuit is correct. The Commerce Clause prohibits economic protectionism that benefits in-state economic interests and burdens out-of-state interests, regardless of whether the relevant companies are headquarters or incorporated. *Nat'l Pork Producers Council v. Ross*, 598 U.S. 356, 369 (2023) (In its modern cases, this Court has said that the Commerce Clause prohibits the enforcement of state laws driven by … economic protectionism—that is, regulatory measures designed to benefit in-state economic interests by burdening out-of-state competitors) (internal quotes omitted); *Granholm v. Heald*, 544 U.S. 460, 472 ("Time and again this Court has held that, in all but the narrowest circumstances, state laws

22

violate the Commerce Clause if they mandate differential treatment of in-state and out-of-state economic interests that benefits the former and burden the latter.") (internal quotes omitted). What matters is whether the state law favors an in-state economic interest. An incumbent utility with billions of dollars of existing in-state infrastructure investment, hundreds of employees, and a bevy of lobbyists in the state house constitutes an in-state economic interest, regardless of whether it claims another state as its headquarters or place of incorporation.[16]

This Court should follow the Fifth Circuit's, rather than the incorrect Eighth Circuit interpretation, of Commerce Clause discrimination. The Indiana ROFR statute's preference for companies with existing presence within Indiana constitutes discrimination.

### 2. The Fifth Circuit correctly rejected utility company immunity.

The Fifth Circuit also correctly rejected arguments that states may favor in-state utility companies in a competitive transmission market because those in-state utilities also serve an uncompetitive retail market. There is no "utility company" exception to the Commerce Clause. States cannot favor utilities any more than they can favor other in-state companies.

The Fifth Circuit correctly distinguished *General Motors Corp. v. Tracy*, 519 U.S. 278 (1997)—which utilities typically mis-cite as creating a utility company exemption

---

[16] It is also irrelevant that the Indiana law does not universally favor *all* in-state economic interests. A law discriminates by favoring *some* in-state and disfavoring similar out-of-state interests. *C&A Carbone*, 511 U.S. at 391 (a law "is no less discriminatory because in-state or in-town processors are also covered by the prohibition").

to the Commerce Clause. *NextEra*, 48 F.4th at 318. As the Fifth Circuit explained, "Utilities, despite their history as monopolies and the vestiges of that tradition even in deregulated markets, are not 'immune from [ ] ordinary Commerce clause jurisprudence.'" *Id.*, *quoting Tracy*, 519 U.S. at 291 n.8. That is, *Tracy* turned on a specific scenario in which a preferential state law applies predominantly—"for all, or even most applications"— to a "noncompetitive, captive market in which the local utilities alone operate." *Id.* at 319; *accord Energy Michigan, Inc. v. Mich. Pub. Serv. Comm'n*, 126 F.4th 476, 492-94 (6th Cir., 2025) (rejecting a public utility exception under *Tracy* because "*Tracy* simply clarified what qualifies as discrimination in the unique regulatory setting in which that case arose"), 495-96 (rejecting the argument that "a captive market overseen by" state regulators permits the state to "otherwise discriminate against interstate commerce in a parallel noncaptive market in which the utility also operates"). But, as the Fifth Circuit correctly held, *Tracy* does *not* apply to state laws favoring in-state utility companies in "undoubtedly competitive" markets—including the market to build and own transmission projects. *Id.* at 319-20 (quoting *Tracy*, 519 U.S. at 303-04); *see also Energy Michigan*, 126 F.4th at 497 (refusing to read *Tracy* beyond "its unique factual setting" because doing so "would exempt a major sector of the U.S. economy from the Commerce Clause" and "would license blatant economic protectionism when a state favors a utility in a noncaptive market.").

In fact, the Supreme Court regularly overturns state laws governing local utility companies that discriminate against interstate commerce. The Court invalidated

Oklahoma's statute requiring utilities to burn Oklahoma-mined coal to generate electricity sold to their customers in *Wyoming v. Oklahoma*. 502 U.S. 437 (1992). The Seventh Circuit similarly invalidated Illinois and Indiana laws encouraging utilities to burn in-state coal. *All. for Clean Coal v. Bayh*, 72 F.3d 556 (7th Cir. 1995); *All. for Clean Coal v. Miller*, 44 F.3d 591 (7th Cir. 1995). The Indiana Court of Appeals also held the state's preference for "Indiana Coal" to violate the Commerce Clause. *Gen. Motors Corp. v. Indianapolis Power & Light Co.*, 654 N.E.2d 752, 763-67 (Ind. Ct. App. 1995). And the Supreme Court invalidated West Virginia's law requiring pipeline utilities to serve West Virginians first in *Pennsylvania v. West Virginia*, 262 U.S. 553 (1923). In none of those cases was the fact that the state was regulating utility businesses a basis for ignoring the Commerce Clause's prohibition on favoring in-state businesses.

The Commerce Clause intends to avoid balkanization between states by favoring companies already doing business in-state—including utility companies. This Court previously agreed with the Fifth Circuit's interpretation of the Commerce Clause applied to state ROFR laws to preliminarily enjoin Indiana's ROFR statute. Nothing in the Seventh Circuit's intervening decision questions the merits of the Court's analysis and, to the contrary, its decision seemingly invited this Court to issue a permanent injunction based on the same analysis. This Court should enter that permanent injunction now. Consumers will benefit from lower costs and innovative solutions.

## Conclusion

25

HEA 1420 harms consumers by precluding competition from out-of-state transmission developers. Amici respectfully ask this Court to issue a decision declaring HEA 1420 violates the Commerce Clause and enjoining enforcement.

Dated: August 15, 2025.

Respectfully submitted,

EARTHJUSTICE
_s/ David Bender_
David Bender
Ind. Bar No. 39274-49
180 Steuart St #194330
San Francisco, CA 94105
(202) 667-4500
dbender@earthjustice.org

_Counsel for Amicus Curiae Citizens Action Coalition of Indiana, Wisconsin CUB, and Illinois CUB._